# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | |
| | **)** | **CRIMINAL ACTION FILE** |
| **v.** | **)** | |
| | **)** | **NO. 1:15-cr-212-WSD/AJB** |
| **WILLIAM CALVIN McCRAY,** | **)** | |
| **a/k/a "Skrill Will,"** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

Defendant William Calvin McCray ("McCray") is charged in a second superseding indictment with conspiracy to commit sex trafficking of a minor, in violation of 18 U.S.C. § 1594(c) (Count One); the substantive offense of sex trafficking of a minor, in violation of 18 U.S.C. §§ 1591(a), (b)(1) and (b)(2) (Count Two); transportation of a minor, in violation of 18 U.S.C. § 2423(a) (Count Three); and obstructing the enforcement of § 1591(a), in violation of 15 U.S.C. § 1591(d) (Counts Four and Five).  [Doc. 71].  He has moved (1) to suppress evidence and for return of property, [Docs. 15, 20, 21], (2) to suppress statements, [Doc. 13], and (3) to dismiss Counts Four and Five, [Docs. 66, 83].[1]  The Court held an evidentiary hearing

---

[1]      McCray's motion to strike surplusage, [Doc. 14], will be discussed in a separate order.

on the suppression motions, [Doc. 32 (hereinafter "T___")], after which the parties filed briefs, [Docs. 37 (McCray), 41 (Govt.), 42 (McCray)].

For the following reasons, the undersigned **RECOMMENDS** that the motions be **DENIED**.[2]

I.   *Motions to suppress evidence and statements and for return of property, [Docs. 13, 15, 20, 21]*

A.   *Facts*

McCray seeks to suppress the fruits of the search of a vehicle he was operating at the time of his November 12, 2014 arrest, and the Government challenges his standing[3] to contest the seizure and search of the vehicle.

---

[2]   McCray did not challenge the voluntariness of his post-arrest statements in his post-evidentiary hearing briefs. [*See* Docs. 47, 42 *passim*]. The Court, therefore, will limit its discussion of the facts and law as to his statements simply to allow the District Judge to conclude that the Government's acquisition of McCray's post-arrest statements complied with the dictates of *Miranda v. Arizona*, 384 U.S. 436 (1966), and were otherwise voluntary.

[3]   The undersigned recognizes that the Supreme Court disapproves of the use of the word "standing." *See Rakas v. Illinois*, 439 U.S. 128, 139-40 (1978); *see also United States v. Hawkins*, 681 F.2d 1343, 1344-45 (11th Cir. 1982). However, the undersigned will use the word "standing" when referring to whether McCray had an expectation of privacy in the vehicle searched because courts routinely use "standing" as "shorthand for the existence of a privacy or possessory interest sufficient to assert a Fourth Amendment claim." *United States v. Daniel*, 982 F.2d 146, 149 n.2 (5th Cir. 1993).

2

1.    *Standing*

The facts concerning McCray's standing are as follows.  The vehicle, a red 2013 Nissan Altima, had been rented from Hertz by Amanda Freeman, McCray's fiancée and mother of his child.  T9-10.[4]  Freeman had rented the Nissan three weeks before McCray's arrest on a week-to-week basis; only her name was on the rental contract, and she used it to go to and from work.  T10-11, 14, 17, 22.  She paid for the vehicle and personally renewed the term of the rental period, although the Government suggests that the victim in this case, known by the initials "A.B.," may have renewed it on Freeman's behalf on at least one occasion.  T15, 23.  Since May 2014, Freeman had rented other vehicles that she let McCray drive.  T30.  Although McCray did not give Freeman any money towards the rental of the Nissan, he had given her some money towards the rental of other vehicles, T31, and since they were living together, McCray gave Freeman money for general living expenses that could be said to have included money for rental vehicles.  T33.  When Freeman let McCray use the rental car, he would drop her off at her workplace and their daughter at the babysitter's.  T17-18. Freeman knew that he was driving the Nissan from Nashville, Tennessee, where they

---

[4]    Neither party introduced the rental agreement between Hertz and Freeman.

3

lived, to Atlanta.  T11-12, 32.  On this occasion, she had friends help her get to work and drive her daughter.  T18.

After McCray's arrest, Freeman contacted Hertz, who charged her for two drivers, retroactive to the start of the rental period.  T12-13.  At the time she initially rented the Nissan, Freeman did not inform Hertz that another person would be driving the vehicle because she could not afford the increased cost and, she testified (unbelievably, in the Court's opinion), at the time of the rental, only she was going to drive it.  T18, 19.  However, she conceded that she allowed McCray to drive the vehicle five to six times in the three weeks after she rented the vehicle.  T20.

Freeman also testified that until his trip to Atlanta, which ostensibly was for McCray's music business, he had used the car on previous occasions locally to look for a job.  T20.  At the time the vehicle was seized, McCray had possessed the vehicle for two days and was scheduled to bring it back to Freeman by 2:00 p.m. on the day that he was arrested so that she could get to work.  T23, 26.  As a result of his not returning the vehicle, Freeman did not go to work and did not take her daughter to daycare.  T26.

Although there were portions of Freeman's testimony that belie belief, it is apparent to the Court that McCray had Freeman's permission to use the vehicle and to drive it to Atlanta.

4

2.      *McCray's arrest, and the seizure and search of the Nissan*

The facts giving rise to McCray's arrest and the seizure and search of the red Nissan are as follows.  On October 27, 2014, Coweta County Sheriff's Office Criminal Investigator Ryan Foles[5] began investigating a case involving a runaway juvenile, referred to as "A.B.," who had been brought to Coweta County following a report of suspicious persons at an address in Tucker, Gwinnett County.  T37-38; Govt. Ex. 1. Gwinnett County Police Department ("GCPD") officers had responded to the Tucker location and made contact with A.B., McCray, and Alfredo Lopez-Monzon.  T39; Govt. Ex. 1.  A.B., who at first claimed her name was "Amanda Freeman," eventually told the investigating officers her true name and stated that Lopez had attempted to rape her and had placed a pillow over her face; the officer suspected that McCray was A.B.'s pimp.  T39-40; Govt. Ex. 1.  During the investigation at Tucker address, McCray remained in the driveway in a red Nissan with New York plates (GGL6795).  T40, 41; Govt. Ex. 1.  McCray asked for gas money, and A.B. provided it to him.  T40.  GCPD officers were told that McCray had brought her to the location and was waiting for her

---

[5]      Foles had been with the Coweta County Sheriff's Office since 2010 and was promoted to investigator in 2011.  T61.

5

to exit the house so that they could leave together.  T40.  GCPD officers advised McCray that A.B. was underage.  T52; Govt. Ex. 1.

GCPD's investigation revealed that A.B. was a juvenile runaway from Bibb County and that she had become a ward of the state in Coweta County.  From Tucker, she was returned to her foster home in Coweta County, but she quickly absconded from that residence, which is when Foles was assigned the investigation.  A.B.'s foster mother told Foles that she saw from her telephone caller identification that A.B. had made a telephone call from the foster home before she disappeared again.  T41-43.  A.B.'s foster mother further told Foles that she had received information that A.B. possibly was being advertised for prostitution in Backpage.com, with the date of the advertisement being October 24, 2014, and the phone number listed in the ad to call being a 615 area code number, the same number that A.B. had dialed from the foster home.  Further investigation revealed that this telephone number had been used by McCray.  T46-47; Govt. Ex. 3.

Foles then reviewed A.B.'s Facebook page and saw a reference to Jasmine Dillard.  A.B.'s foster mother knew Dillard, and Foles arranged for the foster mother to call Dillard.  During that conversation, Dillard reported that A.B. was running away from the foster home and may be in the company of "Will."  The telephone number that

6

Dillard provided for "Will" was the same telephone number listed in the Backpage.com ad as well as the one that A.B. had called before she absconded the foster home.  T48.

On November 3, 2014, A.B. was located in DeKalb County.  T48.  Foles interviewed her, and she disclosed that she had been taken by "Will" to Tennessee for prostitution.  T48; Govt. Ex. 4.  A.B. told Foles that she had met McCray weeks prior to the interview and that she ended up in an apartment with him one night, where they discussed that she would be a prostitute.  She stated that he forced her into prostitution with violence.  T49-50.  She stated that they traveled around Atlanta to various locations where she was prostituted, which she called "doing plays."  After being prostituted, she stated that McCray raped her in an apartment in DeKalb County.  She also gave information that was corroborated by the investigation in Gwinnett County, including that she and McCray traveled in a red Nissan.  A.B. explained that she ran away from her foster home in Coweta County, that she used the utility bill from that location to direct McCray where to pick her up, and that she had memorized McCray's phone number.  After he picked her up, they went to an Atlanta nightclub where she used Freeman's identification to buy drinks, and then they drove to Tennessee for one week, where she performed three acts of prostitution.  T50-51.  A.B. also reported that she used Freeman's name and her identification to rent cars for McCray.  T154.

7

A.B. further stated that she became Facebook "friends" with one of the johns. A.B. stated that she got sick and wanted to go home, but McCray wanted to take her to Miami or New Orleans for prostitution.  He dropped her off at a DeKalb County apartment complex, and she called her mother.  Thereafter, A.B. was apprehended on a runaway warrant.  T50-51.

As a result of A.B. stating that they had gone to Tennessee, Foles began searching the Backpage.com ads in the Nashville, Tennessee, area, and he located an ad almost identical to the one containing A.B.'s photograph that had run in the Atlanta edition, except that the telephone number was different.  T52-53.  Foles searched electronically and located other escort ads tied to this telephone number.  T53.  He then located a YouTube account that was linked to that telephone number and contained "Skrill Will" rap music videos.  Since Foles had a copy of McCray's driver's license photo, he was able to identify "Skrill Will" as McCray.  T54.  With this information, on November 7, 2014, Foles applied for and received an arrest warrant in Coweta County, charging McCray with violating O.C.G.A. § 16-15-46, trafficking persons for sexual servitude.  T54; Govt. Ex. 5.

During the investigation, A.B. had pointed out various addresses, including the specific unit at the Clifton Glen Apartments in Stone Mountain, Georgia

8

(504 Three Oaks Bend, Apt. 4), where she alleged that McCray raped her.  Police also received information that the red Nissan was observed at that apartment complex.  T55-56, 151-52 (discussing report of neighbor that vehicle had been parked in front of the apartment for the last few days, that a white girl was seen in the car, and that she appeared to have slept in the car).  Although Coweta County Deputy Sheriffs could make arrests in DeKalb County, Foles enlisted the DeKalb County Police Department to help him locate and arrest McCray because they knew the area better, Foles was concerned that there were more people involved than just McCray, and A.B. had reported that she was raped in DeKalb County.  T56, 77, 99, 149.  There were briefings, be-on-the-lookout ("BOLO") postings, and emails transmitted to the other officers (Coweta, DeKalb, and federal task force officers) about McCray, his vehicle, and the charges.  T56-59, 83; Govt. Exs. 6, 7.

Shortly after police roll call on November 12, 2014, DeKalb Police Officer Grier located the red Nissan with New York plates at the Clifton Glen Apartments in DeKalb County.  T78.  Police had been searching for the vehicle at that location the night before or earlier that morning, but had not seen it.  T122.  DeKalb County police, including a SWAT unit, went to the apartment complex and established a perimeter around the apartment and the red Nissan that was parked in front of the apartment.  T80, 100, 101,

9

129.  The police knocked on the door to Apartment 4 but no one answered.  T101.  A detective saw someone peeking out the window.  T101.  The police texted McCray that they were outside and that he should surrender, but McCray initially responded that he was not present at that location but rather was at a studio in downtown Atlanta.  T85-86.  Since a resident at the complex also stated that McCray was present, police executed an earlier-obtained state search warrant for the apartment.  T80, 86-87, 101; Govt. Ex. 8.[6]  McCray was not located inside the apartment, but he subsequently was found hiding inside a utility closet in the breezeway right outside the searched apartment.  T81, 86, 103-04.  McCray was searched incident to his arrest, and his wallet and other items were seized.  T88-89; Govt. Ex. 11.  McCray and his belongings were turned over to Coweta County authorities.  T90.

When issuing the search warrant for the apartment, the DeKalb County Magistrate did not authorize a search of the red Nissan.  T102, 106, 107-08; Govt. Ex. 8.[7]  Upon McCray's arrest, the red Nissan was parked right in front of the

---

[6]     Police seized from the apartment an Apple laptop computer and a black T-Mobile ZTE phone, but the Government stated in its post-hearing brief that it will not seek to introduce those items at McCray's trial.  [Doc. 37 at 10].

[7]     The affidavit for the warrant provided as follows:

On 11/07/2014, Inv. R. Foles with the Coweta County Sheriff's Office

10

apartment about twenty yards away (and inside the perimeter set up by the police at the scene). By looking in the car window, one could see male and female clothing visible in the backseat, making it appear that people were living out of the car, as well as thumb drives, a cell phone, and a GPS device supplied by the rental car company. T59-60, 130-31, 133-35, 155; Govt. Exs. 20, 21. By then, law enforcement knew that the Nissan was a rental car, that it was rented by Freeman, and that it was the same car involved in the Gwinnett County incident. T154. A Coweta County Deputy Sheriff, who also was a Homeland Security Task Force Officer, sealed the vehicle with tamper-proof evidence tape. T131, 138. The vehicle was seized by Coweta County law

---

> petitioned and was granted an arrest warrant for William Calvin McCray on the charge of Trafficking of Persons for Labor or Sexual Servitude. During this investigation, I learned that McCray was in possession of a red Nissan Maximum [sic] bearing NY license plate: GGL6795. After interviewing the victim, she stated that McCray used this vehicle to prostitute her to several men in the Metro Atlanta area. Additionally, she took investigators to the Clifton Glen[] apartments located at 600 Hambrick Rd. Stone Mountain, GA 30083 and specifically to building 504, apartment #4 where she explained this was a location where McCray sleeps at times. On 11/10/2014, a BOLO was given to the De[K]alb County Police Department with this tag.

Govt. Ex. 8 at 2.

enforcement and taken to Coweta County.[8]  T143.  Once the vehicle was placed in a

secure lot in Coweta County, it was photographed, and a box of condoms also was

observed in plain view inside the vehicle.  T136; Govt. Exs. 25, 26.  Search warrants

were sought and obtained from a Coweta County judge first for the vehicle and then for

laptop computers and cell phones located within the vehicle.  Govt. Exs. 9,[9] 10; T59-60,

---

[8]      The vehicle was transported to Coweta County by a wrecker contracted with the Coweta County Sheriff's Office.  T104.

[9]      In the affidavit in support of the Coweta County search warrant for the Nissan, Foles recounted the following.  According to A.B., she had been taken to the Gwinnett County location on October 26, 2014, by McCray in a red Nissan, in order to have sex with a man for money at that location.  The police showed up, determined that A.B. was a runaway juvenile from Coweta County, and documented that the vehicle was a red Nissan with NY plate GGL6795.  After A.B. was returned to the foster home in Coweta County, McCray picked her up in the red Nissan and took her away for purposes of sexual servitude.

Following her apprehension, A.B. told him that McCray used a rental car from Hertz to transport her around metro Atlanta and throughout Tennessee, and that after he obtained an arrest warrant for McCray, he placed a BOLO for the vehicle, which was located outside the building where McCray was arrested in Stone Mountain.  Foles reported to the Coweta County judge that after the Nissan was secured and taken to Coweta County, he learned from Hertz that the vehicle was rented from Hertz by Amanda Freeman, and that this was the same name that A.B. initially gave to the Gwinnett County police before they discovered that she was a runaway juvenile.  Foles also averred that Freeman birthed a child belonging to McCray.

Finally, Foles stated:

Based on the facts of the case and Your Affiant's knowledge, training, and

12

70, 81-82, 104, 110; Def. Ex. 1.  The Coweta County issuing judge was not told that a DeKalb County judge refused to issue the search warrant for the red Nissan.

Following his arrest, McCray insisted on speaking to DeKalb Police Department Sergeant Torrey Kennedy, so instead of being handed off to Coweta County authorities, McCray was transported by Coweta County officers to DeKalb County Police headquarters.  T92.  There, he was placed in an interview room, and the subsequent questioning was audio- and video-recorded.  T93; Govt. Exs. 18, 19.  Kennedy gave McCray a bottle of water.  T93.  Kennedy identified himself.  He was not armed.  The questioning lasted less than two hours.  T94; Govt. Exs. 18, 19.  McCray was lucid and did not appear to be under the influence of alcohol or drugs.  Kennedy made no promises or threats to him, nor did he use any physical force.  T94.  He advised McCray of his *Miranda* rights from a preprinted form, and McCray signed the form.  T95;

---

experience in the subject of human trafficking; it is reasonable to believe there are items such as electronic devices, paperwork, clothing, cell phones, ledgers and trace evidence located inside this vehicle as pimps use rental cars to move around their victims.  Your Affiant humbly requests your court the ability to search this property for those items and the like.

Govt. Ex. 9 at 3-4.

Govt. Ex. 17.[10]   McCray initialed each right, waived each right both orally and in

writing, and signed the waiver form.   T96-97; Govt. Ex. 17.   McCray stated that he

could read, that he completed the twelfth grade, and that he was not under the influence

of drugs or alcohol.   T97; *see also* Govt. Exs. 18, 19.   At no time during the interview

did McCray ask for a lawyer, refuse to answer questions, or seek to stop the

questioning.   T98-99.

---

[10]     The form provided:

You have the right to remain silent.   Anything you say can and will be
used against you in a Court of law.

You have a right to talk to a lawyer and have him/her present with you
while you are being questioned.

If you can not afford to hire a lawyer, one will be appointed to represent
you before any questions if you wish.

You may exercise these rights and not answer any questions or make any
statements.

T96; Govt. Ex. 17.   The form also provided that "I have read my rights and understand
each of them," and McCray placed his initials next to that line of text.   T96-97;
Govt. Ex. 17.

14

B.    Discussion

  1.    *McCray lacks standing to challenge the seizure and search of the red Nissan*

    a.    *The parties' arguments*

  The Government argues that McCray lacks standing to challenge the seizure and search of the Nissan since he was not an authorized operator of a rental vehicle.   [Doc. 37 at 12 (citing *United States v. Boruff*, 909 F.2d 111, 117 (5th Cir. 1990) (finding defendant, who was not authorized operator of rental car, lacked standing to challenge search of car, even though defendant was in sole possession and control of car at time of search); *United States v. Padilla*, 111 F.3d 685, 687 (9th Cir. 1997) (finding that defendants with only a temporary "bailment interest" lacked standing and here they did not have standing))].   While recognizing that the Eleventh Circuit has found standing in a vehicle where the driver has permission of the absent owner, [*id.* at 13 (citing *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1988))], the Government argues that the Court should reconsider its conclusion at the evidentiary hearing that Freeman authorized McCray to use the Nissan, since her testimony that she allowed him to take the car out of state despite the fact that she would be stranded and placed in financial risk is not believable.   [*Id.*].

15

McCray responds that there is a circuit split as to whether a rental car driver not on the rental contract has standing to challenge a search of a rental car, and the Eleventh Circuit has not decided the issue. [Doc. 41 at 5 (citing cases)]. He argues that the Court should follow the totality-of-circumstances test from *United States v. Smith*, 263 F.3d 571, 586-87 (6th Cir. 2001), which standard was applied by Judge Moore in *United States v. Murray*, No. CR410-266, 2011 WL 1806971, at *3 (S.D. Ga. May 11, 2011). In that latter case, the court considered whether the defendant (1) could legally operate the vehicle and the status of his license; (2) could produce the rental contract and provide sufficient information about the vehicle; (3) was related to the renter or otherwise has an "intimate relation"; (4) had permission from the authorized driver to use the rental car; and (5) had a business relationship with the rental car company and the nature of that relationship. [Doc. 41 at 6-7 (citing *Murray*, *id.*)]. McCray contends that three of these factors point to his having standing: first, he had a driver's license and was legally able to drive the Nissan; second, Freeman was his fiancée and mother of his child; and third, he had Freeman's permission to use the car. As to the other factors, McCray argues that he was not arrested in the vehicle, so there is no evidence about what information he had about it, but points out that he was driving it for an extended period of time; and while there is no other evidence about his

16

relation with Hertz, Hertz charged Freeman retroactively for his use of the vehicle. [*Id.* at 7].

    b. *Analysis*

  The Court concludes that McCray lacks an objective expectation of privacy in the Nissan and thus lacks standing to challenge its seizure and search. At the outset, the Court rejects the Government's request for reconsideration of the finding made at the hearing that Freeman gave permission to McCray to operate the Nissan. The Court recognizes that allowing McCray to use the vehicle made no sense to Freeman either practically or economically. But Freeman's permission to let McCray use the vehicle is hardly the first time in history that a person for emotional reasons made an ill-advised decision contrary to their best personal or economic interests.[11] Also, while Freeman's testimony was not credible in many respects (i.e., the Court believes that Freeman rented the vehicle *primarily* for McCray's use with the illusory hope that she could sometimes use the vehicle), there is no evidence in the record whatsoever that Freeman did not allow McCray to use the red Nissan. Thus, the evidence supports a finding that Freeman authorized McCray to use the vehicle on his trip to this district.

_____

[11] *See, e.g.,* Frank Sinatra, Jack Wolf, Joel S. Herron, *I'm a Fool to Want You* (Columbia Records 1951).

Freeman's permission, however, does not end the inquiry, because courts have recognized that the standing to challenge a search of a rental vehicle by one who is a stranger to the rental contract presents a distinct Fourth Amendment issue. Fourth Amendment jurisprudence requires that one challenging as unreasonable a search or seizure  must have "standing," i.e., a legitimate expectation of privacy in the premises searched. *See United States v. Gonzalez*, 940 F.2d 1413, 1420 n.8 (11th Cir. 1991). As a result, the Fourth Amendment only protects an individual in those places where he can demonstrate a reasonable expectation of privacy against government intrusion. *See Katz v. United States*, 389 U.S. 347, 353 (1967). Fourth Amendment rights are personal, and only individuals who actually enjoy the reasonable expectation of privacy may challenge the validity of a government search. *Rakas v. Illinois*, 439 U.S. 128, 133-34, 143 (1978); *United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000). An individual has standing to challenge a search if "(1) he has a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable." *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008). That is, a defendant must establish both a subjective and an objective expectation of privacy. *United States v. Segura-Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006); *United States v. Robinson*, 62 F.3d 1325, 1328 (11th Cir. 1995). What matters is whether the

18

defendant has a reasonable expectation of privacy in the place searched, not the things seized.  *United States v. Salvucci*, 448 U.S. 83, 91 (1980) (abolishing automatic standing rule in cases involving possession offenses).  The subjective prong is a factual inquiry, *United States v. McKennon*, 814 F.2d 1539, 1543 (11th Cir. 1987); *United States v. Jones*, 184 Fed. Appx. 943, 947 (11th Cir. June 22, 2006); and "requires that a person exhibit an actual expectation of privacy," *United States v. King*, 509 F.3d 1338, 1341 (11th Cir. 2007) (quoting *Segura-Baltazar*, 448 F.3d at 1286).  The objective prong is a question of law, *McKennon*, 814 F.2d at 1543, and "requires that the privacy expectation be one that society is prepared to recognize as reasonable." *King*, 509 F.3d 1338, 1341 (11th Cir. 2007) (quoting *Segura-Baltazar*, 448 F.3d at 1286).

Courts assess on a case-by-case basis the "standing" of a particular person to challenge an intrusion by government officials into an area over which that person lacks primary control.  *Oliver v. United States,* 466 U.S. 170, 191 n.13 (1984).  No one circumstance is talismanic to this inquiry.  *United States v. Haydel*, 649 F.2d 1152, 1154 (5th Cir. Unit A Jul. 8, 1981)[12]; *see also Rakas*, 439 U.S. at 152

_____

[12]     The Eleventh Circuit has adopted as binding precedent decisions of the Fifth Circuit, including Unit A panel decisions of that circuit, rendered prior to October 1, 1981.  *See United States v. Todd*, 108 F.3d 1329, 1333 n.5 (11th Cir. 1997);

19

(stating that the legitimacy of one's privacy claim is determined by totality of the circumstances) (Powell, J., concurring).  "While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of . . . [the] inquiry."  *Salvucci*, 448 U.S. at 92 (1980) (citation omitted); *see also Rakas*, 439 U.S. at 143 (stating that "arcane distinctions developed in property and tort law . . . ought not . . . control" the reasonableness of an expectation of privacy) (citing *Jones v. United States*, 362 U.S. 257, 266 (1960)).  Having said that, property law is not irrelevant to the inquiry.  As the Supreme Court stated in *Rakas*, "by focusing on legitimate expectations of privacy in Fourth Amendment jurisprudence, the Court has not altogether abandoned use of property concepts in determining the presence or absence of privacy interests protected by that Amendment."  *Rakas*, 439 U.S. at 144 n.12; *see id.* ("Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.").  Although emphasis on "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control," *id.* at 143,

―――――――――――――――――――

*Limelight Prods., Inc., v. Limelite Studios, Inc.*, 60 F.3d 767, 769 n.1 (11th Cir. 1995).

AO 72A
(Rev.8/82)

as Justice Blackmun stated, "[n]ot every concept of ownership or possession is 'arcane.'" *Rawlings v. Kentucky*, 448 U.S. 98, 112 (1980) (Blackmun, J., concurring). The Supreme Court has continued to consider property concepts in determining Fourth Amendment privacy interests. *See e.g. Florida v. Jardines*, 133 S. Ct. 1409, 1414-15 (2013) (discussing common law roots of curtilage around a home); *United States v. Jones*, 565 U.S. 400, 404 (2012) (use of GPS tracker to monitor car's movements over twenty-eight days constituted search because monitor installation was a physical trespass). Other factors to be weighed include whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy, and whether he was legitimately on the premises. *United States v. Pitt*, 717 F.2d 1334, 1337 (11th Cir. 1983); *Haydel*, 649 F.2d at 1154-55. "The essence of this inquiry is whether the defendant has 'demonstrate[d] a significant and current interest' in the property at the time it was searched." *United States v. Bushay*, 859 F. Supp. 2d 1335, 1350 (N.D. Ga. 2012) (Batten, J.) (quoting *United States v. Garcia*, 741 F.2d 363, 366 (11th Cir. 1984)). To have an expectation of privacy in premises that he did not own or lease, a defendant must show " 'an unrestricted right

21

of occupancy or custody and control of the premises as distinguished from occasional presence on the premises as a mere guest or invitee.' " *Id.* (quoting *United States v. Baron-Mantilla*, 743 F.2d 868, 870 (11th Cir. 1984)); *see also United States v. Chaves*, 169 F.3d 687, 690-91 (11th Cir. 1999) (same); *United States v. Bachner*, 706 F.2d 1121, 1126 n.6 (11th Cir. 1983) (same); *Garcia*, 741 F.2d at 366 (holding that although appellant had more than tenuous interest in searched apartment, appellant had no standing where connections were not regular or personal enough to find that appellant adopted apartment as a place of business or as a residence). The defendant bears the burden of showing, by a preponderance of the evidence, that he has a legitimate expectation of privacy in the area searched. *Harris*, 526 F.3d at 1338; *United States v. Brazel*, 102 F.3d 1120, 1147 (11th Cir. 1997); *Bushay*, 859 F. Supp. 2d at 1361-63 (defendant must demonstrate an expectation of privacy by a preponderance of the evidence).

The Eleventh Circuit has not decided whether a rental car driver operating the vehicle without permission of the rental car company but with permission of the absent authorized user has Fourth Amendment standing to challenge the search of that vehicle. *See United States v. Gayle*, 608 Fed. Appx. 783, 788-89 (11th Cir. Apr. 27, 2015) (refusing to decide issue involving unlicensed rental car driver

not listed on rental contract as authorized user where, in any event, search was lawful);

*see also United States v. Miller*, 821 F.2d 546, 548 (11th Cir. 1987) (holding that driver of car borrowed from friend had standing, and observing "[w]ithout deciding whether, in this circuit, the [driver of a vehicle rented to an absent third party] would have had standing, we think that the appellant in this case had a far clearer expectation of privacy in the borrowed car than does a driver in [that] situation"). Although it did not decide the issue, the *Gayle* court described the circuit split on this issue as follows:

> The Fourth, Fifth, and Tenth Circuits have held that unauthorized drivers of rental vehicles never have standing to challenge a vehicle search. *United States v. Wellons*, 32 F.3d 117, 119 (4th Cir. 1994); *United States v. Boruff*, 909 F.2d 111, 117 (5th Cir. 1990); *United States v. Obregon*, 748 F.2d 1371, 1374-75 (10th Cir. 1984). On the other hand, the Eighth and Ninth Circuits have held that an unauthorized driver may challenge the search of a rental vehicle if he can establish that he had permission from the authorized driver to use the vehicle. *United States v. Thomas*, 447 F.3d 1191, 1198-99 (9th Cir. 2006); *United States v. Best*, 135 F.3d 1223, 1225 (8th Cir. 1998). The Third and Sixth Circuits have determined that an unauthorized driver does not have standing to challenge the search, but has noted the possibility that exceptional circumstances might create the legitimate expectation of privacy. *United States v. Kennedy*, 638 F.3d 159, 165 (3d Cir. 2011); *United States v. Smith*, 263 F.3d 571, 586-87 (6th Cir. 2001).

*Gayle*, 608 Fed. Appx. at 788-89. Thus, in recommending a resolution of this issue, the Court must anticipate which of these competing standards the Eleventh Circuit will adopt when confronting this issue.

23

Several district judges in this circuit that have discussed the issue, and these decisions help guide the Court in its recommended disposition. First, in *Murray*, issued before the *Gayle* decision, Judge Moore disagreed with the magistrate judge's recommendation that the defendant lacked standing. The *Murray* defendant was a licensed driver with permission from the renter to drive the car but was not authorized by the rental contract. The *Murray* court categorized three separate tests employed by other circuits in discussing this issue: (1) the bright-line test—a driver not on the rental contract has no standing (citing the Fourth, Fifth, and Tenth Circuit cases); (2) the permission test—the driver need receive only the permission of the renter (citing the Eighth and Ninth Circuit cases); and (3) the totality-of-circumstances test (discussing the First and Sixth Circuit cases). The *Murray* court opined that the Eleventh Circuit would adopt the latter test because both the Eleventh Circuit and the Supreme Court have eschewed hard-and-fast rules in the Fourth Amendment standing arena. *Murray*, 2011 WL 1806971 at *2 (citing *Cooper*, 133 F.3d at 1401; *Jones v. United States*, 362 U.S. 257, 266 (1966)). The *Murray* court also noted that the Eleventh Circuit concluded that the rental car renter/driver had standing in *Cooper* even though the rental period had expired, *id.* (citing *Cooper*, 133 F.3d at 1398-1402), and further observed that the Eleventh Circuit had expressed disdain for tying Fourth Amendment

24

standing simply to ownership written upon a vehicle title. *Id.* (citing *United States v. Miller*, 821 F.2d 546, 548-49 (11ᵗʰ Cir. 1987) (granting standing to driver operating car with permission of owner)). For these reasons, the *Murray* court found the bright-line test inconsistent with circuit precedent. *Id.*

*Murray* also found unhelpful the cases that granted standing solely on permission of the renter since under that scenario, likely only a person unaware of the operation of the terms of the rental contract, i.e., an "innocent borrower," could claim standing. *Id.* at *3. Judge Moore also favorably cited the example noted by the magistrate judge in that case, of the out-of-town renter falling ill and a relative, business associate, or friend having to return the rental car to the rental car company: under the permission test, the driver surprisingly would not have standing because he did not get the renter's permission to use the car. The *Murray* court reasoned that since *Cooper* requires emphasis as to the particular circumstances of each individual case, such a hard and fast standard likewise would not be consistent with Eleventh Circuit precedent. *Id.* at *3 n.1.

The *Murray* court thus adopted the totality-of-the-circumstances test as best conforming to Supreme Court policy and the principles of Eleventh Circuit decisions. In doing so, it therefore applied the factors enunciated in *Smith*, 236 F.3d at 586-87:

whether (1) the defendant could legally operate the vehicle and the status of his license; (2) the defendant was able to present the rental agreement and provide sufficient information about the vehicle; (3) the defendant was related to the renter or otherwise had an "intimate relationship"; (4) the defendant had permission of the authorized driver to use the rental car; and (5) the defendant had a business relationship with the rental car company. *Murray*, 2011 WL 1806971 at *3. The court then found that the defendant in that case had both a subjective expectation of privacy in the vehicle and that the expectation was one that society was prepared to recognize. The *Murray* defendant had a valid driver's license, and thus his operation of the vehicle, "contents of the rental agreement aside," was not a violation of any criminal statute. *Id.* He contemporaneously provided a copy of the rental agreement and explained that it was rented in the name of a friend, whose name matched the name on the rental agreement. He and the renter were "good friends" and the friend had given him permission to operate the vehicle. Since the defendant did not have a credit card, he gave cash to his friend, who used his credit card to rent the vehicle. The defendant possessed and used the vehicle for more than a week before his arrest. Finally, Judge Moore concluded that although there was no evidence of the defendant's relationship to the rental car

26

company, that was not dispositive because the other factors predominated in favor of standing. *Id.* Thus, the *Murray* defendant had standing.

In *United States v. Alexis*, 169 F. Supp. 3d 1303 (S.D. Fla. 2016), the district court concluded that the driver whose license was suspended and who had tinted the vehicle's windows in violation of Florida law but with the renter's permission, lacked standing to challenge the search of the rental car he was driving. Relying on the Eleventh Circuit's *Gayle* decision, the *Alexis* court characterized the other circuit courts' opinions as having formulated only two tests in analyzing the standing of an unauthorized driver of a rental vehicle. *Alexis*, 169 F. Supp. 3d at 1311. First, as an example of the authorization test, it pointed to the Fifth Circuit's *Boruff* decision, where that court concluded that because the rental agreement prohibited anyone but the authorized user from driving the car, the unauthorized driver's expectation of privacy was unreasonable. *Id.* (citing *Boruff*, 909 F.2d at 117). The *Alexis* court took a narrower view of the cases that *Murray* construed as applying a totality-of-circumstances test. Like the Eleventh Circuit in *Gayle*, it treated the Sixth Circuit's decision in *Smith* and the Third Circuit's decision in *United States v. Kennedy*, 638 F.3d 159, 165 (3d Cir. 2011), as providing an exception to the permission test under exceptional circumstances, which resulted in a finding of standing when "the

27

driver 'was the *de facto* renter of the vehicle.' " *Alexis*, 169 F. Supp. 3d at 1312 (quoting *Smith*, 263 F.3d at 586-87).  Thus, the *Alexis* court pointed out that in *Smith*, the defendant's wife rented the vehicle but the defendant had personally contacted the rental car company to reserve the car in his name and his credit card was billed for the rental, and thus the *Alexis* court concluded that the *Smith* "defendant's 'business relationship with the rental company and his intimate relationship with his wife, the authorized driver of the vehicle, are relationships which are recognized by law and society,' " and thus Smith had standing.  *Id.* (quoting *Smith*, 263 F.3d at 582).

The *Alexis* court rejected the permission test, criticizing the Ninth Circuit's decision in *Thomas* where that court found that the driver had standing because he possessed the vehicle with permission of the owner, possessed the key, and had the right to exclude all others except the owner.  The *Alexis* court noted that *Thomas* rejected the Government's argument that the rental car company, the actual owner of the car, had not given the defendant permission to drive the car and that his actions violated the rental agreement, which the *Thomas* court compared to a technical violation of the agreement such as untimely returning the vehicle after the rental period expires.  *Alexis*, 169 F. Supp. 3d at 1312 (citing *Thomas*, 447 F.3d at 1191, 1198).

28

In *Alexis*, the court found that the defendant was not the authorized driver and was driving on a suspended license, but that the renter had given him permission to regularly drive the vehicle and to tint the windows in violation of state law at the authorized driver's expense. *Id.* at 1312-13. The court questioned the permission test, since the rental car company's risk when an unauthorized driver operates the vehicle is far greater than where the renter retains the vehicle for a period of time after the rental term expires. In the former situation, the company is not informed who will be driving its vehicle, his age, or the unauthorized driver's license status or driving history, while in the latter situation, frequently there are built-in billing mechanisms such as late fees and penalties. *Id.* at 1313 (citing *Kennedy*, 638 F.3d at 166-67). The *Alexis* court also found persuasive *Kennedy*'s differentiation between unauthorized drivers and vehicles returned late: " '[S]ociety views authorized drivers who return rental cars a few hours late quite differently from unauthorized drivers who borrow rental cars without the rental car company's knowledge or permission. . . . [T]he lack of a cognizable property interest in the rental vehicle and the accompanying right to exclude make it generally unreasonable for an unauthorized driver to expect privacy in the vehicle.' " *Id.* (quoting *Kennedy*, 638 F.3d at 167-68). It found this conclusion consistent with the Eleventh Circuit's *Cooper* decision, where the court had concluded

29

that although the rental period had expired, the driver remained "in privity of contract" with the rental car company, a distinguishing fact from the Fourth Circuit's *Wellons* decision, where the driver was not an authorized driver. *Id.* (citing *Cooper*, 133 F.3d at 1394). The *Alexis* court then noted that the defendant had no relationship with the rental car company, contrary to the *Smith* defendant who had contacted the company, reserved the car, and used his credit card to pay for it, and further observed that the rental company likely would not have rented the car to him because he was not licensed. *Id.* Considering this lack of relationship and his suspended license, the *Alexis* court thus concluded that Alexis's situation was closer to that of a driver of a stolen car than that of a renter under an expired contract, and therefore, he did not have standing. *Id.* at 1314.[13]

In the present case, the Court concludes that McCray had a subjective expectation of privacy in the red Nissan, since the record shows that Freeman gave him permission to rent it and he in fact used the vehicle as his own.

_____

[13] The *Alexis* court also noted that the defendant put illegal tint on the windows and manipulated a panel in order to hide contraband as further evidence that he was appropriating the vehicle for his own purposes without regard for the wishes of the owner (i.e., the rental company). *Alexis*, 169 F. Supp. at 1314.

30

However, he lacked an objective expectation of privacy and therefore does not have standing to contest its seizure and search.  First, the Court rejects applying either the authorization or permission tests as bright line tests, since they are inconsistent with Supreme Court and Eleventh Circuit Fourth Amendment standing jurisprudence, which favor considering the totality of the circumstances.  *Rakas*, 439 U.S. at 152-53; *United States v. Sarda-Villa*, 760 F.2d 1232, 1235 (11th Cir. 1985).  The Court specifically rejects the authorization test, because the mere fact that McCray was not on the rental contract does not end the Court's analysis.  " 'Constitutional duties trump contractual limitations!' "  *Blumel v. Mylander*, 954 F. Supp. 1547, 1556 (M.D. Fla. 1997), *cited with approval in Cooper*, 133 F.3d at 1402 n.18.  That is, there could be circumstances where not being on the rental contract is not fatal to a finding of standing.  The Court also concludes that the permission test is an inadequate standard upon which to analyze an unauthorized driver's standing, because it fails to take into consideration the interests of the rental car company in having an unknown and unauthorized driver possess and operate its vehicle, and ignoring such a fact would be inconsistent with the Supreme Court's standing jurisprudence, which requires the Court to consider "understandings that are recognized and permitted by society."  *Rakas*, 439 U.S. at 144 n.12.  In this regard, the Court disagrees with the Ninth Circuit's analysis in *Thomas*,

31

where the court characterized the rental company's lack of authorization as a "technical violation" of the rental agreement. *Thomas*, 477 F.3d at 1198; *cf. United States v. Crisp*, 542 F. Supp. 2d 1267, 1277 (M.D. Fla. 2008) (distinguishing *Miller*, where the absent owner had given the defendant driver permission to use the car, because in *Crisp*, the owner of the rental car, the rental car company, did not give its permission nor was it likely that it would have, given the defendant's suspended driver's license).[14] Like the *Alexis* court, the Court concludes that the rental company's lack of authorization is a factor that strongly weighs against society's recognizing the objective privacy rights of an unauthorized driver.

Thus, the Court concludes that the multi-factor analysis utilized in *Murray* and *Alexis* is the best approach and the one most likely to be employed by the Eleventh Circuit. Applying these factors, although it is true that Freeman was McCray's fiancée and they had a child together, Freeman gave McCray permission to use the Nissan, and McCray apparently had a valid license to operate a motor vehicle, the other factors

---

[14]    In *Crisp*, Judge Howard stated in dicta that the weight of authority would support the conclusion that a driver of a rental vehicle who neither rented the vehicle nor is authorized to operate the vehicle by the rental company does not have standing in that vehicle. *Crisp*, 542 F. Supp. 2d at 1279. However, *Crisp* was decided on subjective expectation of privacy grounds, since the defendant was both an unauthorized driver and was driving on a suspended license. *Id.* at 1280-81.

strongly point towards a finding that McCray lacks an objective legitimate expectation of privacy. First, the rental agreement was not introduced into evidence, and since McCray has the burden of proof on this issue, its absence counts against him. Nonetheless, the evidence is undisputed that McCray was not a driver authorized by Hertz to operate its vehicle, since Freeman made the deliberate decision not to tell Hertz that McCray was going to be driving the vehicle, not because she did not intend for him to drive the Nissan, but because of the increased costs to have another driver operate the car. There is no evidence that McCray paid for this vehicle or contributed to its costs. T31. In addition, for whatever reasons that do not require much imagination (such as the ability to try and separate himself from the vehicle in the event of apprehension), McCray seems to have gone out of his way to not have this vehicle and the other rental car(s) that he used to be placed in his name. He had Freeman and A.B. (using Freeman's identification) rent or extend the rental on the vehicles. Moreover, since the rental agreement was not introduced, the Court is unsure whether there were increased penalties or costs for taking the vehicle out of state, another fact that would count against the objective reasonableness of McCray's expectation of privacy. Suffice it to say that McCray has the burden and did not provide sufficient information about his relationship to the vehicle.

33

Finally, critically, there is the utter lack of McCray's relationship with Hertz, the rental company.  As noted above, using Freeman and A.B. appears to be McCray's effort to separate himself from the rental vehicles, or an acknowledgment that had he tried to rent the vehicles on his own, he would have been refused.  Either scenario is contrary to having an expectation of privacy that society would deem reasonable.  Unlike *Smith*, there is no indication that McCray was the *de facto* renter of the Nissan; in fact, he took steps to avoid being the responsible party on the rental contract.  This conclusion is not altered by the fact that Freeman was charged an additional amount after Hertz discovered that he had driven the vehicle, because Hertz was never asked for its permission in advance to let someone other than Freeman rent the vehicle, much less McCray, and did not have the opportunity to assess its risks (financial and otherwise) in advance of having McCray operate its vehicle.  Further, there is no evidence that McCray contributed to the cost of the vehicle's rental, and therefore he did not have an expectation of privacy in it that society would deem reasonable.  While it is true that in the strictest sense McCray possessed the Nissan at the time he was arrested, he did not have the legal right to exclude either Freeman or Hertz from the vehicle, one of the indices of privacy that society would recognize.  As a result, he lacks standing to challenge the seizure and search of the vehicle.

34

2.      *The red Nissan was lawfully seized and searched*

Even if McCray did have standing, the Court would recommend that his suppression motion be denied because the Nissan was lawfully seized and searched.

a.      *The parties' arguments*

The Government argues that law enforcement had probable cause to seize and search the Nissan because the facts showed that McCray used the vehicle to prostitute A.B. [Doc. 37 at 17-21].  It also argues that the vehicle could be seized and searched without a warrant pursuant to the automobile exception to the warrant requirement.  [*Id.* at 21-22].  It also claims that the Court should reject McCray's argument that it was improper for Coweta County law enforcement to seize the vehicle, arguing that (1) DeKalb County officers lawfully seized the vehicle, and (2) in any event, even if the Coweta County officers violated state law in seizing the Nissan, as a matter of federal constitutional law, the seizure was proper.  [*Id.* at 23-24 (citing *Virginia v. Moore*, 553 U.S. 164, 167, 176-78 (2008))].  Finally, it argues that the vehicle and the electronic devices located therein were lawfully searched pursuant to valid Coweta County warrants.  [*Id.* at 24-25].

In response, McCray first argues that once the DeKalb County magistrate denied the search warrant for the Nissan, i.e., made a finding that the application in support of

35

the warrant lacked probable cause, the officers were precluded from seizing the vehicle

unless they obtained a warrant. [Doc. 41 at 7-8]. He also argues that there were no

exigencies that authorized the warrantless seizure of the vehicle, and unlike *Coolidge*

*v. New Hampshire*, 403 U.S. 443 (1971), there was no contraband in the Nissan, nor

were the officers in a hostile environment that required removing the vehicle to a safe

location. [Doc. 41 at 8-9]. He reiterates that upon the DeKalb County magistrate's

finding that probable cause was lacking as to the Nissan, the officers could not resort

to the automobile exception to seize the vehicle. [*Id.* at 9-10]. McCray then argues that

the subsequent Coweta County warrant did not cure the problem because the Coweta

County judge was not told that the DeKalb County judge had refused to issue the

warrant. [*Id.* at 11-13 (citations omitted)]. In this regard, McCray argues the Coweta

officers engaged in impermissible judge shopping and were estopped from obtaining

a search warrant in Coweta County once the warrant was denied in DeKalb County, at

least without telling the Coweta County judge that the DeKalb County judge had denied

authority to search the same vehicle. [*Id.* at 12 (citing *United States v. Davis*,

346 F. Supp. 435 (S.D. Ill. 1972))].

McCray next disputes the Government's arguments that it was the DeKalb

County officers that lawfully seized the vehicle, arguing that the record shows that

Coweta County deputies seized the Nissan.  [*Id.* at 13].  It then argues that the Georgia Constitution prohibits the Coweta County officers' seizure of the vehicle.  [*Id.* at 14 (citing Ga. Const. of 1983, Art. IX, § II, ¶ III(b))].  He contends that *Moore* does not save this state-constitutional defect, claiming that *Moore* stands for the proposition that violations of state law that provide *more* protections than the Fourth Amendment's requirements are not cognizable in applying the Fourth Amendment in a federal prosecution.  [Doc. 41 at 14-15].  He argues that in this case the Coweta County officers lacked the authority to act as police officers in DeKalb County and their actions were void *per se*.  [*Id.* at 15].  Instead, he claims that *United States v. Masters*, 614 F.3d 236, 239 (6th Cir. 2010), in instructive, since there, the court held that *Moore* did not apply to save a search where the state court judge did not have authority to issue a search warrant outside his jurisdiction.  [Doc. 41 at 15-16].

In reply, the Government argues, first, that the Coweta County officers were not estopped by the DeKalb County judge's denial of the warrant to search the vehicle because the DeKalb County officer presented only a bare-bones, harried application to the DeKalb County judge, unlike the more detailed affidavit submitted in support of the warrant requested in Coweta County.  [Doc. 42 at 3-4].  It also argues that the *Davis* case relied upon by McCray is unworthy of reliance because it cited no authority for

37

its estoppel conclusion and more importantly, the *Davis* court held that the subsequent warrant was unsupported by probable cause, thus distinguishing it from the present case. [*Id.* at 4-5 (citing *Davis*, 346 F. Supp. at 442)]. It also submits that a later Seventh Circuit case, *United States v. Pace*, 898 F.2d 1218, 1230-31 (7th Cir. 1990), rejected the argument that a previous denial of a warrant estops officers from seeking a warrant from another judge, concluding that the determinative fact of the validity of the warrant issued is whether it was supported by probable cause. [Doc. 42 at 5-6].

The Government next argues that McCray's argument based on the Georgia Constitution is wrong because the provision he cites in support of his argument permits officers to exercise extra-jurisdictional authority if otherwise authorized by law and because several Georgia code provisions allow sheriff's deputies to exercise authority outside of their home county. [*Id.* at 7-8 (citing O.C.G.A. §§ 15-16-1, -10, -22, 17-4-25)]. It also relies upon several Georgia cases holding that sheriffs have statewide arrest powers. [*Id.* at 8 (citing *Ayers v. Ass'n of Cnty. Comm'rs of Ga.*, 332 Ga. App. 230, 234, 771 S.E.2d 743, 747 (2015); *Wells v. State of Georgia*, 206 Ga. App. 513, 515, 426 S.E.2d 231, 233 (1992))]. Moreover, it contends that the Eleventh Circuit's decision in *Manders v. Lee*, 338 F.3d 1304, 1312-13 (11th Cir. 2003),

that Georgia sheriffs represent the sovereignty of the state, supports the extra-jurisdictional arrest powers of sheriff's deputies.  [Doc. 42 at 8-9].

    *b.*    *Analysis*

The Government has the better arguments.  First, the Coweta County officers were not estopped from obtaining a warrant in Coweta County after the DeKalb County judge denied the warrant sought by the DeKalb County officer.  While the better practice is to inform the second judge that a prior warrant was denied, there is nothing in the Fourth Amendment that requires such a practice.  Instead, the touchstone for issuing a warrant is the existence of probable cause to perform the search, which arguably was lacking in the DeKalb County warrant application and was clearly present in the Coweta County warrant application.  As the *Pace* court observed:

> The Fourth Amendment on its face does not prohibit the government from seeking a second magistrate's approval to search when another magistrate denies a search warrant.  The Fourth Amendment commands only that a "neutral and detached magistrate" determine that probable cause exists.  Thus, the important questions, from a Fourth Amendment standpoint, are whether the magistrate really was "neutral and detached," and whether probable cause actually existed, not how many magistrates the government applied to before finally obtaining a warrant.  *Franks v. Delaware*[, 478 U.S. 154 (1978),] supports this approach.  In *Franks*, the Court held that even where a defendant makes a substantial showing that the government recklessly or deliberately lied to the magistrate, no hearing is required if the other material in the warrant affidavit suffices to show probable cause.  *Franks*, 438 U.S. at 171-72[ ].  Submitting false

material to the magistrate subverts the Fourth Amendment's warrant requirement because deliberately falsified information could mislead a magistrate into finding probable cause and issuing a warrant where he might otherwise not do so. *See id.* at 167-68[ ]. Yet, the Court is willing to let a warrant stand if absent the false information probable cause still exists, even though the magistrate himself might have thought the facts important in finding probable cause. There is even less reason to suppress evidence from a search pursuant to a warrant issued by a magistrate who properly found probable cause based strictly on facts that the warrant affiant honestly and reasonably believed. This approach in no way lessens the Fourth Amendment's protections: if the second magistrate's decision to issue the warrant was incorrect, a reviewing court can eventually suppress the evidence. *See* 2 Wayne R. LaFave, *Search and Seizure*, § 4.2(e), at 164-65 (1987). [Appellant] contends that allowing the government to resubmit a rejected warrant application to a second magistrate will lead to "magistrate shopping," thus deprecating the magistrate's role and diminishing the warrant requirement to a mere rubber-stamping process. As a practical matter, the kind of "magistrate shopping" [Appellant] envisions probably does not create a great problem. The parties have been able to uncover only one reported opinion (and we have found no other) besides the district court's opinion in this case that has even addressed the issue of resubmitting a warrant application to a second magistrate. *See United States v. Davis*, 346 F. Supp. 435, 442 (S.D. Ill. 1972). Moreover, the defendant can still assert that probable cause did not exist to issue the warrant (a challenge [Appellant] has made here), or that the applying officer knew that the second magistrate was not the "detached, neutral magistrate" the Fourth Amendment requires. *See generally* LaFave, *supra*, § 4.2. A blanket rule barring the government from resubmitting a warrant application to a second magistrate would do little, if anything, to protect Fourth Amendment values. Such a rule would, however, cause courts to suppress evidence found in searches pursuant to warrants issued on probable cause. The district court correctly rejected such an approach.

*Pace*, 898 F.2d at 1230-31; *accord United States v. McCoy*, 678 F. Supp. 2d 1336, 1351 (M.D. Ga. 2009) (rejecting argument that earlier denial of warrant constituted *res judicata*; "a Federal Magistrate Judge's denial of a search warrant application cannot be a final judgment on the merits") (citing *Pace*, 898 F.2d at 1230-31).

McCray makes no argument that the Coweta County warrant was not supported by probable cause or that the Coweta County issuing judge was not neutral and detached. In any event, A.B.'s statements that McCray transported her in the Nissan for prostitution, which was corroborated by (1) the GCPD officers' observations at the Tucker residence, and (2) what the officers at the apartment complex could see in plain view, supports a finding that there was probable cause to seize the vehicle and search it (with or without a warrant).

Second, the Coweta County Sheriff Deputies had the authority to arrest McCray in DeKalb County and to seize his vehicle and transport it back to Coweta County to search it pursuant to a warrant. Under Georgia law, a sheriff's deputy is a law-enforcement or peace officer, O.C.G.A. §§ 15-16-1 *et seq.*, and thus may make arrests outside of his or her county of residence. O.C.G.A. § 17-4-25; *Nyane v. State*, 306 Ga. App. 591, 594, 703 S.E.2d 53, 57 (2010); *Wells*, 206 Ga. App. at 515, 426 S.E.2d at 233 ("A law enforcement officer may make an arrest without a warrant

41

for an offense committed in his presence. . . .  This is true even if the arrest is outside his jurisdiction.") (citing O.C.G.A. § 17-4-20; *State v. Giangregorio*, 181 Ga. App. 324, 325, 352 S.E.2d 193, 194 (1986); *Hope v. State*, 193 Ga. App. 202, 204, 387 S.E.2d 414, 416 (1989)).  *Cf. State v. Heredia*, 252 Ga. App. 89, 91, 555 S.E.2d 91, 93 (2001) (describing law enforcement's authority to arrest for traffic violation outside of jurisdiction pursuant to O.C.G.A. §§ 17-4-23(a), 40-13-30).

Moreover, courts in our circuit consistently have held that a violation of state law in procuring a warrant or conducting a search is immaterial to whether a federal court must suppress evidence.  "[F]ederal law, not state law, governs the admissibility of evidence in federal court, and 'complaints that the evidence was obtained in violation of state law are of no effect.' "  *United States v. Noriega*, 676 F.3d 1252, 1263 n.4 (11th Cir. 2012) (rejecting defendant's claim that evidence should be suppressed because the magistrate judge "did not make a verbatim record" in violation of Ala. R. Crim. P. 3.8(b)(4)) (citing *United States v. Glinton*, 154 F.3d 1245, 1252 (11th Cir. 1998)); *see also United States v. Hinton*, 113 F. Supp. 3d 1277, 1285 (N.D. Ga. 2015) ("[T]he critical inquiry before the Court is whether the challenged search violated Defendant's Fourth Amendment rights, not state law."); *United States v. Torres*, No. CR414348, 2015 WL 179075, at *3 (S.D. Ga. Jan. 14, 2015) (rejecting

the defendant's reliance on the state agents' violation of a state statute concerning the issuance of subpoenas in support of his motion to suppress evidence because " 'federal courts in a federal prosecution do not suppress evidence that is seized by state officers in violation of state law, so long as the search complied with the Fourth Amendment' ") (quoting *United States v. Wheelock*, 772 F.3d 825, 830 (8th Cir. 2014)); *United States v. Hill*, No. CR 114-028, 2014 WL 5410214, at *4 (S.D. Ga. Sept. 15, 2014) (rejecting defendant's contention that evidence of recordings made without his consent violated state law and therefore must be suppressed because "federal law requires consent of only one party to the conversation, and "[s]o long as one party to the recorded conversation knows about and consents to it, there is no Fourth Amendment prohibition to using such evidence in a criminal prosecution")[15]; *United States v. Witten*, No. 13-CR-10022, 2014 WL 3101912, at *6 (S.D. Fla. July 7, 2014) ("even where state officers are involved in the arrest at issue, state law does not govern the Fourth Amendment probable cause determination") (citing *Virginia v. Moore*, 553 U.S. 164, 176 (2008) (local city police officers' violation of state law in making arrest did not

---

[15]   Cited with approval in *United States v. Gordon*, No. 1:14-CR-312-WSD, 2015 WL 7863289, at *3 (N.D. Ga. Dec. 2, 2015), *reconsideration denied*, No. 1:14-CR-312-WSD, 2016 WL 680542 (N.D. Ga. Feb. 19, 2016), *aff'd*, No. 16-15069, 2017 WL 1419059 (11th Cir. Apr. 21, 2017).

affect its reasonableness for Fourth Amendment purposes)), *aff'd*, 649 Fed. Appx. 880, (11th Cir. May 13, 2016); *United States v. Wahl*, No. 1:07CR18-SPM, 2008 WL 2323879, at *5 (N.D. Fla. May 30, 2008) ("In this case, the deputy may have violated state law by seizing the car in a location outside of his jurisdiction.  But this violation does not change the standard that must be met under the Fourth Amendment. If there is probable cause to believe that a vehicle may contain contraband or evidence of a crime, then that vehicle may be seized and searched.") (citing *United States v. Ross*, 456 U.S. 798 (1982)).

In this case, based on A.B.'s statements, the DeKalb County and Coweta County officers' investigation at the scene of McCray's arrest, and the GCPD officers' observations at the Tucker residence, probable cause existed to seize the red Nissan. Under the so-called automobile exception[16] to the Fourth Amendment's preference for warrants, the police can conduct a warrantless search of a vehicle "if (1) the vehicle is

---

[16]     The term "automobile exception" is somewhat of a misnomer, since the Supreme Court has expressly stated that there is "no general 'automobile exception' to the warrant requirement." *South Dakota v. Opperman*, 428 U.S. 364, 382 (1976). Rather, this term of art is better understood as simply embracing the now-settled doctrine that it is permissible to conduct a warrantless search of an automobile, and any containers found therein, provided that, at the time of the search, there is probable cause to believe that contraband is secreted at some unspecified location within the automobile. *California v. Acevedo*, 500 U.S. 565 (1992); *Ross*, 456 U.S. 798.

44

readily mobile; and (2) the police have probable cause for the search." *United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir. 2007). "The requirement of mobility is satisfied merely if the automobile is operational." *Id.* (internal quotation marks omitted); *see also Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (per curiam) (no special exigency is required beyond a showing of the mobility of the automobile); *United States v. Watts*, 329 F.3d 1282, 1285 (11th Cir. 2003). In searching the vehicle, law enforcement is permitted to "search all parts of the vehicle, and any containers therein, where the object of the search might be found." *United States v. Baldwin*, 774 F.3d 711, 720 (11th Cir. 2014). In this case, there is no dispute that the Nissan was operational. In fact, when the DeKalb County police first went to the apartment complex they did not see the vehicle, but it was present when they returned. This fact alone demonstrates that the Nissan was operational. Moreover, once the probable-cause and operational prongs of the automobile exception are found to exist, the Fourth Amendment allows law enforcement to seize the vehicle and then search it later. *Michigan v. Thomas*, 458 U.S. 259, 261 (1982); *Ross*, 456 U.S. at 807 n.9; *Chambers v. Maroney*, 399 U.S. 42, 52 (1970); *United States v. Parrado*, 911 F.2d 1567, 1571 (11th Cir. 1990).

45

As a result, the undersigned **RECOMMENDS** that McCray's motion to suppress be **DENIED**.[17]

### 3.   *Motion to suppress statements*

McCray's basis for seeking to suppress his post-arrest statements was the illegality of his arrest.  T172.  Since the Court concludes that he was lawfully arrested, the Court likewise concludes that his statements were lawfully obtained and not the fruits of an unlawful arrest.  In addition, the Government proved that it advised McCray of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), that he knowingly

---

[17]   To the extent that McCray did not abandon his request for return of property by failing to make an independent argument in his post-hearing briefs as to his entitlement to relief under Federal rule of Criminal Procedure 41(g), his motion for return of property should be denied as well.  Rule 41(g) provides, in part, as follows: "A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return."  To prevail on such a motion, "a criminal defendant must demonstrate that (1) he is entitled to lawful possession of the seized property; (2) the property is not contraband; and (3) either the seizure was illegal or the government's need for the property as evidence has ended." *Ferreira v. United States*, 354 F. Supp. 2d 406, 409 (S.D.N.Y. 2005) (citations omitted); *see also United States v. Garcon*, 406 Fed. Appx. 366, 369 (11th Cir. Dec. 21, 2010) (recognizing that "a Rule 41(g) motion is properly denied if the defendant is not entitled to lawful possession of the seized property, the property is contraband or subject to forfeiture, or the government's need for the property as evidence continues") (citation omitted).  As McCray has failed to satisfy the first and third prongs of this standard, he is not entitled to return of property.

and voluntarily waived those rights and agreed to answer questions, and that his subsequent statements were voluntarily made.

Accordingly, the undersigned **RECOMMENDS** that McCray's motion to suppress statements be **DENIED**.

II.   *Motion to dismiss, [Docs. 66, 83]*

  A.   *The parties' arguments*

McCray seeks dismissal of Counts Four and Five of the second superseding indictment, both alleging obstruction in violation of 18 U.S.C. § 1591(d), on the grounds that double jeopardy bars his being tried for obstruction following his earlier guilty plea to contempt of court arising out of the same conduct. [Doc. 83]. In support, he shows that, although he was detained pending trial, on September 21, 2015, the undersigned ordered McCray not to have further contact with A.B. [*See* Dkt. Entry 22; Doc. 23 at 6-8]. Then, on April 28, 2016, the grand jury returned the first superseding indictment against him, charging him with obstruction in violation of § 1951(d) as a result of contact between August 2015 and February 2016. [Doc. 45]. On May 12, 2016, the Government filed a motion for a hearing regarding McCray's contempt of court and request for modification of pretrial detention conditions, [Doc. 53], that resulted, on September 22, 2016, in McCray pleading guilty to criminal contempt in

47

case no. 1:16-mj-795-AJB, and the Court sentencing him to six months for violating the Court's no-contact order.  [*See* Doc. 68 at 30].

On October 6, 2016, McCray moved to dismiss Count Four of the superseding indictment, arguing that the Double Jeopardy Clause barred his prosecution for obstruction based on his guilty plea to the contempt charge.  [Doc. 66].  When the Government obtained a second superseding indictment alleging obstruction conduct occurring in February 2016, [*see* Doc. 71 at Count Five], McCray moved to dismiss both obstruction counts as violating his double-jeopardy rights.  [Doc. 83].

Specifically, he argues that because the elements of the contempt charge are the same as the elements of the obstruction charge in Counts Four and Five of the second superseding indictment, the charges in the indictment are barred by the double jeopardy clause.  [*Id.* at 3-4 (citing *United States v. Dixon*, 509 U.S. 688, 696 (1993)].  He argues that the charging document for the contempt charge, [*see* Doc. 53 at 5-6], incorporated the conduct charged in Count Four and incorporated Count Four itself, and therefore made the essential elements of Counts Four and Five the same as the contempt charge. Therefore, he contends that these counts must be dismissed.  [Doc. 83 at 4].  He also contends that 18 U.S.C. § 3285, which would allow a substantive-crime conviction to

48

follow a previous contempt charge for the same conduct, was abrogated by *Dixon*. [*Id.*].

The Government opposes dismissal.  It argues that double jeopardy is not offended because the conduct that is the subject of Count Four occurred before September 21, 2015, the date of the undersigned's order that gave rise to the contempt charge and conviction.  [Doc. 88 at 10-11].  The Government also argues that Count Four was not incorporated into the charging instrument for the contempt conviction, and that the Government merely referenced the first superseding indictment in its recitation of the procedural history of the case.  [*Id.* at 18 (citing [Doc. 53 at 6])]. As for Count Five, the Government argues that although the conduct at issue overlaps with the conduct underlying the contempt conviction, the elements of the contempt conviction are different from the elements of the obstruction charge, and thus double jeopardy does not bar the Government's proceeding as to that count.  [Doc. 88 at 2, 11]. It further argues that in *Dixon*, the Supreme Court held that the "same elements" test under *Blockburger v. United States*, 284 U.S. 299 (1932), and not the "same conduct" test under *United States v. Grady*, 495 U.S. 508 (1990), determines whether the Double Jeopardy Clause prevents a subsequent prosecution or punishment. [Doc. 88 at 12 (citing *Dixon*, 509 U.S. at 704)].  It then contends that the Court found McCray guilty of contempt for violating two specific provisions of the September 21,

49

2015, Order, that is, that he not have any contact with any witnesses and that he not engage in any three-way calling. [*Id.* at 16-17 (quoting [Doc. 23 at 6-7])]. It therefore contends that the elements of criminal contempt in violation of 18 U.S.C. § 401(3) ((1) a violation; (2) of a clear and reasonably specific order; and (3) the violation was willful) are different than the elements of an obstruction charge under 18 U.S.C. § 1591(d) ((1) the defendant obstructed, attempted to obstruct, interfered with, or prevented the enforcement of 18 U.S.C. § 1951; and (2) the defendant did so knowingly, that is, voluntarily and intentionally and not because of accident or mistake). [Doc. 88 at 16-17 (citations omitted)].

  B.   Discussion

  The Court concludes that McCray's trial on Counts Four and Five is not barred due to the double-jeopardy clause by his prior conviction for contempt. First, the Court agrees with the Government that Count Four covers conduct that allegedly occurred before the Court issued its order prohibiting McCray from contacting any witness or using three-way calling at Deyton. On September 21, 2015, the Court ordered McCray, as follows:

  > I will order you not to have any contact, direct or indirect, with any witness or victim in this case. Direct contact means your having telephone calls or physical or voice communication with those persons or

50

electronic communications.  And indirect means you are causing someone else to have contact with victims or witnesses. . . .  I will also prohibit you from having any three-way calling in violation of both this order and the rules of any facility that you are in.

[Doc. 23 at 6-7].  The Government's charging document for the finding of contempt provided as follows:

In February 2016, the FBI learned that McCray had once again contacted A.B. from jail using a three-way call feature.  The FBI conducted some investigation and eventually discovered that on February 12, 2016, McCray used another Deyton detainee's PIN to make a three-way call to A.B.'s new cell phone number.  []  In that call, McCray asked A.B. whether she planned to come to court to testify at McCray's trial, and he advised her that she should "tell them the truth."  []  McCray then conveyed to A.B. what he meant by "the truth":

So, I don't know man, you just need to tell them the truth and be real man like, man I, you know we went, I rolled with him in Tennessee because the car and and I had and I had nothing and even, even the pictures or whatever is posted but I didn't even see nobody and nothing really happened.

[]

McCray further attempted to influence A.B.'s testimony by encouraging her not to come to court, albeit through veiled references. [ ] ("I am pretty sure they are going to try and make it go to court, I don't know, I mean I don't know if it would be better if you don't or don't, I don't know what you think?")  But later in the conversation McCray made his point clear by instructing A.B. to avoid the FBI and the prosecutors:  "Just, just, just keep going on the low though you know what I mean?" []  McCray closed the conversation with A.B. by suggesting that he would write to her at her address, and by referencing a "bootleg" message he had previously sent to A.B.:

51

> You sound like you're busy though umm I'll try to get your uh your address and shit or something man I don't know.  I figure I can't be calling you like that though you know . . . So, but I'll figure a way, you know but you know you got, you got, my little boot leg, you got my boot leg message though so you know what's up though . . . I am going to figure out a way to write you or something, or something alright.

[Doc. 53 at 6-7 (citations to exhibits omitted)].  After setting out Count Four of the superseding indictment, the Government then wrote:

> Shortly after the return of the superseding indictment, the undersigned AUSA contacted this Court to request a status conference.  This Court asked that the government file a motion spelling out the relief requested.  The government now files that motion accordingly.

[*Id.* at 7].  The Government then contended that McCray violated the Court's September 21, 2015, Order,

> in two distinct ways:  First, the jail call from February 12, 2016, clearly establishes that McCray willfully made "contact, direct or indirect, with any witness or victim in this case," that is, by calling the victim, A.B.  This Court  explained, in the September 21st Order, that "[d]irect contact means your having telephone calls or physical or voice communication with those persons or electronic communications."   Second, the February 12th jail call was clearly done using a three-way call feature through McCray's grandmother (identified as "GM" in the transcript, [], which directly violated the Court's September 21st order prohibiting "any three-way calling."

[*Id.* (citations to exhibit omitted)].

Count Four of the second superseding indictment alleges conduct between August 2015 and September 2015, [Doc. 71 at 5], and the contempt conviction was based on conduct alleged to have occurred in February 2016.  Moreover, contrary to McCray's argument, Count Four of the first superseding indictment was not incorporated into the contempt charge but rather served only to explain the chronology of the case to the Court.  Thus, Count Four does not offend Double Jeopardy.

Furthermore, Defendant's trial on Count Five is not barred by Double Jeopardy. As the Eleventh Circuit recently held, albeit in an unpublished opinion:

> We determine whether a double jeopardy violation has occurred by applying the Supreme Court's test established in *Blockburger v. United States*, 284 U.S. 299[ ] (1932).  "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.* at 304[ ].  In other words, the test "inquires whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution." *United States v. Dixon*, 509 U.S. 688, 696 (1993).

*Gonzalez v. Sec'y, Fla. Dep't of Corr.*, No. 15-14357, 2017 WL 1842514, at *3 (11th Cir. May 8, 2017).  Prosecutions under § 401(3) and § 1591(d) do not constitute the "same offense" because each has different elements.

To support a § 401(3) conviction, " 'the government must prove: (1) that the court entered a lawful order of reasonable specificity; (2) the order was violated; and (3) the violation was willful.' " *United States v. Bernardine*, 237 F.3d 1279, 1282 (11th Cir. 2001) (quoting *United States v. Maynard*, 933 F.2d 918, 920 (11th Cir. 1991); *see also United States v. KS&W Offshore Eng'g, Inc.*, 932 F.2d 906, 909 (11th Cir. 1991) ("The essential elements of criminal contempt are a lawful and reasonably specific order of the court and the willful violation of that order.").  On the other hand, 18 U.S.C. § 1591(d) provides that "[w]hoever obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section, shall be fined under this title, imprisoned for a term not to exceed 20 years, or both."  Thus, in order to convict a defendant of that charge, the Government must prove beyond a reasonable doubt that the defendant knowingly obstructed or attempted to obstruct the enforcement of § 1591, elements not present in a § 401(3) prosecution.

As a result, the undersigned **RECOMMENDS** that McCray's motions to dismiss on double jeopardy grounds, [Docs. 66, 83], be **DENIED**.

54

### III.    Conclusion

For all of the above reasons, the undersigned **RECOMMENDS** that Defendant's motions to suppress evidence and statements, and for return of property, [Docs. 13, 15, 20, 21], and to dismiss, [Docs. 66, 83], be **DENIED**.

The Court has now ruled or recommended rulings on all matters referred and that have not been deferred for ruling by the District Judge.   Therefore, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED and CERTIFIED**, this the   15th   day of June, 2017.

_____

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

55