# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.                                                    1:15-cr-212-WSD

WILLIAM CALVIN McCRAY,
a/k/a "Skrill Will,"

Defendant.

## <u>OPINION AND ORDER</u>

This matter is before the Court on Magistrate Judge Alan J. Baverman's

Final Report and Recommendation [93] ("R&R").  The R&R recommends the

Court deny Defendant William Calvin McCray's ("Defendant" or "McCray")

Motions to Suppress Evidence and Statements and for Return of Property [13],

[15], [20], [21].  The R&R also recommends the Court deny McCray's Motions to

Dismiss [66], [83].  Also before the Court are McCray's Objections to the R&R

[101].

## I.   BACKGROUND

### A.   Facts[1]

On June 2, 2015, McCray was indicted on charges of conspiracy to commit sex trafficking of a minor, in violation of 18 U.S.C. § 1594(c) (Count One); the substantive offense of sex trafficking of a minor, in violation of 18 U.S.C. §§ 1591(a), (b)(1) and (b)(2) (Count Two); and transportation of a minor for prostitution, in violation of 18 U.S.C. § 2423(a) (Count Three).  On April 28, 2016, the grand jury returned the first superseding indictment against McCray, adding a charge of obstruction in violation of 18 U.S.C. § 1591(d) as a result of prohibited contact between him and his victim between August 2015 and February 2016.  On December 13, 2016, the grand jury returned the second superseding indictment against McCray, charging him in Count Four with obstruction of Section 1591(d) as a result of contact between him and his victim from August 2015 through September 2015, and in Count Five with obstruction of Section 1591(d) as a result of contact with his victim in February 2016.

---

[1]     The facts are taken from the R&R and the record.  The parties have not objected to any specific facts in the R&R, and the Court finds no plain error in them.  The Court thus adopts the facts set out in the R&R.  See Garvey v. Vaughn, 993 F.2d 776, 779 n.9 (11th Cir. 1993).

McCray seeks to suppress the fruits of the search of a vehicle he was operating at the time of his November 12, 2014, arrest.  The Government challenges his standing to contest the seizure and search of the vehicle.

         1.     Suppression Standing[2]

The vehicle, a red 2013 Nissan Altima (the "Nissan"), was rented from Hertz by Amanda Freeman, McCray's fiancée and the mother of his child. (T9-10).[3]  Freeman rented the Nissan, on a week-to-week basis, three weeks before McCray's arrest; only her name was on the rental contract, and she used the car to go to and from work.  (T10-11, 14, 17, 22).  She paid for the vehicle and personally renewed the term of the rental period, though the Government suggests that the victim in this case, known by the initials "A.B.," may have renewed it on Freeman's behalf on at least one occasion.  (T15, 23).  Since May 2014, Freeman rented other vehicles that she let McCray drive.  (T30).  Though McCray did not contribute any money to Freeman to rent the Nissan, he had in the past given her

---

[2]     The Court recognizes that the Supreme Court disapproves of the use of the word "standing" in this context.  See Rakas v. Illinois, 439 U.S. 128, 139-40 (1978); see also United States v. Hawkins, 681 F.2d 1343, 1344-45 (11th Cir. 1982).  The Court uses the term "suppression standing" when referring to whether McCray had an expectation of privacy in the vehicle searched, because courts routinely use "standing" as "shorthand for the existence of a privacy or possessory interest sufficient to assert a Fourth Amendment claim."  United States v. Daniel, 982 F.2d 146, 149 n.2 (5th Cir. 1993).

[3]     November 20, 2015, Transcript [32] ("T").

some money towards the rental of other vehicles.  (T31).  He also contributed

money to Freeman when they lived together for general living expenses.  (T33).[4]

When Freeman let McCray use the rental car, he dropped her off at her work and

dropped their daughter off at a babysitter's.  (T17-18).  Freeman knew that McCray

drove the Nissan from Nashville, Tennessee, where they lived, to Atlanta, and that

he had possession of the car on November 12, 2014.  (T11-12, 32).  When McCray

had the car during this trip, Freeman's friends helped her get to work and helped

her get her daughter to the babysitter's.  (T18).

At the time she initially rented the Nissan, Freeman did not tell Hertz that

another person would be driving the vehicle because she could not afford the

increased cost.  (T.18, 19).  She testified that, at the time of the rental, she told

Hertz only she was going to drive the car.[5]  (T18, 19).  After McCray's arrest,

Freeman contacted Hertz to tell them about a second driver.  Hertz charged her for

two drivers, retroactive to the start of the rental period.  (T12-13).

Freeman testified that, until McCray's mid-November trip to Atlanta,

Freeman allowed McCray to use the car locally to look for a job.  (T20).  She

---

[4]     These general living expense monies would have enabled Freeman to have
sufficient funds to rent a vehicle although McCray did not give her funds
specifically for that purpose.

[5]     The Magistrate Judge did not find this testimony credible.  (R&R at 4).

believes he used it on five or six occasions.  (T20).  When the vehicle was seized, McCray had possessed the vehicle for two days and was scheduled to return it to Freeman in Nashville by 2:00 p.m. on November 12, 2014,—the day that he was arrested—for her to use to get to work.  (T23, 26).  When the vehicle was not returned by November 12, 2014, Freeman did not go to work and did not take her daughter to daycare.  (T26).

2.   McCray's Arrest, and the Seizure and Search of the Nissan

The investigation in this case began as a result of a report of suspicious people at an address in Tucker, Georgia in Gwinnett County.  (T37-38; Govt. Ex. 1).  Gwinnett County Police Department ("GCPD") officers responded to the Tucker location on October 26, 2014, and made contact with "A.B."  McCray and Alfredo Lopez-Monzon were also at the Tucker address.  (T39; Govt. Ex. 1).  A.B. at first claimed her name was "Amanda Freeman," but eventually told the investigating officers her real name.  She also told the investigators that Lopez had placed a pillow over her face and attempted to rape her.  The officer suspected that McCray was A.B.'s pimp.  (T39-40; Govt. Ex. 1).[6]   The investigation revealed

---

[6]     During the investigation at the Tucker address, McCray remained in the driveway in a red Nissan with New York plates (GGL6795).  (T40, 41; Govt. Ex. 1).  McCray asked A.B. for gas money and she provided it to him.  (T40).

that McCray had brought A.B. to the location and was waiting for her to exit the house so that they could leave together.  (T40).

The GCPD's investigation revealed that A.B. was a juvenile runaway from Bibb County, Georgia, and that she was a ward of the state living in foster care in Coweta County, Georgia.[7]  From Tucker, Georgia, A.B. was returned to her foster home in Coweta County.  She quickly ran away from that residence.  When she did, on October 27, 2014, Coweta County Sheriff's Office Criminal Investigator Ryan Foles began his investigation.  A.B.'s foster mother told Foles that she saw from her telephone caller identification that A.B. had made a telephone call from the foster home before she disappeared from it.  (T41-43).  A.B.'s foster mother further told Foles that she had received information that A.B. was being advertised on Backpage.com for prostitution.  The date of the advertisement was October 24, 2014.  The phone number listed to call had the same 615 area code that A.B. dialed from the foster home.  The investigation revealed this was the telephone number used by McCray.  (T46-47; Govt. Ex. 3).

Foles reviewed A.B.'s Facebook page and saw a reference to Jasmine Dillard.  A.B.'s foster mother knew Dillard, and Foles asked the foster mother to

---

[7]     GCPD officers advised McCray during the investigation that A.B. was underage.  (T52; Govt. Ex. 1).

call Dillard.  During the call, Dillard reported that A.B. had run away from her

foster home and may be in the company of "Will."  The telephone number that

Dillard provided for "Will" was the same telephone number listed in the

Backpage.com ad.  (T48).

On November 3, 2014, A.B. was found in DeKalb County.  (T48).  Foles

interviewed her, and she told him that she was taken by "Will" to Tennessee for

prostitution.  (T48; Govt. Ex. 4).  A.B. told Foles that she had met McCray weeks

before the interview and that she ended up in an apartment with him one night,

where they discussed that she would be a prostitute.  She told Foles that McCray

threatened violence to force her into prostitution.  (T49-50).  She stated that she

and McCray traveled around Atlanta to various locations where she was

prostituted, which she called "doing plays."  After being prostituted, she stated that

McCray raped her in an apartment in DeKalb County.  She said they traveled

around Atlanta in a red Nissan.

A.B. explained she initially ran away from her foster home in Coweta

County, and that she used the utility bill from that location to tell McCray where to

pick her up.  She already had memorized McCray's phone number.  After he

picked her up, they went to an Atlanta nightclub where she used Freeman's

identification to buy drinks.  They then drove to Tennessee for about a week,

where she performed three acts of prostitution.  (T50-51).  A.B. reported that she used Freeman's name and her identification to rent cars for McCray.  (T154).  A.B. stated that she got sick while in Tennessee and wanted to go home, but McCray wanted to take her to Miami or New Orleans for prostitution.  When he dropped her off at a DeKalb County apartment complex, she called her mother.  A.B. was apprehended on a runaway juvenile warrant.  (T50-51).

Foles searched the Backpage.com ads in the Nashville, Tennessee, area, and found an ad almost identical to the one containing A.B.'s photograph that had run in the Atlanta edition, except for the telephone number.  (T52-53).  Foles conducted a computer search and located other escort ads tied to the telephone number in the Nashville Backpage.com ad.  (T53).  He found a YouTube account linked to the telephone number on which "Skrill Will" rap music videos were posted.  Foles had a copy of McCray's driver's license photo, and was able to identify "Skrill Will" as McCray.  (T54).  On November 7, 2014, Foles applied for and was issued an arrest warrant charging McCray with violating O.C.G.A. § 16-15-46, trafficking persons for sexual servitude.  (T54; Govt. Ex. 5).

During Foles's investigation, A.B. identified various addresses associated with McCray, including a unit at the Clifton Glen Apartments in Stone Mountain, Georgia (504 Three Oaks Bend, Apt. 4), where she alleged that McCray raped her.

Police also received information that the red Nissan was observed at that apartment complex.  (T55-56, 151-52).[8]  Coweta County Deputy Sheriffs could make arrests in DeKalb County, but Foles decided to enlist the DeKalb County Police Department to help him locate and arrest McCray.  Foles was concerned that there were more people involved than just McCray, and because A.B. had reported that she was raped in DeKalb County it made sense to ask DeKalb police for help.  (T56, 77, 99, 149).[9]  Officers obtained a search warrant for the Clifton Glen apartment unit.  (See T84).  Officers also applied for a search warrant for the red Nissan, but the DeKalb County magistrate judge denied the application.  (T102, 106, 107-08; Govt. Ex. 8).

Shortly after police roll call on November 12, 2014, DeKalb Police Officer Grier located the red Nissan with New York license plates at the Clifton Glen Apartments in DeKalb County.  (T78).  DeKalb County police, including a SWAT unit, went to the complex and set up a perimeter around the apartment and the red Nissan parked in front of the apartment.  (T80, 100, 101, 129).  The police knocked

---

[8]     A resident in the Clifton Glen Apartments had reported that the red Nissan had been parked in front of the apartment for the few days before the interview, that a white girl was seen in the car, and that she appeared to have slept in the car.
[9]     In connection with the arrest search, there were briefings, be-on-the-lookout ("BOLO") postings, and emails transmitted to the other officers about McCray, his vehicle, and the charges.  (T56-59, 83; Govt. Exs. 6, 7).

on the door to Apartment 4 but no one answered. (T101). A detective saw someone peeking out the window. (T101). The police texted McCray that they were outside and that he should surrender. McCray initially responded that he was not present at the apartment but at a studio in downtown Atlanta. (T85- 86). A resident at the complex stated that McCray was present and, having seen someone peeking out of the window, police executed the search warrant issued for the apartment. (T80, 86-87, 101; Govt. Ex. 8). McCray was not found inside, but later was found hiding inside a utility closet in the breezeway right outside the apartment, and he was arrested. (T81, 86, 103-104). McCray was searched incident to his arrest, and his wallet and other items were seized. (T88-89; Govt. Ex. 11). McCray and these seized items were turned over to Coweta County authorities. (T90).

When McCray was arrested, the red Nissan was parked in front of the apartment, about twenty yards away, and inside the scene perimeter set up by the police. Looking in the car window, investigators saw male and female clothing in the backseat, making it appear that people were living out of the car. They also saw thumb drives, a cell phone, and the GPS device supplied by the rental car company. (T59- 60, 130-31, 133-35, 155; Govt. Exs. 20, 21). Law enforcement already knew the Nissan was a rental car, that it was rented by Freeman, and that it

was the same car that was at the residence when the Gwinnett County officials first

encountered A.B. and McCray.  (T154).  A Coweta County Deputy Sheriff sealed

the vehicle with tamper-proof evidence tape.  (T131, 138).  The vehicle was seized

by Coweta County law enforcement and taken to Coweta County.[10]  (T143).  The

vehicle was placed in a secure lot in Coweta County and photographed.  During the

impoundment process, a box of condoms was observed in plain view inside the

vehicle.  (T136; Govt. Exs. 25, 26).  Search warrants were sought and obtained

from a Coweta County judge for the vehicle and for laptop computers and cell

phones in the vehicle.  (Govt. Exs. 9,[11] 10; T59-60, 70, 81-82, 104, 110; Def. Ex.

---

[10]     The vehicle was transported to Coweta County by a wrecker with which the
Coweta County Sheriff's Office had a contract.  (T104).

[11]     In the affidavit in support of the Coweta County search warrant for the
Nissan, Foles recounted the following.  According to A.B., she had been taken to
the Gwinnett County location on October 26, 2014, by McCray in a red Nissan, in
order to have sex with a man for money at that location.  The police showed up,
determined that A.B. was a runaway juvenile from Coweta County, and
documented that the vehicle was a red Nissan with NY plate GGL6795.  After
A.B. was returned to the foster home in Coweta County, McCray picked her up in
the red Nissan and took her away for purposes of sexual servitude.

When A.B. was apprehended, she told Foles that McCray used a Hertz rental
car to transport her around metro Atlanta and throughout Tennessee, and after he
obtained an arrest warrant for McCray, he placed a BOLO for the vehicle, which
was located outside the building where McCray was arrested in Stone Mountain.
Foles reported to the Coweta County judge that after the Nissan was secured and
taken to Coweta County, he learned, from Hertz, that the vehicle was rented by
Amanda Freeman, and that this was the same name that A.B. initially gave to the

1).  The Coweta County judge who issued the search warrant for the car was not

told that a DeKalb County judge refused to issue the search warrant for the red

Nissan when the warrant for McCray's arrest was requested and issued.  The

DeKalb judge did not believe there was at that time sufficient probable cause to

issue the warrant.

Following his arrest, McCray insisted on speaking to DeKalb Police

Department Sergeant Torrey Kennedy.  In response to his request, McCray was

transported to DeKalb County Police headquarters.  (T92).  There, he was placed

in an interview room and interviewed.  The interview was audio- and video-

recorded.  (T93; Govt. Exs. 18, 19).  At the interview, Sgt. Kennedy gave McCray

a bottle of water.  (T93).  Kennedy identified himself, and was not armed.  The

interview lasted less than two hours.  (T94; Govt. Exs. 18, 19).  During the

---

Gwinnett County police before they discovered that she was a runaway.  Foles also
stated that Freeman birthed a child fathered by McCray.  Foles stated:

> Based on the facts of the case and Your Affiant's knowledge, training,
> and experience in the subject of human trafficking[,] it is reasonable
> to believe there are items such as electronic devices, paperwork,
> clothing, cell phones, ledgers and trace evidence located inside this
> vehicle as pimps use rental cars to move around their victims.  Your
> Affiant humbly requests your court the ability to search this property
> for those items and the like.

Govt. Ex. 9 at 3-4.

interview, McCray was lucid and did not appear to be under the influence of alcohol or drugs.  Kennedy did not make any promises or threats to McCray. (T94).  He read McCray his <u>Miranda</u> rights from a preprinted form.  (T95; Govt. Ex. 17).  McCray initialed each right read, waived each one orally and in writing, and signed the waiver form.  (T96-97; Govt. Ex. 17).  McCray stated that he could read, that he completed the twelfth grade, and that he was not under the influence of drugs or alcohol.  (T97; <u>see also</u> Govt. Exs. 18, 19).  During questioning, McCray did not ask for a lawyer, did not refuse to answer questions, and did not ask the questioning to stop.  (T98-99).[12]

### 3.   Double Jeopardy Claim

On June 2, 2015, McCray was indicted on charges of conspiracy, sex trafficking of a minor, and transportation of a minor for prostitution [1].  On September 21, 2015, McCray, who was detained pending trial, was ordered by the Magistrate Judge not to have further contact with A.B.  The Court ordered McCray as follows:

> I will order you not to have any contact, direct or indirect, with any witness or victim in this case.  Direct contact means your having telephone calls or physical or voice communication with those persons or electronic communications.  And indirect means you are

---

[12]   The case ultimately was adopted for prosecution by the United States Attorney's office in this district.

13

causing someone else to have contact with victims or witnesses. . . .  I
will also prohibit you from having any three-way calling in violation
of both this order and the rules of any facility that you are in.

([23] at 6-7).

On April 28, 2016, the grand jury returned the first superseding indictment

against McCray, charging him with obstruction in violation of Section 1591(d) as a

result of contact between him and A.B. between August 2015 and February 2016,

after he was ordered not to have contact with victims.  On May 12, 2016, the

Government filed a motion for a hearing on McCray's contempt of the Court's

September 21, 2015, order and to request modification of pretrial detention

conditions.  ([53]).  The Government's motion requesting a finding of contempt

provided:

In February 2016, the FBI learned that McCray had once again
contacted A.B. from jail using a three-way call feature.  The FBI
conducted some investigation and eventually discovered that on
February 12, 2016, McCray used another Deyton detainee's PIN to
make a three-way call to A.B.'s new cell phone number. [] In that call,
McCray asked A.B. whether she planned to come to court to testify at
McCray's trial, and he advised her that she should "tell them the
truth." [] McCray then conveyed to A.B. what he meant by "the
truth":

So, I don't know man, you just need to tell them the truth
and be real man like, man I, you know we went, I rolled
with him in Tennessee because the car and and [sic] I had
and I had nothing and even, even the pictures or whatever
is posted but I didn't even see nobody and nothing really
happened.

14

[]

> McCray further attempted to influence A.B.'s testimony by
> encouraging her not to come to court, albeit through veiled references.
> [ ] ("I am pretty sure they are going to try and make it go to court, I
> don't know, I mean I don't know if it would be better if you don't or
> don't, I don't know what you think?") But later in the conversation
> McCray made his point clear by instructing A.B. to avoid the FBI and
> the prosecutors: "Just, just, just keep going on the low though you
> know what I mean?" [] McCray closed the conversation with A.B. by
> suggesting that he would write to her at her address, and by
> referencing a "bootleg" message he had previously sent to A.B. . . . .

([53] at 5-7 (citations to exhibits omitted)).  After setting forth Count Four of the

first superseding indictment, the Government then wrote:

> Shortly after the return of the superseding indictment, the undersigned
> AUSA contacted this Court to request a status conference.  This Court
> asked that the government file a motion spelling out the relief
> requested.  The government now files that motion accordingly.

(Id. at 7).  The Government then contended that McCray violated the Court's

September 21, 2015, Order

> in two distinct ways:  First, the jail call from February 12, 2016,
> clearly establishes that McCray willfully made "contact, direct or
> indirect, with any witness or victim in this case," that is, by calling the
> victim, A.B.  This Court explained, in the September 21st Order, that
> "[d]irect contact means your having telephone calls or physical or
> voice communication with those persons or electronic
> communications."  Second, the February 12th jail call was clearly
> done using a three-way call feature through McCray's grandmother
> (identified as "GM" in the transcript, [], which directly violated the
> Court's September 21st order prohibiting "any three-way calling."

(Id. (citations to exhibit omitted)).

15

On September 22, 2016, McCray pleaded guilty to criminal contempt, and the Magistrate Judge sentenced him to six months for violating the no-contact order. On December 13, 2016, the grand jury returned the second superseding indictment against McCray, charging him in Count Four with obstruction of Section 1591(d) as a result of contact between him and A.B. from August 2015 through September 2015, and in Count Five with obstruction of Section 1591(d) as a result of contact with A.B. in February 2016.

B.    Procedural History

On June 2, 2015, McCray was indicted on charges of conspiracy, sex trafficking of a minor, and transportation of a minor for prostitution [1]. On April 28, 2016, the grand jury returned the first superseding indictment against McCray, charging him with obstruction in violation of Section 1591(d) as a result of contact between him and A.B. between August 2015 and February 2016, after he was ordered not to have contact with victims. On December 13, 2016, the grand jury returned the second superseding indictment against McCray, charging him in Count Four with obstruction of Section 1591(d) as a result of contact between him and A.B. from August 2015 through September 2015, and in Count Five with obstruction of Section 1591(d) as a result of contact with A.B. in February 2016.

16

On July 8, 2015, McCray filed his Motion to Suppress Statements [13].  In it, McCray moves to suppress post-arrest statements that he claims were not made voluntarily.  On July 10, 2015, he filed his Motion to Suppress Evidence [15], seeking to suppress evidence found and seized at the time of his arrest and from the red Nissan.  On August 25, 2015, and September 21, 2015, he filed his Supplemental Motions to Suppress Evidence [20], [21].

On November 20, 2015, the Magistrate Judge held a hearing on McCray's Motion to Suppress Statements and Motion to Suppress Evidence.

On October 6, 2016, McCray filed his Motion to Dismiss Count Four of the first superseding indictment [66].  After the Government obtained a second superseding indictment alleging obstruction conduct occurring in February 2016 [71], on February 22, 2017, McCray filed his Motion to Dismiss Counts Four and Five of the Indictment [83].  McCray argues that double jeopardy bars his being tried for obstruction following his having previously been found guilty of contempt of court arising out of the same conduct.

On June 15, 2017, the Magistrate Judge issued his R&R.  The Magistrate Judge found that McCray lacked an objective expectation of privacy in the Nissan, and thus cannot challenge its search and seizure.  He concluded that, even if McCray did have a sufficient expectation of privacy, the Nissan was lawfully

seized and searched because law enforcement had probable cause to do so.  The Magistrate Judge recommends the Court deny McCray's Motion to Suppress.  Because the Magistrate Judge concluded McCray's arrest was lawful, the Magistrate Judge also concluded that McCray's statements were lawfully obtained and were not the fruits of an unlawful arrest.  The Magistrate Judge recommends that McCray's Motion to Suppress Statements be denied.  The Magistrate Judge recommends McCray's Motions to Dismiss be denied, because a trial on Counts Four and Five is not barred by double jeopardy.

On July 13, 2017, McCray filed his Objections to the R&R.  McCray objects to the Magistrate Judge's conclusion that he lacked standing to challenge the search and seizure of the Nissan, arguing that the Magistrate Judge "erroneously rejected the authorization or permissive tests adopted by other circuits." (Obj. at 1-2).  McCray next objects to the Magistrate Judge's finding that the Nissan was lawfully seized and searched.  He objects specifically to the finding that the Coweta County officers were not precluded from obtaining a warrant in Coweta County after the DeKalb County judge denied the issuance of a warrant for the car.  McCray further objects to the Magistrate Judge's finding that he is not entitled to the return of the cell phone and computer seized from his apartment, arguing these items were seized illegally and do not otherwise have any

evidentiary value.  Finally, McCray objects to the Magistrate Judge's finding that Counts Four and Five should not be dismissed on double jeopardy grounds.

## II.   DISCUSSION

A.   Legal Standard

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation.  28 U.S.C. § 636(b)(1); Williams v. Wainwright, 681 F.2d 732, 732 (11th Cir. 1982) (per curiam).  A district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1).  Where no party has objected to the report and recommendation, the Court conducts only a plain error review of the record. United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983) (per curiam).  Because McCray objects to the R&R, the Court conducts its *de novo* review.

B.   Motions to Suppress Evidence and Statements and for Return of Property

1.   Suppression Standing to Challenge Seizure and Search of the Nissan

The Government argues that McCray lacks suppression standing to challenge the seizure and search of the Nissan because he was not an authorized

operator of the rented red Nissan.  The Eleventh Circuit has not decided whether the driver of a rental car who is not listed as a driver on the rental car contract may challenge a search of the rental car.  See United States v. Gayle, 608 F. App'x 783, 788-89 (11th Cir. Apr. 27, 2015) (refusing to decide issue involving unlicensed rental car driver not listed on rental contract as authorized user where, in any event, search was lawful).  Other circuit courts have taken differing approaches.  See id. McCray argues the Court should follow the totality-of-circumstances test from United States v. Smith, 263 F.3d 571 (6th Cir. 2001), which was applied in a district court case in our Circuit captioned United States v. Murray, No. CR410-266, 2011 WL 1806971 (S.D. Ga. 2011).

After a thorough analysis of the circuit split, relevant Eleventh Circuit authority, and the approaches taken by other district courts in our Circuit, the Magistrate Judge concluded that "the multi-factor analysis utilized in Murray and [United States v.] Alexis[, 169 F. Supp. 3d 1303 (S.D. Fla. 2016)] is the best approach and the one most likely to be employed by the Eleventh Circuit." (R&R at 32).  Applying these factors, the Magistrate Judge concluded that McCray lacks suppression standing to challenge the seizure and search of the Nissan.

In his Objections, McCray now argues that the Magistrate Judge erred in looking to the totality of the circumstances, despite the fact that McCray urged the

Magistrate Judge to do so.  Defendant argues both that the Magistrate Judge "erroneously rejected the authorization or permissive tests adopted by other circuits," and that the Magistrate Judge should have used the "totality of the circumstances test" that the Magistrate Judge, in fact, used.  Though it is unclear on what basis Defendant objects to the Magistrate Judge's R&R, the Court, in its discretion, conducts its *de novo* review regarding whether Defendant has suppression standing to challenge the seizure and search of the Nissan.

"In order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; *i.e.*, one that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." Minnesota v. Carter, 525 U.S. 83, 88 (1998) (internal quotation marks omitted). For the Fourth Amendment then to apply, a person must have a "reasonable expectation of privacy under the circumstances."  United States v. Siau, 281 F. App'x. 949, 950 (11th Cir. 2008) (internal quotations omitted) (quoting California v. Ciraolo, 476 U.S. 207, 211 (1967)).

To challenge the search of the Nissan, McCray "must establish both a subjective and an objective expectation of privacy," with the subjective component

requiring "that a person exhibit an actual expectation of privacy," and the objective component requiring "that the privacy expectation be one that society is prepared to recognize as reasonable."  United States v. King, 509 F.3d 1338, 1341 (11th Cir. 2007) (internal quotation marks omitted); United States v. Brazel, 102 F.3d 1120, 1147 (11th Cir. 1997) ("To have standing, a defendant bears the burden of showing a legitimate expectation of privacy in the area searched.").  The defendant has the burden to show, by a preponderance of the evidence, that he has a legitimate expectation of privacy in the area searched.  United States v. Harris, 526 F.3d 1334, 1338 (11th Cir. 2008).

Here, the Magistrate Judge concluded that McCray had a subjective expectation of privacy in the Nissan, because the record shows that Freeman gave him permission to drive it and he in fact used the vehicle as his own.  No party objects to this finding, and the Court agrees that McCray had a subjective expectation of privacy.  See Slay, 714 F.2d at 1095.  The Court next turns to whether McCray had an objective expectation of privacy.

The Eleventh Circuit has not decided "whether an unlicensed and unauthorized driver of a rental car has standing to challenge the search of the rented vehicle," and "[t]he circuits that have considered the issue are split."  Gayle,

608 F. App'x at 788–89.  The <u>Gayle</u> court described the split among the circuit

courts as follows:

> The Fourth, Fifth, and Tenth Circuits have held that unauthorized
> drivers of rental vehicles never have standing to challenge a vehicle
> search.  <u>United States v. Wellons</u>, 32 F.3d 117, 119 (4th Cir.
> 1994); <u>United States v. Boruff</u>, 909 F.2d 111, 117 (5th Cir.
> 1990); <u>United States v. Obregon</u>, 748 F.2d 1371, 1374-75 (10th Cir.
> 1984).  On the other hand, the Eighth and Ninth Circuits have held
> that an unauthorized driver may challenge the search of a rental
> vehicle if he can establish that he had permission from the authorized
> driver to use the vehicle.  <u>United States v. Thomas</u>, 447 F.3d 1191,
> 1198-99 (9th Cir. 2006); <u>United States v. Best</u>, 135 F.3d 1223, 1225
> (8th Cir. 1998).  The Third and Sixth Circuits have determined that an
> unauthorized driver does not have standing to challenge the search,
> but has noted the possibility that exceptional circumstances might
> create the legitimate expectation of privacy.  <u>United States
> v. Kennedy</u>, 638 F.3d 159, 165 (3d Cir. 2011); <u>United States v. Smith</u>,
> 263 F.3d 571, 586-87 (6th Cir. 2001).

<u>Id.</u>

District judges in our Circuit have decided whether unauthorized drivers of

rental cars have standing to contest a search of a rental vehicle.  In <u>Murray</u>, the

Southern District of Georgia considered whether a defendant had standing to

challenge a search of a rental car he drove with the permission of the lessee.

<u>Murray</u>, 2011 WL 1806971, at *2.  The <u>Murray</u> court categorized three separate

tests employed by other circuits:  (1) the bright-line test employed by the Fourth,

Fifth, and Tenth Circuits—a driver not on the rental contract has no standing;

(2) the permission test used by the Eighth and Ninth Circuits—the driver need

receive only the permission of the renter; and (3) the totality-of-the-circumstances test of the First and Sixth Circuits.  The Murray court opined that the Eleventh Circuit would adopt the totality-of-the-circumstances test because both the Eleventh Circuit and the Supreme Court have eschewed hard-and-fast rules in the Fourth Amendment standing arena.  Murray, 2011 WL 1806971 at *2 (citing United States v. Cooper, 133 F.3d 1394, 1401 (11th Cir. 1988); Jones v. United States, 362 U.S. 257, 266 (1966)).

The Murray court thus adopted the totality-of-the-circumstances test, and applied the factors set forth in the Sixth Circuit's Smith opinion, which look to whether (1) the defendant could legally operate the vehicle and the status of his license; (2) the defendant was able to present the rental agreement and provide sufficient information about the vehicle; (3) the defendant was related to the renter or otherwise had an "intimate relationship;" (4) the defendant had permission of the authorized driver to use the rental car; and (5) the defendant had a business relationship with the rental car company and the nature thereof.  Murray, 2011 WL 1806971 at *3.

In Alexis, the Southern District of Florida rejected the Eighth and Ninth Circuits' permission test.  The court took a narrower view of Smith than the Murray court.  Alexis treated the Sixth Circuit's decision in Smith and the Third

Circuit's decision in Kennedy as providing an exception to the permission test under exceptional circumstances where "the driver 'was the *de facto* renter of the vehicle.'" Alexis, 169 F. Supp. 3d at 1312 (quoting Smith, 263 F.3d at 586-87). In holding that the defendant, who had a suspended license but was allowed to borrow the vehicle from the lessee, did not have a reasonable expectation of privacy, the court reasoned that the defendant (1) had no relationship with Hertz, (2) never provided Hertz any information, (3) never sought Hertz's authorization to use the rental, and (4) "likely believed that Hertz would not have permitted him to drive the Impala, due to his suspended license." Id. at 1313.

Here, the Court rejects the authorization or permission tests as bright-line tests, because they are inconsistent with Supreme Court and Eleventh Circuit Fourth Amendment standing jurisprudence, which favor considering the totality of the circumstances. See Rakas v. Illinois, 439 U.S. 128, 152-53 (1978); United States v. Sarda-Villa, 760 F.2d 1232, 1235 (11th Cir. 1985). The Court finds the multi-factor analysis applied in Murray and Alexis is sound, and finds that this approach is likely to be adopted by the Eleventh Circuit. Specifically, the Court considers the Smith factors utilized by the Murray court, and concludes, like the Alexis court, that the rental company's lack of authorization is a factor that

25

strongly weighs against society's recognition of the objective privacy rights of an unauthorized driver.

Applying these factors, the Court concludes McCray lacked an objective expectation of privacy in the Nissan.  The following facts weigh in favor of McCray:  (1) Freeman and McCray were engaged and had a child together; (2) Freeman gave McCray permission to use the Nissan; and (3) McCray had a valid license to operate a motor vehicle.  The majority of the evidence, however, weighs against McCray.

First, and most importantly, there is no evidence McCray had any relationship at all with Hertz or that Hertz authorized him to operate the vehicle. McCray was not authorized by Hertz to operate its vehicle, because Freeman deliberately decided not to tell Hertz that McCray would drive the vehicle to avoid the additional costs to add an authorized driver.  McCray argues that Freeman was charged an additional amount after Hertz discovered that McCray had driven the vehicle, but Hertz was never asked for advance permission to allow an individual other than Freeman to rent the vehicle.  Further, the rental agreement was not introduced into evidence.  Because McCray has the burden of proof to establish an objective expectation of privacy, this lack of evidence weighs against him. McCray also does not present any evidence that he paid for the vehicle or

contributed to its costs.  As the Magistrate Judge noted, "McCray seems to have gone out of his way to not have [the Nissan] and other rental car(s) that he used to be placed in his name.  He had Freeman and A.B. (using Freeman's identification) rent or extend the rental on the vehicles."  (R&R at 33).  This shows McCray's deliberate effort to separate himself from the rental vehicles, or an acknowledgement that, had he tried to rent the vehicles on his own, he would have been refused.  These facts are inconsistent with an objective expectation of privacy under the circumstances.

The Court finds that, under the totality of the circumstances, McCray did not have an objective expectation of privacy in the Nissan.  He thus lacks suppression standing to challenge the seizure and search of the Nissan, and his Motions to Suppress Evidence are denied.

### 2.    Lawfulness of Seizure and Search

The Government next argues that, even if McCray has suppression standing, his Motion to Suppress should be denied because the Nissan was lawfully seized and searched.  The Government argues that law enforcement had probable cause to seize and search the Nissan because the facts showed that McCray used the vehicle to prostitute A.B.  It also argues that the vehicle could be seized and searched without a warrant pursuant to the automobile exception to the warrant requirement.

27

McCray contends that, once the DeKalb County magistrate denied the search warrant for the Nissan, the officers were precluded from seizing the vehicle unless they obtained a warrant.  He also argues that there were no exigencies that authorized the warrantless seizure of the vehicle.

The Magistrate Judge found that Coweta County officers were not estopped from obtaining a warrant in Coweta County after the DeKalb County judge denied the warrant sought by the DeKalb County officer.  McCray objects to this finding. In United States v. Pace, 898 F.2d 1218, 1230-31 (7th Cir. 1990), the Seventh Circuit, the only circuit to address the issue, stated:

> The Fourth Amendment on its face does not prohibit the government from seeking a second magistrate's approval to search when another magistrate denies a search warrant.  The Fourth Amendment commands only that a "neutral and detached magistrate" determine that probable cause exists. Thus, the important questions, from a Fourth Amendment standpoint, are whether the magistrate really was "neutral and detached," and whether probable cause actually existed, not how many magistrates the government applied to before finally obtaining a warrant.  Franks v. Delaware supports this approach. In Franks, the Court held that even where a defendant makes a substantial showing that the government recklessly or deliberately lied to the magistrate, no hearing is required if the other material in the warrant affidavit suffices to show probable cause.  Franks, 438 U.S. at 171-72, 98 S.Ct. at 2684-85.  Submitting false material to the magistrate subverts the Fourth Amendment's warrant requirement because deliberately falsified information could mislead a magistrate into finding probable cause and issuing a warrant where he might otherwise not do so.  See id. at 167-68, 98 S.Ct. at 2682-83.  Yet, the Court is willing to let a warrant stand if absent the false information probable cause still exists, even though the magistrate himself might

have thought the facts important in finding probable cause. There is even less reason to suppress evidence from a search pursuant to a warrant issued by a magistrate who properly found probable cause based strictly on facts that the warrant affiant honestly and reasonably believed.

This approach in no way lessens the Fourth Amendment's protections: if the second magistrate's decision to issue the warrant was incorrect, a reviewing court can eventually suppress the evidence. See 2 Wayne R. LaFave, Search and Seizure, § 4.2(e), at 164-65 (1987). Savides contends that allowing the government to resubmit a rejected warrant application to a second magistrate will lead to "magistrate shopping," thus deprecating the magistrate's role and diminishing the warrant requirement to a mere rubber-stamping process. As a practical matter, the kind of "magistrate shopping" Savides envisions probably does not create a great problem. The parties have been able to uncover only one reported opinion (and we have found no other) besides the district court's opinion in this case that has even addressed the issue of resubmitting a warrant application to a second magistrate. See United States v. Davis, 346 F. Supp. 435, 442 (S.D. Ill. 1972). Moreover, the defendant can still assert that probable cause did not exist to issue the warrant (a challenge Savides has made here), or that the applying officer knew that the second magistrate was not the "detached, neutral magistrate" the Fourth Amendment requires. See generally LaFave, supra, § 4.2. A blanket rule barring the government from resubmitting a warrant application to a second magistrate would do little, if anything, to protect Fourth Amendment values. Such a rule would, however, cause courts to suppress evidence found in searches pursuant to warrants issued on probable cause. The district court correctly rejected such an approach.

Pace, 898 F.2d at 1230-31, accord United States v. McCoy, 678 F. Supp. 2d 1336,

1351 (M.D. Ga. 2009) (rejecting argument that earlier denial of warrant constituted

res judicata; "a Federal Magistrate Judge's denial of a search warrant application

cannot be a final judgment on the merits" (citing Pace, 898 F.2d at 1230-31)).

This principle is particularly important here where the original search warrant application did not have available the physical evidence observable in plain view when law enforcement officials looked in the car window when it was parked in the public parking area of the apartment complex. This observed physical evidence was in this case important information that was not available when the search warrant application was presented to the DeKalb County magistrate. Indeed, McCray does not even contend here that the Coweta County warrant was not supported by probable cause or that the Coweta County issuing judge was not neutral and detached. He argues only a bright-line estoppel test to prohibit a second warrant application even where new information is available. The argument is not rational or legally reasonable. The Court agrees with the Magistrate Judge's conclusion that A.B.'s statements that McCray transported her in the Nissan for prostitution, which was corroborated by (1) the GCPD officers' observations at the Tucker residence, and (2) what the officers at the apartment complex could see in plain view, supports a finding that there was probable cause to seize the vehicle and search it. Coweta County officers were not estopped from obtaining a warrant in Coweta County after the DeKalb County judge denied the warrant then sought by the DeKalb County officer.

30

McCray next challenges the legality of the Coweta County Sheriff Deputies' seizure of the Nissan in DeKalb County based on McCray's arrest.  The Magistrate Judge found that Coweta County Sheriff Deputies had the authority to arrest McCray in DeKalb County and to seize his vehicle and transport it back to Coweta County to search it pursuant to a warrant.  The Magistrate Judge found that, under Georgia law, a sheriff's deputy is a law-enforcement or peace officer and thus may make arrests outside of his or her county of residence, and, in any case, a violation of state law in procuring a warrant or conducting a search is immaterial to whether a federal court must suppress evidence.  (R&R at 41-42).  The Court agrees that Coweta County Sheriff Deputies had the authority to arrest McCray in DeKalb County and to seize his vehicle and transport it to Coweta County to search it pursuant to a warrant.  See Wells v. State of Georgia, 426 S.E.2d 231, 233 (Ga. Ct. App. 1992) ("A law enforcement officer may make an arrest without a warrant for an offense committed in his presence. . . .  This is true even if the arrest is outside his jurisdiction."); United States v. Hinton, 113 F. Supp. 3d 1277, 1285 (N.D. Ga. 2015) ("[T]he critical inquiry before the Court is whether the challenged search violated Defendant's Fourth Amendment rights, not state law.").

Even if the Coweta County officers were estopped from obtaining or acting upon the Coweta County search warrant—which the Court finds they were not—

31

the "automobile exception" to the Fourth Amendment's preference for warrants

applied in this case.  The automobile exception allows a police officer to conduct a

warrantless search of a vehicle "if (1) the vehicle is readily mobile; and (2) the

police have probable cause for the search."  United States v. Lindsey, 482 F.3d

1285, 1293 (11th Cir. 2007).  The Magistrate Judge found that there is no dispute

the Nissan was operational and thus readily mobile.  No party objects to this

finding, and the Court agrees this first requirement of the automobile exception is

satisfied.

As to the second requirement, McCray argues that, when the DeKalb County

magistrate judge "made the finding that the police lacked probable cause, the

police lost the ability to invoke the automobile exception [because a] condition

precedent of the automobile exception is that the police must have probable cause

to believe that the vehicle contains contraband or evidence of a crime."

(Obj. at 3-4).  The Court disagrees.  First, McCray does not offer any support for

his argument that the DeKalb County magistrate judge's finding barred the DeKalb

and Coweta County officers' subsequent conduct.  Second, the Court finds that,

based on A.B.'s statements, the DeKalb County and Coweta County officers'

investigation at the scene of McCray's arrest, and the GCPD officers' observations

at the Tucker residence, probable cause existed to believe that the Nissan contained

32

evidence of a crime.  Once the probable-cause and operational prongs of the

automobile exception are found to exist, the Fourth Amendment allows law

enforcement to seize the vehicle and then search it later.  <u>Michigan v. Thomas</u>,

458 U.S. 259, 261 (1982).  On *de novo* review, the Court denies McCray's Motions

to Suppress Evidence.

### 3.    Motion for Return of Property

The Magistrate Judge found that, to the extent McCray did not abandon his

request for return of property by failing to make an independent argument in his

post-hearing briefs as to his entitlement to relief under Federal Rule of Criminal

Procedure 41(g), his Motion for Return of Property should be denied.  Rule 41(g)

provides, in part, as follows:  "A person aggrieved by an unlawful search and

seizure of property or by the deprivation of property may move for the property's

return."  To prevail on such a motion, "a criminal defendant must demonstrate that

(1) he is entitled to lawful possession of the seized property; (2) the property is not

contraband; and (3) either the seizure was illegal or the government's need for the

property as evidence has ended."  <u>Ferreira v. United States</u>, 354 F. Supp. 2d 406,

409 (S.D.N.Y. 2005) (citations omitted); <u>see also</u> <u>United States v. Garcon</u>,

406 F. App'x 366, 369 (11th Cir. Dec. 21, 2010) (recognizing that "a Rule 41(g)

motion is properly denied if the defendant is not entitled to lawful possession of

the seized property, the property is contraband or subject to forfeiture, or the

government's need for the property as evidence continues") (citation omitted).

The Magistrate Judge found that McCray failed to satisfy the first and third prongs

of this standards.

McCray now argues that the Government "has admitted the computer and

cell phone seized from the apartment were s[e]ized illegally and were not going to

be used at trial."  (Obj. at 5).  This argument, at most, establishes only the third

prong of the Rule 41(g) standard.  Because McCray failed to establish the first

prong of the Rule 41(g) standard, he is not entitled to return of property, and his

Motion for Return of Property is denied.

4.   Motion to Suppress Statements

McCray's basis for seeking to suppress his post-arrest statements was the

illegality of his arrest.  The Magistrate Judge found that, because McCray was

lawfully arrested, his statements were lawfully obtained and not the fruits of an

unlawful arrest.  In his Objections, McCray maintains, without any further detail,

that his arrest was unlawful and thus any statement obtained subsequent to the

arrest was likewise unlawfully obtained.  (Obj. at 5).[13]  The Court having found, on
*de novo* review, that McCray's arrest was lawful, the Court concludes the
statements McCray seeks to suppress were also lawfully obtained.  In addition, the
Government proved that it advised McCray of his rights pursuant to <u>Miranda</u>
<u>v. Arizona</u>, 384 U.S. 436 (1966), that he knowingly and voluntarily waived those
rights and agreed to answer questions, and that his subsequent statements were
voluntarily made.  McCray's Motion to Suppress Statements is denied.

  C. <u>Motions to Dismiss</u>

  McCray seeks dismissal of Counts Four and Five of the second superseding
indictment, both alleging obstruction in violation of 18 U.S.C. § 1591(d), on the
grounds that double jeopardy bars his being tried for obstruction following his
earlier guilty plea to contempt of court arising out of the same conduct.

  "The Double Jeopardy Clause protects against a second prosecution for the
same offense," including "multiple punishments for the same offense."
<u>Brown v. Ohio</u>, 432 U.S. 161, 165 (1977) (quotation omitted).  "Where
consecutive sentences are imposed at a single criminal trial, the role of the
constitutional guarantee is limited to assuring that the court does not exceed its

---

[13] McCray does not explain the basis for his contention that his arrest was
unlawful.  The Court notes that McCray was arrested pursuant to an arrest warrant,
the validity of which McCray does not appear to challenge.

legislative authorization by imposing multiple punishments for the same offense."
Id.; see also Jones v. Thomas, 491 U.S. 376, 381 (1989).

To determine whether a double jeopardy violation has occurred, the Court applies the Supreme Court's test in Blockburger v. United States, 284 U.S. 299 (1932). "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Id. at 304. In other words, the test "inquires whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution." United States v. Dixon, 509 U.S. 688, 696 (1993).

The Court concludes that McCray's trial on Counts Four and Five is not barred by the double jeopardy clause by his prior conviction for contempt. Count Four of the second superseding indictment alleges conduct occurring between August 2015 and September 2015, ([71] at 5), and the contempt conviction was based on conduct alleged to have occurred in February 2016. McCray's argument that Count Four of the first superseding indictment was incorporated into the contempt charge is discredited by the plain language of the contempt charge, which described Count Four only to explain to the chronology of the case to the Court,

36

and clearly set forth that the violation alleged was based on conduct that occurred in February 2016.  Trial on Count Four is not barred by the double jeopardy clause, because Count Four and McCray's prior conviction for contempt are not based on the "same act or transaction."  Blockburger, 284 U.S. at 304.

Trial on Count Five also is not barred by the double jeopardy clause, because prosecutions under Sections 401(3) and 1591(d) contain different elements.  To support a Section 401(3) contempt conviction, "'the government must prove: (1) that the court entered a lawful order of reasonable specificity; (2) the order was violated; and (3) the violation was willful.'"  United States v. Bernardine, 237 F.3d 1279, 1282 (11th Cir. 2001) (quoting United States v. Maynard, 933 F.2d 918, 920 (11th Cir. 1991)); see also United States v. KS&W Offshore Eng'g, Inc., 932 F.2d 906, 909 (11th Cir. 1991) ("The essential elements of criminal contempt are a lawful and reasonably specific order of the court and the willful violation of that order.").  Section 1591(d) provides that "[w]hoever obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section, shall be fined under this title, imprisoned for a term not to exceed 20 years, or both."  18 U.S.C. § 1591(d).  To convict a defendant of that charge, the Government must prove beyond a reasonable doubt that the defendant knowingly obstructed or attempted to obstruct the enforcement of

37

Section 1591, elements not present in a Section 401(3) prosecution.  The elements of the two offenses are different, and double jeopardy does not bar trial on Count Five.  See United States v. Farah, 766 F.3d 599, 612 (6th Cir. 2014) (applying Blockburger and finding conviction under Section 1591(d) was not barred under double jeopardy by previous contempt conviction under Section 401(3)).  McCray's Motions to Dismiss are denied.

## III.   CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Magistrate Judge Alan J. Baverman's Final Report and Recommendation [93] is **ADOPTED**.

**IT IS FURTHER ORDERED** that McCray's Objections to the R&R [101] are **OVERRULED**.

**IT IS FURTHER ORDERED** that McCray's Motions to Suppress Evidence and Statements, Motion for Return of Property, and Motions to Dismiss [13], [15], [20], [21] [66], [83] are **DENIED**.

**SO ORDERED** this 25th day of July, 2017.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE