**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION FILE** |
| **v.** | **NO. 1:15-CR-212-TCB-AJB** |
| **WILLIAM CALVIN McCRAY,**<br>**a/k/a "Skrill Will,"** | |
| **Defendant.** | |

**UNITED STATES MAGISTRATE JUDGE'S**
**FINAL REPORT AND RECOMMENDATION**

This case was decertified by the District Judge and referred back to the undersigned to determine Defendant William Calvin McCray's competency to stand trial. [Doc. 152]. For the following reasons, the undersigned **RECOMMENDS** that the District Court deem McCray **COMPETENT TO STAND TRIAL WITH ACCOMMODATIONS**. The undersigned also **RECOMMENDS** that because the accommodations proposed by the Government's expert are impractical, given the dynamic nature of a criminal jury trial, steps should be taken in advance of a trial to accommodate Defendant's cognitive deficiencies in order to improve his ability to assist his counsel in defending the case.

## I.   **BACKGROUND**

Defendant McCray is charged in a second superseding indictment with conspiracy to commit sex trafficking of a minor, in violation of 18 U.S.C. § 1594(c) (Count One); the substantive offense of sex trafficking of a minor, in violation of 18 U.S.C. §§ 1591(a), (b)(1) and (b)(2) (Count Two); transportation of a minor, in violation of 18 U.S.C. § 2423(a) (Count Three); and obstructing the enforcement of § 1591(a), in violation of 15 U.S.C. § 1591(d) (Counts Four and Five). [Doc. 71].

After denying Defendant's motions to suppress evidence and statements, for return of property, and to dismiss, [Doc. 102], and ruling upon the Government's motions filed before the scheduled trial, [Doc. 102], the District Court ordered McCray to undergo a competency evaluation. [Doc. 143]. On April 25, 2018, the Warden at the Metropolitan Correctional Center in Chicago, Illinois, ("MCCC"), submitted the report of David M. Szyhowski, Psy. D., [Doc. 145]. On June 21, 2018, McCray filed a motion to determine his competency, [Doc. 149], noting some of Dr. Szyhowski's findings and those of Adriana Flores, Ph. D., who had evaluated Defendant on November 30, 2017, and May 1, 2018. [*Id.* at 5].

After the District Judge decertified the case and referred it back to the undersigned to conduct a competency hearing, [Doc. 152], the undersigned held an evidentiary hearing, [Doc. 162, (T_)], after which the parties filed briefs,

2

[Docs. 167, 168, 170].  Per the Court's direction, McCray also filed a surreply to address the appropriate accommodations to compensate at trial for McCray's intellectual functioning.  [Doc. 193].  With briefing completed, the matter of McCray's competency is ripe for recommended resolution.

## II.   **APPLICABLE LAW**

"The Due Process Clause of the Fifth Amendment prohibits the government from trying a defendant who is incompetent."  *United States v. Rahim*, 431 F.3d 753, 759 (11th Cir. 2005) (citing *Pate v. Robinson*, 383 U.S. 375, 378 (1966)); *see also Indiana v. Edwards*, 554 U.S. 164, 170 (2008) ("[T]he Constitution does not permit trial of an individual who lacks 'mental competency.' ").  An individual is considered competent to assist in his proceedings when he has the sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and he has a rational and factual understanding of the proceedings against him.  *United States v. Nickels*, 324 F.3d 1250, 1252 (11th Cir. 2003); *see Godinez v. Moran*, 509 U.S. 389, 396 (1993); *Dusky v. United States*, 362 U.S. 402 (1960); *Johnston v. Singletary*, 162 F.3d 630, 634 n.4 (11th Cir. 1998); *United States v. Hogan*, 986 F.2d 1364, 1371 (11th Cir. 1993); *United States v. Cruz*, 805 F.2d 1464, 1479 (11th Cir. 1986); 18 U.S.C. § 4241(a), (d), (e) (noting that a court must find a defendant incompetent

when a preponderance of the evidence shows that "the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense"); *see also United States v. Collins*, 834 Fed. Appx. 537, 541 (11th Cir. Nov. 9, 2020) ("Because at their core, competency determinations have 'a modest aim: [they] seek[ ] to ensure that [the defendant] has the capacity to understand the proceedings and to assist counsel.' ") (quoting *Godinez*, 509 U.S. at 402).

The following factors are relevant in assessing competency:  "a defendant's past medical history, the opinion of psychiatric experts, and the defendant's behavior during trial."  *Woodall v. Foti*, 648 F.2d 268, 273 (5th Cir. Unit A, June 16, 1981)[1]; *see also Drope v. Missouri*, 420 U.S. 162, 180 (1975).  Expert opinion is not binding on the court if there is a reason to discount it.  *United States v. Bradley*, 644 F.3d 1213, 1268-69 (11th Cir. 2011); *United States v. Izquierdo*, 448 F.3d 1269, 1278-79 (11th Cir. 2006).

---

[1]     In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent decisions of the Fifth Circuit, including Unit A panel decisions of that circuit, handed down prior to October 1, 1981.  *See W.R. Huff Asset Mgmt. Co., L.L.C. v. Kohlberg, Kravis, Roberts & Co., L.P.*, 566 F.3d 979, 985 n.6 (11th Cir. 2009); *United States v. Todd*, 108 F.3d 1329, 1333 (11th Cir. 1997).

III.  **FACTS**

In his report and testimony, Dr. Szyhowski[2] diagnosed McCray with Antisocial Personality Disorder[3] and Specific Learning Disorder (Reading), provisional, and ruled out Borderline Intellectual Functioning.[4]  Govt. Ex. 2 ([Doc. 158-3]) at 9; T21.  He explained that a learning disorder with reading impairment pertains to a person's ability to read and to learn to read and deals

_____

[2]    Dr. Szyhowski is a forensic psychologist with the Bureau of Prisons ("BOP").  T11.  He received a doctorate in clinical psychology in 2008 from the Adler School of Professional Psychology in Chicago.  *Id.*; *see also* Govt. Ex. 1 ([Doc. 158-1]) (Szyhowski's curriculum vitae).  He has worked for the BOP for ten years, T12, and during his tenure he has performed approximately 250 evaluations, primarily for competence to proceed, but also has conducted evaluations for the insanity defense and other evaluations related to sentencing consideration, such as hospitalization upon sentencing.  T15.  He has been qualified as an expert witness between twenty-five and thirty times and has concluded about eighteen to nineteen percent of the time that the defendant was not competent to proceed.  *Id.*  He is called approximately eighty-five percent of the time by the Government and fifteen percent of the time for the defense.  T16.  His testimony has been rejected twice.  T17.  The parties stipulated to the expert qualifications of their respective expert witnesses.  T20.

[3]    Dr. Szyhowski described a personality disorder as a characterological class of illness that is composed of a person's consistent and ingrained behaviors.  Those with Antisocial Personality Disorder have a proclivity to violate the norms and standards of general society by being more prone to criminal action, less empathetic, and exhibit "a lot less moral in character qualities than we see in the typical person."  T21.

[4]    Dr. Szyhowski testified that he would need more information to establish the diagnosis of Borderline Intellectual Functioning.  T22.

5

specifically with a noted deficit in the ability to read and comprehend. T21-22. He explained that he designated the diagnosis "provisional" based on the documentary evidence he had at the time of his evaluation. T21-22.

Dr. Szyhowski observed that McCray displayed good attention and concentration skills and "was easily able to answer most questions that were posed to him." Govt. Ex. 2 at 4. He noted that McCray demonstrated the capacity to seek clarification and to ask for questions to be repeated when he did not initially understand. *Id.* Dr. Szyhowski concluded that, generally, McCray appeared to have unimpaired recent and remote memory functions. He also found McCray's problem-solving and decision-making abilities to be intact as shown by his ability to consider outcomes to hypothetical problems. His judgment and insight were deemed fair, and he displayed the capacity to think critically about his situation. *Id.*

Dr. Szyhowski did not review any school records, although he knew that McCray was in special-education classes and received tutoring in an intensive-resource class. T71, 87. Dr. Szyhowski related that McCray completed high school with the assistance of a tutor but was unable to attend college because his ACT scores were inadequate. T87. He also understood that McCray dropped out of a music-education degree program and generally worked at manual-labor

6

jobs.  T88.  Dr. Szyhowski also was aware that McCray had been denied disability benefits.  Govt. Ex. 2 at 3.

It was Dr. Szyhowski's opinion that McCray was competent to proceed because he had a rational understanding of the case proceedings.  T23.[5]  This was based in part on Dr. Szyhowski's review of the text and images of the Backpage advertisement that the Government contends McCray used in his prostitution business, Govt. Ex. 3 ([Doc. 158-4])[6]:  Dr. Szyhowski noted the advertisement contained a lot of nuance by simultaneously conveying overt and covert messages, T25-26, which spoke to McCray's practical abilities "to understand the nuance not only just of language but of circumstances as well, and to fluidly navigate kind of pitfalls and roadblocks that may serve to get a person in trouble."  T26-27.  At the same time, Dr. Szyhowski acknowledged that the terms used were simple and colloquial.  T73-74.

Dr. Szyhowski also relied upon his review of three-way phone calls made by McCray while he was in custody, Govt. Ex. 5 ([Doc. 158-6]), and he testified that

------------------------

[5]    He did not evaluate McCray's competency at the time of the offense.  T23.

[6]    Dr. Szyhowski acknowledged that McCray's name was not on the advertisement.  T72.

those calls indicated to him McCray's ability to behave in an organized manner and critically think about his current set of legal circumstances. T30-31. He described these communications as reflecting a very adaptive way of communicating with the victim as well as communicating germane information about his legal circumstances, including discussing important evidentiary matters and some of the direction that he wished his defense to proceed, such that he had the underlying capacity to understand legal matters and participate in a meaningful way in his overall defense. T31.

Dr. Szyhowski also based his opinion on his clinical interviews (six visits totaling eight to nine hours), testing, and collateral sources, including the ones just discussed. T32. He concluded that McCray was not faking and had made good efforts. T37, 107. He also reviewed McCray's criminal history, which included a trial and a guilty plea, T35, as well as reports from other staff members at MCCC, T36.

Dr. Szyhowski performed the following tests and evaluations: Clinical Interview and Mental Status Evaluation ("CI&MSE"), Millon Clinical Multiaxial Inventory-Fourth Edition ("MCMI-IV"),[7] Evaluation of Competency to Stand

---

[7] Dr. Szyhowski described the MCMI-IV as an objective personality assessment comprised of 190 true-false questions designed to probe for issues of

Trial-Revised Edition ("ECST-R"),[8] and the Test of Regular Word Reading

Efficiency ("TIWRE").[9]  T22-23, 38.  Dr. Szyhowski testified that the MCMI-IV

has an approximate fourth-grade reading level.  He concluded that because McCray

had poor academic achievement and difficulty reading, as confirmed by the TIWRE,

the Minnesota Multiphasic Personality Inventory, Second Revised Edition

("MMPI-II"), which has a sixth-grade reading level, was not warranted.  T39.  He

testified that he would have preferred to give the Wechsler Adult Intelligence Scale

_____

pathology, i.e., depression, anxiety, psychosis, and for symptoms consistent with various mental illnesses.  T37.

[8]     Dr. Szyhowski testified that the ECST-R is an objective measurement of competency derived from the *Dusky v. United States*, 362 U.S. 402 (1960), standard to determine three broad categories: factual understanding, rational understanding, and the ability to consult with counsel.  It is a guided interview where the examiner asks prescribed questions in each of the domains and records the answers, and the examiner also may ask optional questions for clarification. T38-39.  Dr. Szyhowski acknowledged that one of the criticisms of the ECST-R is that the scoring is heavily weighted towards psychotic illnesses as opposed to other identified illnesses but opined that even in a case such as this, where McCray was not suffering from psychosis, the test is helpful in showing whether the defendant understands the proceedings and can assist counsel.  T106, 120-21.

[9]     Dr. Szyhowski explained that the TIWRE consists of irregular words presented to the individual, who then is asked to pronounce the words.  A person's capacity to pronounce irregular words is related to their vocabulary and reading abilities.  The TIWRE estimates a subject's reading level and compares that assessment to a national sample.  Govt. Ex. 2 at 6; T38.

Fourth Edition ("WAIS-IV"),[10] however, security precautions in the unit where McCray was housed did not allow that test to be administered.  T40.[11]

Because of McCray's difficulties with reading, he requested an alternative method of administration of the MCMI-IV and Dr. Szyhowski therefore read the test questions to him.  Govt. Ex. 2 at 5; *see also* T48, 77-78.  As a result, however, it took twice as long as usual to conduct the test (two hours as opposed to one hour), particularly since Dr. Szyhowski had to repeat some questions and define some terms.  T48, 77-78.  McCray was unable to answer ten out of 195 questions. T80-81, 83-84, 109.  Dr. Szyhowski acknowledged that McCray had difficulty with many of the vocabulary terms and that, for those vocabulary terms he did not understand, McCray requested an explanation in order to answer.  *Id.*

---

[10]     Dr. Szyhowski testified that the WAIS-IV measures overall intelligence and that it is comprised of ten to fifteen subtests providing index scores for four different broad areas, which then are calculated into a full-scale intelligence score.  T61-62.

[11]     Dr. Szyhowski first interviewed McCray in general population, T74, but thereafter interacted with McCray in the Special Housing Unit.  T75.  All but the TIWRE were administered while McCray was handcuffed with his hands behind his back.  T75-77.

Dr. Szyhowski wrote in his report how this testing manner inhibited evaluating the test results:

> While he was able to understand the items when words and phrases were explained to him, there is no normative data to suggest alternative questions possess the same external validity. As it could not be determined the questions he was asked were equivalents to those of the MCMI-[IV], no attempt at scoring was made.

*Id.* Still, Dr. Szyhowski concluded that the MCMI-IV results had some value and opined that they showed that McCray had an adequate attention span. *Id.* Dr. Szyhowski also described the actions McCray needed to take in order to better understand and answer the questions posed to him during the test:

> McCray was often observed whispering the item to himself in brief chunks until he had a clearer understanding of what information the item was seeking. He would then respond with the required True/False format, sometimes qualifying his answers. The third noteworthy piece of data from this administration was [McCray's] ability to understand information when explained to him using more rudimentary and lower grade-level. He also appeared to understand questions better when given time to repeat them, process what they meant, and when given an environment where the time-constraints were eliminated.

*Id.* at 5-6. However, despite McCray's limitations and the obstacles to conducting the test as designed, Dr. Szyhowski concluded that the MCMI-IV demonstrated that McCray was relatively intact mentally, except for certain cognitive abilities related to reading. He appeared to be capable of managing his day-to-day routines such as hygiene, acquiesced fairly well to most of the rules, and attended programs

11

at his leisure.  He had a fairly normal adjustment to the facility. T43-44.  However, as to the Assessment of Response Style portion of the MCMI-IV, Dr. Szyhowski concluded that McCray was not responding honestly.  T44-45.  He nevertheless described McCray as motivated to take the test and genuinely interested in wanting to understand the content of the questions.  T48-49.  Dr. Szyhowski testified that although the MCMI-IV had limited utility because of how the test had to be conducted, he indicated that McCray had the capacity to try and understand things when he was motivated to understand them.  T49, 84-86.  However, he acknowledged that the MCMI-IV demonstrated more of McCray's devotion to complete the test rather than his understanding, and he conceded that McCray became frustrated at times, and as a result, merely assented to the answers.  T85, 86.

Next, Dr. Szyhowski determined that, based on the TIWRE, McCray was reading at a fourth-grade level, which was well below average level, and he therefore indicated that McCray was unlikely to be able read complicated legal materials on his own. T50, 90; Govt. Ex. 2 at 6.  Dr. Szyhowski additionally opined that because most legal materials are written beyond that level, McCray may not be able to draw the information out on his own and would need to have it explained to him.  T51.

Finally, as to the ECST-R, Dr. Szyhowski concluded that McCray has sufficient factual understanding of the charges against him, a sufficient rational understanding of the case proceedings, and an unimpaired ability to work with his counsel.  T54-56.  First, Dr. Szyhowski concluded that McCray understood the charges against him were " '[p]rostitution of a minor.' "  Govt. Ex. 2 at 6.[12, 13] Although he did not discuss the concepts of conspiracy or interstate nexus with McCray, Dr. Szyhowski thought that McCray could understand those concepts with further explanation.  T95-96.  He also understood that upon conviction he was facing a number of years in prison.  Govt. Ex. 2 at 6 ("I have heard so many numbers.  Something about life, thirty years, forty years, twenty[-]five years.").

Dr. Szyhowski also concluded that McCray verbalized an understanding of the adversarial nature of the legal system and the roles of the prosecutor, defense lawyer, judge, and jury.  *Id.* at 6-7, 9.  Dr. Szyhowski additionally noted that McCray needed some prompting before he answered that the role of counsel was

---

[12]     However, Dr. Szyhowski acknowledged that despite his prior jury trial experience, McCray expressed concern that the Government would try to place undercover detectives on the jury.  T93-94.

[13]     Although he did not discuss the concepts of conspiracy or interstate nexus with McCray, Dr. Szyhowski thought that McCray could understand those concepts with further explanation.  T95-96.

13

in part to try to minimize punishment, and McCray also incorrectly stated that he personally could talk to the prosecutor.   T104-05. At the same time, McCray expressed to Dr. Szyhowski that he wished that his lawyer would listen to him and give him advice.  Govt. Ex. 2 at 7.[14]

Dr. Szyhowski also noted that McCray questioned whether an undercover officer could be placed on the jury, since the "government picks them out."   *Id.* However, after it was explained that a jury summons was sent to potential jurors and that the prosecution and defense collaborate in the process of picking a jury, Dr. Szyhowski concluded that McCray was not dead-set in his belief that law enforcement agents would be placed on the jury:

> In addressing his identified belief that jurors could be undercover law enforcement officers, he was able to demonstrate flexibility. He was able to consider that all jurors were not hand-picked agents of the government, but the defendant still retained his misgivings about trusting individuals he did not know to render a verdict in his case.  He was able to further temper his current concerns regarding any biases of a jury, reflecting on his own positive experiences where he was once found not-guilty by a jury.

*Id.*

---

[14]      The Court observes that at the time of Dr. Szyhowski's evaluation, McCray was represented by different counsel.

Dr. Szyhowski also opined that McCray demonstrated a sound rational understanding of the current legal proceedings. McCray recognized that the case could be resolved through plea bargaining or a trial, knew that a plea and a trial were different, and knew that the choice how to proceed was up to him in consultation with his lawyer. He understood the concept of plea bargaining, remarking that he wished he had not pleaded guilty in an earlier case because he received a greater sentence than he anticipated. *Id.* He also stated that he would consult with persons he trusts about any plea bargaining in the present case. He also understood that at a trial, the prosecution and the defense have the opportunity to present evidence and that witnesses testify. *Id.* And while Dr. Szyhowski opined that McCray understood the nuances involved in either pleading guilty or going to trial, Dr. Szyhowski did note some problems McCray had grasping his current case:

> As it relates to his current charges, Mr. McCray expressed difficulty in understanding legal terminology and stated he does not understand all of the nuances of his case. He stated he disagrees with statements made against him as well as some of the evidence. He stated he also does not understand how to read legal statutes or how to apply them to his case. In general, he appears to understand broad issues related to his case, but struggles with some of the fine details.

*Id.* at 8. Thus, Dr. Szyhowski opined that while McCray could comprehend direct testimony about his own statements, he would need more assistance to comprehend circumstantial evidence or perhaps testimony about coded language. T125.

15

Dr. Szyhowski also concluded that McCray understood the importance of working cooperatively with his lawyer.  Govt. Ex. 2 at 8.  McCray admitted that he did not understand everything about his case and that his failure to comprehend caused his lawyer to become frustrated with him.  *Id.* at 9.  Although Dr. Szyhowski noted McCray's complaints about working with his then-current counsel, McCray acknowledged that his relationship with present counsel was better than with those he previously had and his current attorney has attempted to explain the case to him in more detail.  *Id.*; T56.  Dr. Szyhowski noted that McCray is requesting additional time with his lawyer to understand the nuances of the case, as opposed to simply agreeing to what an attorney proposes.  Govt. Ex. 2 at 8.

Dr. Szyhowski further commented that although McCray appears to understand broad legal issues and some evidentiary matters related to his case, in part based on his past experiences, he does not understand everything about his case, which McCray believes frustrates his lawyer.  Although he was told (presumably by counsel) to "look in books," he has poor reading comprehension and is unable to understand the nuances of language in federal codes.  And, when he is in court and does not understand what is being said or the words used by lawyers are unfamiliar, his mind wanders quickly when he is not involved in the discussion.  Thus, Dr. Szyhowski concluded that McCray understands best when

16

information is broken down into "smaller chunks and in a vernacular closer to his

comprehension level":

> In these situations, he is able to sustain his attention better and
> ultimately articulate his understanding. He stated he believes he
> would understand the details of his charges, the evidence against
> him, as well as what is happening in legal proceedings if his
> attorney would take more time to explain things to him using words
> he understands. This is consistent with his approach to the forensic
> assessment. He was often faced with questions that he did not
> immediately understand and asked for clarification. When the
> clarification was provided in terms he did understand, he was able
> to answer the questions relevantly. This suggests his underlying
> capacity to understand the proceeding is unimpaired, but he does
> have difficulty with the vocabulary used in legal proceedings.

*Id.* at 8-9.

Dr. Szyhowski therefore concluded that McCray did not suffer from a severe

mental disease or defect that negatively impacted his competency-related

functional abilities, opining that he appeared to possess sufficient

competency-related functional ability for continuation of the criminal proceedings.

*Id.* at 9. He viewed McCray's mental-health prognosis as stable. He described his

reading difficulties as a stable feature of his learning style. *Id.* at 11. In conclusion,

Dr. Szyhowski opined that, based on clinical interviews, the assessments used, the

recorded jail calls, and McCray's prior court-proceeding history ("such as knowing

that he has been going through these hearings for quite some time"), McCray was

competent to stand trial, since he (1) had the ability to aid and assist his lawyer in

17

the preparation and execution of a defense; (2) understood the role of his lawyer; (3) had the ability to cooperate with and advise his lawyer; (4) understood the nature of court proceedings; (5) understood the role of other participants in the proceedings such as the judge and the prosecutor; (6) understood the seriousness of the criminal charges against him; (7) had the ability to understand his legal rights like his rights to a public trial, to counsel, to hear witness testimony, and to testify in his own defense; and (8) understood the right to enter different kinds of pleas in a criminal case, including plea bargaining.  T67-69.

Still, Dr. Szyhowski opined that McCray needed accommodations at trial. His learning disorder and below-average intellectual abilities mediate the speed at which McCray processes information as well as the format in which the information is presented to him, with Dr. Szyhowski relating that his comprehension improved during testing when questions were presented to him orally, although he routinely asked for clarification and explanation of concepts in either colloquial language or in language that used vocabulary at lower grade levels. He noted, however, that once McCray received information in this fashion, he was able to paraphrase it in a contextually correct manner:

> When Mr. McCray discussed various aspects of his criminal case, he often did so using colloquial terms, but was able to demonstrate an appropriate understanding of the nature of the case and as well as summarize his experiences with his attorney and in court.  This

is important as it reveals how the defendant processes information and his ability to learn.  It appears the defendant becomes easily discouraged when he does nor grasp what he is reading or what is being presented to him.  During these times he may assent to what is being discussed as a means of lowering his frustration.

Govt. Ex. 2 at 11.  As a result, Dr. Szyhowski concluded that, although McCray was competent to proceed, he suffers from some comprehension problems that require accommodations:

The biggest difficulty that I see with Mr. McCray is in his ability to read.  He had mentioned that he's been given case law before by attorneys and told to go read it, and he's acknowledged that he has difficulty doing that.  And I believe the testing well supports that he probably cannot read case law effectively, which means that he is going to have to have more significant pretrial contacts with his attorney before he goes into hearings or trials in order to prepare himself.  He's going to need a bit more attention from other people explaining things to him, going over different scenarios, and making sure he understands them.  That way he's not stuck at a trial situation or in a hearing not understanding what's going on.  So I believe with more preparation he can be better prepared for what likely happens at hearings and trials that are related to his case.

T56-57, 97, 123-24 (describing McCray's greatest difficulty as processing information, particularly written, with some conceptual difficulties in processing oral information).  Dr. Szyhowski recommended that to mitigate these impairments,

19

McCray should be given an accommodation of additional time to consult with counsel or another person at counsel table to explain things to him, as follows:

> I think if Mr. McCray had the opportunity to speak with counsel or someone appointed by his counsel. I know that sometimes defense investigators and other legally trained people are present at the table. I think if he had the opportunity during proceedings to have someone to check in with, he might be able to then get clarification on what's going on. Also, during recesses and breaks would be another opportunity for him to be able to consult with people but, I think, anytime it comes to a point when he needs to make a decision or when there's a critical juncture about does he understand something that's very relevant to his case and not just a routine matter, to have him explain things back in his own words. That way he's not likely to just be able to assent and say, yes, I understand when, in fact, he does not. But that way it would give individuals some assurances that, yes, this is what he understands and therefore is his understanding sufficient to proceed at that point.

T98; *see also* Govt. Ex. 2 at 11-12. Dr. Szyhowski acknowledged that he could not determine what the Court could consider was a straightforward matter as to which McCray needed no assistance and one that he did. T126. Nonetheless, he opined that the Court could address some of those issues as well by making sure that McCray has sufficient time to interact with counsel, provide the opportunity to take breaks or to allow him breaks to interact with his attorney, and assign a second attorney. He described the role of the second attorney as allowing him "to have someone to consult with at the defense table while his attorney is at the podium" and "giv[ing] him a resource that he could interact with and ask questions to during

20

the course of a proceeding." T57.  He further opined that two lawyers would reduce McCray's frustration level by giving him access to help him understand legal matters and assist him in understanding the process.   T118.   Dr. Szyhowski additionally explained that, due to the fact that in courtroom proceedings a defense lawyer speaks for his client and manages certain aspects of the trial such that not everything has to be approved by the defendant, periodic check-ins at critical times and other times when consultation is more opportune, in conjunction with the presence of second counsel at counsel table to explain things and record his questions needing answers at a reasonable if not contemporaneous time, would be an appropriate accommodation.   T99-101; *see also* T124.   At the same time, Dr. Szyhowski pointed out that while it is not unusual for a person to "zone out" after an hour or more of court proceedings, during the MCMI-IV administration, McCray was able to focus and remain engaged for two hours without breaks. T118-19.

As for the tests discussed by defense expert Dr. Adriana Flores in her report (discussed below), Dr. Szyhowski took issue with the reason Dr. Flores gave for not administering the Inventory of Legal Knowledge Test ("ILKT")[15]—because

---

[15]      Dr. Szyhowski described the ILKT as an evaluation of malingering. It is comprised of sixty-one true-false questions that are read to the subject, with

McCray's poor reading skills prevented administration of this test—since the subject is read the questions by the examiner and not read by the subject himself. T58.  As for the MacArthur Competence Assessment Tool – Criminal Adjustment ("MacArthur"),[16] Dr. Szyhowski testified that he does not use that test because it is based on a vignette—a dispute in a bar where the assailant clubs the victim to death with a pool cue—that is unlike cases typically seen in federal court.  He preferred the ECST-R because it allows the subject to speak about his case.  T60-61, 121. He also disagreed with Dr. Flores's conclusion based on the WAIS-IV that McCray might have a lower IQ than tested (since she concluded his relatively high processing speed scores were outliers) because he indicated that one cannot accidentally score too high on the test.  T64, 66.  Instead, he would have concluded that McCray's processing-speed scores reflected his true abilities, but, in any event, his processing speeds are not linked to what he would have to do in court.  T66-67.

_____

one point assigned for correct answers and no points given for incorrect ones.  The "malingering" cutoff is a score below 47.  T58.  Dr. Szyhowski did not administer the test because he did not get the impression that McCray was feigning legal disability.  T60.

[16]     Dr. Szyhowski described the MacArthur as another *Dusky*-based test of competence-related abilities.  T60.

22

The defense expert, Dr. Flores,[17] met with McCray three times.  She first met with him in late November 2017 on report from defense counsel that there were communication difficulties, and she was asked to perform an evaluation of intellectual functioning.  T133.

———————————

[17]    Dr. Flores is a forensic and clinical psychologist in private practice. Her practice generally consists of referrals of patients from psychiatrists for assessment and diagnostic purposes, and she also conducts forensic psychotherapy for court purposes, workers compensation, and insurance.  T128.  Dr. Flores received a bachelor's degree in psychology from the University of Wisconsin at Milwaukee (1990), a master's degree in clinical psychology (1996), and her Ph. D. in clinical psychology (2000) from Miami University of Ohio.  *Id.*  She interned at Emory University School of Medicine for her Ph. D., where she also completed a post-doctoral fellowship specializing in adolescents at risk.  She became interested in forensics during her internship where she conducted competency-to-stand-trial and responsibility evaluations for Fulton County.  T129.  For ten years she was the attending forensic psychologist at Georgia Regional Hospital Atlanta; for six of those years she worked in an inpatient unit that housed individuals who already were found incompetent or adjudicated not guilty by reason of insanity and were undergoing a thirty-day evaluation before transfer to a longer-term facility.  *Id.*  For the last four years of her tenure at Georgia Regional, she was director of treatment programming.  T130.  In 2008, Dr. Flores started a part-time private practice and went full-time in 2011.  She operates Flores Forensic Clinical Psychology, where she conducts evaluations for forensic matters, civil matters, and performs psychotherapy and evaluations for diagnostic purposes.  *Id.*  Dr. Flores has completed several hundred evaluations for competency to stand trial and over a thousand evaluations for competency.  Most of the competency evaluations were performed for the State, and most of her mitigation work is for the defense.  T131. She has testified as an expert in eighty state and federal court proceedings.  T132. Seventy-five percent of her work is for defendants.  T195.

In connection with this evaluation, Dr. Flores met with McCray for three and one-half hours at the Robert A. Deyton Detention Facility.  T134; Govt. Ex. 7 ([Doc. 158-8]).  He signed an informed-consent form after she explained it to him. *Id.* at 2; Govt. Ex. 8 ([Doc. 163-1]); T221-22.  He reported a family history of learning problems and substance abuse on his mother's side.  Govt. Ex. 7 at 2.  He also reported being the victim of sexual abuse at age eight or nine by an adult female cousin.  *Id.*

McCray stated that he had been in special education due to a language-related learning disability, received speech therapy services at school, and was retained in the third grade.  *Id.*  Although he graduated from high school, he claims that he struggled and had "lots of help and tutoring."  *Id.*  He felt like someone watched out for him to make sure that he graduated.  *Id.* at 2-3.

Dr. Flores testified that review of McCray's school records showed that he had been in special education for a learning disability, primarily for verbal abilities. He was found to have extensive limitations in expressive and receptive language, and he received speech and language services throughout his schooling.  The individual evaluation plans ("IEPs") that Dr. Flores was able to review demonstrated an attempt to help McCray with verbal deficits, including learning to advocate for himself when he did not understand something.  In high school, his

24

IEPs included twenty-five hours per week in a small-class setting with other students in need and one-to-two hours per week of speech and language therapy. His non-special-education classes were in non-academic classes like physical education.   He graduated from high school with a special-education diploma. T138-40[18]; *see also* Govt. Ex. 7 at 3 (reflecting that testing in tenth grade revealed that he was reading at the fifth-grade level, doing math at the middle of the fourth-grade level, and writing at the end of the fourth-grade level, and had a Listing Comprehension score of 71, indicating abilities at the top of the Extremely Low range to the bottom of the Borderline range).

Dr. Flores noted that McCray had a history of unskilled labor and that he reported problems at most jobs due to his perception that he was too slow at completing tasks or was doing them incorrectly.   *Id.*   He also reported daily marijuana use since age thirteen.   *Id.* at 4.

Dr. Flores observed that on the date of the interview and testing, McCray was alert and capable of prolonged attention on the test items and the interview schedule.   He speech was normal in tone, volume, and rate.   He denied any

---

[18]     Dr. Flores noted that frequently these high-school special-education classes focused on vocational skills as opposed to more traditional high-school subjects such as algebra.  T141.

problems with concentration or memory, and none were noted.  His thought process was organized, logical, and coherent.  *Id.* at 4.

Given its scope, Dr. Flores considered the WAIS-IV the "gold standard" in intelligence testing.  T142-43.  The reasons for the WAIS-IV's usefulness in the competency-to-stand-trial analysis, she testified, is first, one of the areas that the WAIS-IV tests is verbal comprehension, skills that are very relevant to competency because those abilities measure a person's abstract reasoning and use of vocabulary. T143.  Second, another area tested was working memory, concerning a person's ability to hold onto a piece of information at the same time as the person does another task, which also is relevant to competency.  *Id.*[19]

Dr. Flores graded McCray in the first percentile on the WAIS-IV verbal-comprehension index, based on his score of 63.  Govt. Ex. 7 at 5.[20]  She

_____

[19]     Dr. Flores opined that another area that WAIS-IV tests, nonverbal skills, is not very relevant to competency.  T143-44.  She also appeared to agree with Dr. Szyhowski that McCray was average in his processing skills, but she testified that such abilities were not very relevant to competency.  However, she opined that his average ability in this skill highlighted McCray's disability in the verbal component, and this dichotomy probably contributed to his admission into special education.  T144-46.

[20]     Dr. Flores concluded that McCray did not have an intellectual disability because he scored average in the processing index but that his verbal comprehension is similar to that of a person with an intellectual disability.  T147-48.

described this as in the Extremely Low range, reflective of extensive deficits in vocabulary, general knowledge, and abstract reasoning, giving as examples his inability to know the meaning of the word "assemble" and incorrectly defining the word "consume." *Id.* at 6-7.

Dr. Flores also concluded that McCray's nonverbal-reasoning abilities, as measured by the Perceptual Reasoning Index ("PRI") (score of 71), were in the Borderline range and placed him in only the three-percentile range.[21] She found him to be in the Borderline range in the ability to sustain attention, concentrate, and exert mental control, because he graded 77, or sixth percentile, in working memory. *Id.*; T148. Dr. Flores noted, however, that these abilities were better-developed than his verbal-reasoning abilities, since he had difficulty with two tasks that demand mental control, that is, attending to and holding information in short-term memory while performing some operation or manipulation with it and then correctly producing the transformed information. Govt. Ex. 7 at 7. Finally, Dr. Flores observed that his ability to process simple or routine visual material without making errors was in the average range (thirty-fourth percentile), although

_____

[21] Dr. Flores wrote that the PRI is designed to measure fluid reasoning in the perception domain with tasks that assess nonverbal concept formation, visual perception and organization, visual-motor coordination, learning, and the ability to separate figure and ground in visual stimuli. Govt. Ex. 7 at 7.

27

the subtests that compose this portion of the test were quite variable, leading her to state that the result should be interpreted cautiously. *Id.*

Based on the WAIS-IV, Dr. Flores concluded that McCray had extensive intellectual deficits and that he functions between the top of the Extremely Low and bottom of the Borderline range of intellectual functioning. *Id.* Of note, she found that his general verbal-comprehension abilities were in the Extremely Low range and his general perceptual reasoning abilities were towards the bottom of the Borderline range. She found him to be in the Borderline range in the ability to sustain attention, concentration, and exertion of mental control but average in the ability to process simple or routine visual material without making errors, although she cautioned that further analysis would be needed due to the variance between these two scores. *Id.* His overall IQ score fell within the low end of the Borderline range because of his relative strength in processing speed abilities. However, she opined that his level of intellectual abilities is similar to that of individuals with a Mild Intellectual Disability. *Id.*

Dr. Flores noted that McCray scored in the one-tenth percentile in the Test of General Reasoning Ability ("TOGRA"), meaning that 99.9 percent of individuals his age have better reasoning and problem-solving abilities than he does, and she stated that the score explained to her why she was having difficulties in

28

some interactions with him.  She described McCray as "very black-and-white" and concrete, in that he has difficulties making inferences and connections between things.  T148; Govt. Ex. 7 at 7-8.  She concluded that this test result was indicative of his extensive deficits in reasoning abilities.

Dr. Flores noted that she also administered an effort test to McCray and found him to score in the acceptable range.  T149.  Dr. Flores concluded that the test scores on the WAIS-IV and TOGRA were likely valid because he gave full effort on an objective measure, which was consistent with her personal interactions with him.  T149.  She considered Dr. Szyhowski's conclusions as to McCray's effort consistent with hers.  T150.

Dr. Flores was recontacted in the Spring of 2018 by defense counsel, was informed that McCray had been evaluated for competency at MCCC by Dr. Szyhowski, and was asked to perform a competency evaluation for the defense. T134-35.  As a result, she prepared her June 13, 2018 report.  T135; Def. Ex. 2 ([Doc. 158-10]).  She advised that her report on competency needed to be read in conjunction with her earlier 2017 psychological evaluation.  *Id.* at 1.

In preparation for the evaluation, Dr. Flores interviewed McCray's father, who reported that his son had struggled his entire life with communication and comprehension.  T135.  His father noted that McCray did not understand things

29

and that he required lot of repetition.  T141-42.  His father also reported that McCray's mother, maternal grandfather, maternal aunt, maternal cousin, and a niece all had cognitive deficits and problems related to learning.  T142.  Further, McCray was born a hemophiliac, and as he was learning to walk, he bruised easily and was hospitalized twice with head injuries.  T142.  Dr. Flores considered McCray's family and medical history as possible causes of his cognitive impairments and consistent with his test scoring.  T143.

McCray signed an informed-consent form after Dr. Flores explained it to him.  Def. Ex. 2 at 2; Govt. Ex. 8.  She noted that the evaluation took almost three times longer than the typical evaluation due to McCray's limited verbal abilities and concrete thinking, which required her to repeat, simplify, and explain things to him.  She also slowed down the evaluation process so that he could understand what she was explaining or asking.  Def. Ex. 2 at 4.

Dr. Flores attempted to administer the ILKT, but like Dr. Szyhowski's administering of the MCMI-IV, she found that McCray was repeatedly asking for clarification, and rather than administer the test in a way that deviated from the standard method, she stopped the test.  T151-52; Def. Ex. 2 at 4 (explaining that ILKT not administered due to McCray's poor reading skills).  Dr. Flores testified that she became frustrated in not being able to communicate in a way that McCray

30

understood.  T152.  For example, in administering the MacArthur,[22] she found that it took her much longer to administer the test to McCray because of his inability to understand the questions being asked.  T158; Def. Ex. 2 at 5 ("He asked me to repeat 10 out of 22 items, some more than once.").  She also pointed to his requests to define "facts" and "frightened" and noted that he appreciated her reading slowly to him.  *Id.*

Dr. Flores reported that McCray scored 10 on Understanding and 11 on Reasoning, indicating that in dealing with scenarios related to a hypothetical defendant, he had adequate capabilities to understand information and to think rationally about alternative courses of action, which scores placed him at the very bottom of the Minimal Impairment range.  *Id.*  However, she opined that he would have scored very poorly if she had not engaged in repetition, simplification, and

--------

[22]     Dr. Flores chose the MacArthur test over the ECST-R because McCray did not exhibit psychotic behaviors.  T157.  The MacArthur (also referred to as The MacArthur Competence Assessment Tool—Criminal Adjudication ("MacCAT-CA")) was described as a twenty-two-item structured interview for the assessment of adjudicative competence.  It uses a vignette format and objectively scored questions to standardize the measurement of three competence-related abilities: understanding, reasoning, and appreciation.  Eight understanding and eight reasoning items are based on a brief vignette that describes a hypothetical crime, while the six appreciation items pertain to the defendant's case. Def. Ex. 2 at 4-5.  Dr. Flores explained that while the scenarios utilized in the MacArthur are more geared to state-law crimes, it nonetheless is useful as a supplement.  T158.

explanation of test items and words. *Id.* As a result, she opined that in order for McCray to learn, remember, and process information to make decisions, he requires the use of very simple vocabulary, extensive repetition, and for statements to be verbalized slowly. *Id.* at 6.

As to the Appreciation portion of the test, McCray's score of 5 out of 12 placed him within the Clinically Significant Impairment range, and Dr. Flores concluded that his extensive cognitive deficits clearly impaired his ability to demonstrate rational appreciation of his own case. She noted that he did not understand the concept of "crossing state lines" and that he could not opine how any sentence he would receive compared with others similarly charged. *Id.* Dr. Flores also observed that only eighteen percent of individuals who scored 10 on Understanding were deemed competent, only twenty-one percent of those scoring 11 on Reasoning were deemed competent, and only seven-tenths of a percent of those with an Appreciation score of 5 were deemed competent. *Id.*

Dr. Flores conducted a competency interview as well. She noted that it was necessary to explain the word "options" to him. *Id.* During this interview, she found that beyond being charged with prostitution of a minor and "something about Backpage," McCray could not elaborate on his charges. T153. However, he knew that a minor was someone under eighteen years of age, and he explained that the

conspiracy to commit sex trafficking with a minor was based on "I put somebody on Backpage and drove across state lines." Def. Ex. 2 at 6. Dr. Flores testified that since McCray is very concrete in his thinking, he did not appear to understand the concepts of conspiracy and crossing state lines and, as a result, Dr. Flores became frustrated with him. T154-56; Def. Ex. 2 at 7. McCray explained that when he does not understand what is being discussed or recognizes another's (such as Dr. Flores's or counsel's) frustration with him, he "zones out" by not concentrating. He stated that when he was on trial in Michigan, he did just that, and it was not until his lawyer told him that he had won that he knew it was over, since the language used at the trial was above his comprehension. T156.

Thus, Dr. Flores opined that while McCray demonstrates sufficient understanding of the roles of the trial participants (judge, prosecutor, defense lawyer), he lacks the ability to understand the charges, and she was concerned about his ability to assist counsel. T156-57; Def. Ex. 2 at 8. She further testified that he did not understand the plea-bargaining process in part because, due to his concrete thinking, he could not weigh what might be in his best interest. T161-62; *see* Def. Ex. 2 at 8-9 (Dr. Flores's notes indicating that she had to explain to McCray what "options" meant in the context of pleading guilty or not guilty; that McCray appeared to believe that if he pleaded not guilty, he would have to " 'prove' his

33

case in court"; that McCray had difficulty understanding that "plea deal" was the same as "plea bargaining"; that he appeared to believe that the Sentencing Guidelines Manual was synonymous with a plea bargain; and that he did not understand what rights were given up as the result of a guilty plea).[23]  His prior experiences in the criminal justice system were governed by what his attorneys told him to do.  T163; *see also* T227 ("I think he has the capacity . . . to accept a plea deal.  He would likely assent to anything that his lawyer said.  Does he actually understand whether somebody—is he able to actually make his own decision about this is in my best interest because of the weight of the evidence?  That's where I think that some of this is lacking.").  However, she acknowledged that after discussing plea bargaining with him, he was able to understand the concept.  T187.  She also testified that McCray is capable of entering a guilty plea based on his lawyers advising him that otherwise he would not win at trial but that she would have concerns about his ability to make a plea decision "without somebody telling

---

[23]    Part of Dr. Flores's opinion on this point was based on McCray's answers to questions about various scenarios about the weight of the evidence against a hypothetical defendant.  T161-62.  However, this conclusion was challenged on cross-examination, given the fact that McCray previously went to trial in Michigan and was acquitted.  T191-92.

him what he needs, what he needs to do, without somebody specifically identifying what's in his best interest." T229.

Despite McCray's ability to enter a guilty plea, Dr. Flores testified that competency to stand trial involves a different set of task demands and a different dynamic process. T230. She elaborated that

> He needs to be able to really understand what's going on, to be able to focus on what's going on for prolonged periods of time. We need to make sure that, in fact, the individuals that are speaking, [the prosecutor], [the defense counsel], the judge, everybody, that they're speaking at a level that he's understanding. As Dr. Szyhowski said, you can't just ask him do you understand because he'll likely say yes. You'd have to ask him are you understanding. So I can tell you that if [defense counsel] were to present Mr. McCray with a plea deal, okay, he would have to ask him tell me what you understand in order to make sure that he understood. And in a trial, because of what a trial is, I just—that's where the issues lie. That's where his verbal abilities would really become a problem.

T230-31. Therefore, Dr. Flores concluded that:

- McCray is unable to adequately communicate with counsel or participate in a trial process, since he has limited expressive and receptive language abilities and poor abstract reasoning.

- He did not grasp the concept of plea bargaining, such as when it may or may not be in his self-interest to plea bargain, and if he did enter a guilty

plea, it likely would be regardless of whether he understood it was or was not in his best interest.

- He would not be able to assist his lawyers at trial in forming an adequate defense or adequately participate at trial because of his extensive cognitive limitations.

- Dr. Szyhowski's recommended accommodations—to have information presented to McCray in language he is more likely to understand and allow him to consider the information and paraphrase it back—are unrealistic because trials are of a dynamic nature; slowing down a trial is not practical, particularly since it took Dr. Flores two-to-three times longer than normal to evaluate McCray; and Dr. Szyhowski's recommendations would be impracticable ("How would defense counsel know whether Mr. McCray is understanding everything being said? Would Mr. McCray then have to paraphrase everything being stated? How often would trial need to stop in order to ensure Mr. McCray's understanding?  Would all court participants (including witnesses) need to be told to use language that Mr. McCray can understand?  And how would they know what level of language to use?   And, what if

Mr. McCray senses others' frustration and tunes out, as he stated he did

in a previous trial?").

Def. Ex. 2 at 11-12.

Dr. Flores therefore opined that McCray was not competent to stand trial due

to extensive cognitive limitations. *Id.* at 12. She also stated that she had "strong

reservations" about his ability to be restored because it was unlikely that he would

be restored to competency in the foreseeable future even with repeated and

extensive instruction on court procedure, since his very limited verbal abilities and

extremely concrete thinking are not subject to remediation. *Id.*

In October 2018, at her own request, Dr. Flores met again with McCray to

further evaluate his language ability. T136; Def. Ex. 3 ([Doc. 158-11]). She was

concerned that McCray suffered from severe deficits in the ability to understand

language, so she performed three tests: (1) Expressive Vocabulary Test, Second

Edition ("EVT-II"); (2) Peabody Picture Vocabulary Test, Fourth Edition

("PPVT-IV"); and (3) Test of Memory Malingering ("TOMM"), to assess for effort.

T165.

The EVT-II involves showing the subject a picture or asking questions. The

questions become increasingly more difficult according to age of the subject, but

Dr. Flores found that she had to go back to the questions for a nine-to-ten-year-old

before McCray started getting more answers correct.  T166-67.  She concluded that his answers were incorrect:  when asked for another word for "difficult" he stated "frustrated"; for "bug" he said "roach" when the correct answer was "insect"; and for "scared" he said "worried."  T166.  She assessed a score of 62, which was consistent with his score of 63 on the verbal-comprehension index of the WAIS-IV intelligence test and in the first percentile.  T167; Def. Ex. 3 at 3.

Dr. Flores concluded that McCray's ability to express language was similar to that of a person who was six-years-and-eight-months old, or at about the first month of the first-grade level.  T167; Def. Ex. 3 at 3.  She testified that he was aware of his deficit and wanted to testify but that he was concerned with his "communication" and did not want to appear "illiterate" on the stand.  T168.  He asked if there was medication that he could take.  *Id.*

Similarly, in conducting the PPVT-IV, Dr. Flores started at the age-nineteen-to-adult level but ended up going backwards to the ten-year-old level.  T168-69.  McCray demonstrated familiarity with pictures of items with which he had experience (for example, a canoe because he used one in hemophiliac camp) but not others with which he had less or no experience (for example, a hydrant).  T169-70.  She assessed a score at the three-tenths percentile, or the equivalent of an eight-year-and-two-month-old person.   T170; Def. Ex. 3 at 3.   She also

38

concluded that McCray did well on the TOMM, in that there was no indication that he was trying to appear that he did not know the answers.  T171.

Dr. Flores also reviewed McCray's school records, and the current test scores were consistent with his expressive and receptive language scores twenty years later, which explained to her why despite his experience in the criminal justice system, he could not understand concepts like conspiracy[24] and crossing state lines.[25]  T170-71.  Similarly, she was concerned that only three months after Dr. Szyhowski discussed with him his concerns about having police on the jury, he was still holding on to this concern even though he had been educated about it by Dr. Szyhowski.  T188-89.

Just before she testified, Dr. Flores also reviewed the transcript of the telephone calls that McCray made to the victim and described the language that he

_____

[24]   Dr. Flores acknowledged, however, that since McCray is the only person charged in the indictment, an allegation that he engaged in a conspiracy could be confusing.  T181-82.

[25]   Dr. Flores concluded that McCray did not know the difference between states.  T184-85.

used in the calls was consistent with his verbal skills.  T173, 200.[26]  Dr. Flores

continued that the calls did not reflect his competency to stand trial:

> Through 30 years of his life he clearly has some communication abilities.  He's able to make phone calls.  He's able to talk.  He's able to get his needs met.  The problem here is that he has very extensive language deficits, both in receptive and expressive language that clearly are impacting, in my opinion, his ability to assist in this case.

T173.  She did not believe that the allegations against McCray—that he ran a

pimping business—reflect on his ability to assist his lawyers because "being a pimp

is actually not all that hard" and "really doesn't take many verbal abilities."  T203.

Dr. Flores testified that even if the evidence established that McCray wrote the

Backpage advertisements, the language was not very sophisticated and he could

have written some of it.  T204-06.[27]

_____

[26]    However, Dr. Flores was not familiar with McCray's post-arrest interview or the bulk of the calls that he made to the victim from jail.  T200-01.

[27]    Dr. Flores questioned how McCray could have written all of the advertisement since both experts concluded that he was not malingering and yet the advertisement contains the word "affiliated," which was correctly spelled and above McCray's language capabilities.  T206.  However, she conceded that if he wrote it, it would affect her confidence in her conclusions:

> If he actually wrote this by himself without any help, okay, would that make me question my results?  Yes, it would, because it would make me wonder how it is that he could so talently [sic] not only fool Dr. Szyhowski and me but that he would obtain scores with me that are identical to what he had in the tenth grade in verbal abilities.  I

Dr. Flores pointed out that she and Dr. Szyhowski agreed that McCray is not psychotic, depressed, or malingering; that testing him took extra time; and that in order for him to understand, things needed to be broken down, repeated, and explained.  T174.  She disagreed with Dr. Szyhowski's conclusion that McCray was competent and that there are reasonable accommodations that would enable him to assist his counsel.  T174-75.  She opined that he was not competent because even though the charges have been pending for some time and he has had experienced federal public defenders as his attorneys,[28] he still does not understand the charges (or could not repeat them) and believed that police officers could be placed on his jury.  T175-76.  As for the trial, McCray told her and Dr. Szyhowski that he tunes out because things are over his head, and because he knows that is what he is doing, he gets frustrated as a coping skill.  T177.  Her concerns were that even with the accommodations recommended by Dr. Szyhowski, McCray

_____

don't see how that's possible.  That's why I'm saying I am highly suspect that he wrote this.  If he did write it, yes.

T207.  However, Dr. Flores acknowledged that he had the ability to copy someone else's words and to commit the offense charged as well as commit the offense of contempt by calling the victim when he was ordered to have no contact.  T208-09, 210-11.

[28]   Dr. Flores recounted in her report that McCray stated that his current lawyer was the only lawyer that he had that was willing to listen to him but that the lawyer also gets frustrated at times with him.  T214 (quoting Def. Ex. 2 at 10).

41

would still zone out; there would be a question of what he was understanding; and since his language skills are similar to an eight-year old, it would be impractical to require witnesses to testify at that level. T177-78. Dr. Flores doubted that McCray could, as the Court asked, independently describe events in a "straightforward manner" since he did poorly in the tests even though they involved everyday common words. T179. Dr. Flores testified that although McCray had the capacity to learn, the rate at which he learns is much lower than the general population. T186. However, she acknowledged that even though the language he used in the telephone calls with the victim was not sophisticated, he knew that there was an adversarial process, that the victim would testify against him, and that "the victim testifying against him is going to be a problem," but she disputed that this knowledge was relevant to McCray's ability to assist counsel. T212-13. Nor did she consider McCray's rap videos on YouTube to undermine her opinion because the language used in the videos was basic and repetitive, and he collaborated with others in their production. T217.[29] She also distinguished his signing of an informed consent form from his competency to assist his lawyer at trial. T225-26.

_____

[29]    Dr. Flores noted that "just because somebody has an IQ of 70 and because somebody has limited verbal abilities does not mean that they cannot sing, that they cannot memorize. It might take them a lot longer, a lot more work to learn it, and the words are extremely simple." T218.

42

Dr. Flores also testified that it was unlikely that McCray could be restored to competency because although he has the ability to be educated on some of the concepts, she had concerns about his ability to communicate with his attorney and understand what was occurring at trial.  T236.

## IV.   **PARTIES' ARGUMENTS**

The Government first argues that *Izquierdo*, 448 F.3d at 1277 & n.7, stands for the proposition that the burden in a competency proceeding is upon the party that raises the issue, and thus McCray bears the burden to prove his incompetence. [Doc. 167 at 16 (quoting *United States v. Whittington*, 586 F.3d 613, 617-18 (8th Cir. 2009) (quoting *Izquierdo*, 448 F.3d at 1276, 1278 ("that the competency statute 'arguably contemplates that the burden will lie with the party making the motion to determine competency' "))].  It further notes that prior Circuit precedent placing the burden on the prosecution concerned a different statute than 18 U.S.C. § 4241 at issue here.   [*Id.* (discussing *United States v. Makris*, 535 F.2d 899, 905 (5th Cir. 1976) ("*Makris II*") & 18 U.S.C. § 4244, and quoting *Izquierdo*, 448 F.3d at 1277-78 ("[T]he competency statute in *Makris II* . . . was a different statute with different language that the competency statute at issue here."))].   The Government also points out that the former statutory scheme regarding incompetency gave a larger role to play to the Attorney General and that

43

in § 4241, the government and the defendant are placed on equal footing in competency matters, [*id.* at 17], and that *Makris II* has effectively been abrogated by the Eleventh Circuit. [*Id.* at 17-18 (quoting *United States v. Fuenmayor-Arevalo*, 490 Fed. Appx. 217, 225 (11th Cir. Sept. 18, 2012) ("A defendant must demonstrate his incompetency by a preponderance of the evidence." (citing *Bradley*, 644 F.3d at 1268)); and citing *United States v. Kight*, No. 1:16-CR-99-WSD, 2018 WL 672119, at *5 (N.D. Ga. Feb. 2, 2018), *reconsideration denied,* No. 1:16-CR-99-WSD, 2018 WL 10700899 (N.D. Ga. Mar. 22, 2018) ("*Bradley* makes it clear that a defendant bears the burden of demonstrating his or her incompetency."))]. Further, the Government acknowledges that if it had challenged McCray's competence, it would bear the burden. [*Id.* at 18-19]. Therefore, the Government contends that the burden in this case is upon McCray. [*Id.* at 19].

The Government next argues that McCray is competent to stand trial. It contends that as to a rational as well as a factual understanding of the proceedings against him, McCray understood the most serious charge against him (prostitution of a minor), and it argues that the fact that he told Dr. Flores but not Dr. Szyhowski that he was charged with "conspiracy sex trafficking" does not alter this conclusion. [Doc. 167 at 19 (citing *Cruz*, 805 F.2d at 1479)]. The Government argues that

44

McCray's failure to describe the conspiracy charge to Dr. Szyhowski is inconsequential and understandable, given that he is the only person charged in the case but nevertheless is charged with engaging in a criminal conspiracy in Count One. [*Id.* at 19-20]. It further contends that McCray's argument that he is therefore innocent because of this in fact "reflect[s] an ability to think critically about the relevant facts and law," pointing out that he asked Dr. Flores with whom he was alleged to have conspired. [*Id.* at 20 (citing Def. Ex. 2 at 7)].

The Government next argues that Defendant understood the difference between pleading guilty and not guilty and the appropriateness of a plea agreement in different contexts based on his prior criminal-justice system experience. [*Id.*]. It notes that he recognized that he had a choice between pleading guilty and not guilty after consulting with his lawyer, the roles of the relevant people associated with the case, and the serious consequences of being found or pleading guilty, that being spending a long time in prison. [*Id.* at 20-21]. The Government contends that this understanding demonstrates a rational and factual understanding of the proceedings. [*Id.* at 21].

The Government disputes that McCray's IQ score of 71 and Dr. Flores's placement of him between "the top of the Extremely Low and bottom of the Borderline range of intelligence" rendered him incompetent, noting the Eleventh

45

Circuit's admonition that low intelligence did not translate into incompetence and that defendants with even greater deficiencies and lower IQ scores have been deemed competent.  [*Id.* at 21-22 (citations omitted).].  It further submits that the evidence demonstrates that despite Dr. Szyhowski's conclusion that McCray had a learning disorder with impairment in reading and gave a rule-out for borderline intellectual functions, these limitations do not adversely affect his understanding of the proceedings against him.  [*Id.* at 22].

The Government next argues that McCray has the ability to consult with his lawyer with a reasonable degree of understanding.  [*Id.* at 23 (citing *Cruz*, 805 F.2d at 1479)].  It submits that even though Dr. Szyhowski's administration of the MCMI-IV was unsuccessful, Dr. Szyhowski concluded that McCray had the ability to understand information when explained to him in " 'more rudimentary and lower-grade terminology.' " [*Id.* (quoting Govt. Ex. 2 at 6)].  It also postulates that McCray's questioning how he could be guilty of a conspiracy when he is the defendant reflects his rudimentary conceptions.  [*Id.*].  The Government also contends that his dealings with Drs. Flores and Szyhowski demonstrate that he is able to communicate appropriately with his lawyer and that, in fact, McCray reported that he enjoyed a good working relationship with his lawyer.  [*Id.* at 23-24].  As for difficulties that McCray has had with counsel, the Government submits that

46

the Eleventh Circuit does not require perfection in comprehension and congeniality. [*Id.* at 24-25].

In his response, McCray first argues that the Eleventh Circuit expressly limited its *Izquierdo* decision to its facts and that the circuits remain split on allocating burdens.  [Doc. 168 at 20-21 (citing *Izquierdo*, 448 F.3d at 1278, and *United States v. Allen*, No. 10-80175-CR, 2011 WL 4352793, at *20 (S.D. Fla. Aug. 26, 2011) (R&R) (collecting cases), *adopted,* No. 10-80175 CR, 2011 WL 352776 (S.D. Fla. Sept. 16, 2011))].

McCray next argues that he does not have the required language skills to assist his lawyer and thus is incompetent to stand trial.  [*Id.* at 21].  He notes that Drs. Flores and Szyhowski agreed that he does not have any psychopathology, is not psychotic, and was not malingering any psychopathology.  [*Id.* at 24].  Further, they both observed that he gave full effort on the administered tests and took extraordinarily longer than was typical to complete the tests but that things needed to be broken down for him, repeated, and explained for him to understand what was taking place.  [*Id.* at 24-25].  Nonetheless, he points out that they differed on whether his cognitive deficiencies impaired his ability to assist counsel, with recommended accommodations (Dr. Szyhowski), or a finding that he lacked the receptive or expressive language abilities to assist counsel at trial (Dr. Flores).

47

[*Id.* at 25].  He contends that Dr. Flores's conclusions should be given more credit because of the extensive testing she performed and because of her long experience in the field, noting that Dr. Flores worked both in the public and private domains and conducted hundreds of competency evaluations, while Dr. Szyhowski only worked as a government doctor and conducted only twenty-five to thirty competency evaluations.  [*Id.* at 25-26].  He also submits that her testing was more extensive than Dr. Szyhowski's, since she administered the WAIS-IV, EVT-2, PPVT-4, and TIWRE, all of which demonstrated deficits in expressive and receptive language that Dr. Flores concluded were so extreme that he did not have the language abilities to assist trial counsel.  McCray points out that Dr. Szyhowski, in contrast, administered only three tests (MCMI-IV, TIWRE, and ECST-R) and was unable to score the MCMI-IV because of McCray's poor language abilities. Further, McCray contends that the other two test results were not probative in favor of competency because the TIWRE indicated McCray read at a fourth-grade level, thereby rendering him unable to understand legal texts, and because Dr. Szyhowski had opined that the ECST-R was heavily weighed to psychosis and less on cognitive difficulties.  [*Id.* at 26-27].

McCray next argues that the tests administered to him by Dr. Flores demonstrated language deficits that prevented him from assisting counsel during

trial.  For example, the WAIS-IV reflected that he was in the one-percentile of verbal comprehension and abilities.  [*Id.* at 27].  He scored in the one-tenth percentile of people his age on the TGRA.  [*Id.*].  He notes that Dr. Flores described him as a very concrete thinker who has great difficulty making inferences and connections between two ideas.  [*Id.* (citing R148)].  McCray also points out that he failed the plea-bargaining section of the MacArthur, although he generally did well on that test, suggesting that his concrete thinking made it difficult for him to weigh facts and make decisions in his best interest.  [*Id.* at 27-28].  The EVT-II reflected that his expressive language was the equivalent of a six-and-two-thirds-year-old, a first-percentile ranking consistent with his WAIS-IV ranking.  [*Id.* at 28].  The PPVT results aligned him with an eight-year-old.  Moreover, he argues, Dr. Flores's tests also were negative for malingering or feigning.  [*Id.*].

McCray also contends that the collateral sources reviewed by Dr. Flores— his school records, evidence related to his hemophiliac-related head injury, reports from his father, and his family's history of cognitive impairments—were consistent with and corroborated the conclusions she drew from the test scores.  [*Id.* at 29-30].  Further, he references Dr. Flores's conclusion that he did not have command of language expected of someone his age based on his struggle to understand

49

questions and deficits in expressing himself.  [*Id.* at 30].  He submits that his ignorance of the conspiracy charge, even though it had been pending against him for some time, and his inability to comprehend the meaning of crossing a state line, or even what a state was, showed his profound deficits in expressive and receptive language that make it impossible for him to assist his lawyer.  [*Id.* at 30-31].

Next, McCray argues that the Court should adopt Dr. Flores's conclusion that no accommodation will make him competent to proceed.  He notes that her conclusion was based on his inability to comprehend the meaning of a conspiracy or crossing state lines; the fact that he already had gone through a criminal trial at which he claims to have "zoned out," which is consistent with his reaction when he does not understand something; and his unshakable belief that the prosecution could put a police officer on his jury.  [*Id.* at 31-32]. McCray argues that unlike his prior state-court trial, his federal trial will require his extensive assistance, since there are several witnesses, including the victim and an unindicted coconspirator, with whom he had substantial and exclusive contact, and thus he will be needed to assist his lawyer in formulating cross-examination of them and any other witnesses called to testify against him.  [*Id.* at 32].  He acknowledges that counsel can do things to prepare him for trial but argues that counsel cannot account for all of the potential testimony or changes that take place at a dynamic event like a trial.  Thus,

he disputes that his counsel would be able to recognize whether and when he has "zoned out" or otherwise understands the testimony from the witness stand. [*Id.* at 32-33].   He also argues that the accommodations suggested by Dr. Szyhowski, such as extra counsel, repetition, frequent breaks, and using simplified language, are unrealistic and unworkable, since they would cause an unknown extension in the time it would take to try the case, given that the time it took to conduct psychological testing was  twice or three times as long as typically encountered and required a lot of repetition, and Drs. Flores and Szyhowski are trained mental-health professionals, which McCray's lawyers are not. [*Id.* at 33-34].

McCray also notes that he is not claiming that he is incompetent due to low intelligence.  While noting that he has low intelligence, his claim is that the type of intellectual deficits identified by the mental health professionals—language deficiencies, primarily low verbal comprehension—makes it impossible for him to assist counsel at trial.   [*Id.* at 34].   He also argues that neither his use of the Backpage advertisements nor his phone calls from jail do not establish that he could assist his counsel at trial.  [*Id.* at 34-35].

In reply, the Government first points out that McCray misrepresented Dr. Szyhowski's experience, since he has testified for the defense approximately

fifteen percent of the time and found approximately twenty percent of those he examined incompetent and he has performed approximately 250 competency exams, not the twenty to thirty as contended by McCray. [Doc. 170 at 2]. It notes that the twenty-five to thirty number referenced by McCray was the times Dr. Szyhowski was qualified as an expert in court, adding that the court did not agree on only two occasions with his conclusions. [*Id.* (citing T17)].

Next, the Government takes issue with McCray's criticism of Dr. Szyhowski's reliance on the ECST-R, noting that courts in this Circuit repeatedly have found it a reliable and objective device to measure a defendant's ability to understand the nature and consequences of the proceedings against him as well as his legal knowledge and abilities related to trial competency. [*Id.* at 3-4 (citing *United States v. Rosso*, Crim. Action No. 3:14-cr-00014-TCB-RGV, 2017 WL 5920387, at *3 (N.D. Ga. Oct. 10, 2017) (R&R), *adopted*, 2017 WL 5904654 (N.D. Ga. Nov. 30, 2017); *United States v. Deruiter*, No. 2:14-CR-46-FTM-38MRM, 2017 WL 9360880, at *9 (M.D. Fla. May 16, 2017) (R&R) ("The ECST-R is an objective measure of legal knowledge and abilities related to trial competency."), *adopted*, 2017 WL 3308967 (M.D. Fla. Aug. 3, 2017); *United States v. Merriweather*, 921 F. Supp. 2d 1265, 1308 (N.D. Ala. 2013) (finding defendant competent based in part on his

"outstanding performance" on the ECST-R, concluding that he "must certainly be able to understand the charges against him, the defenses available to him, and the basic elements of the criminal trial"); *United States v. Cordell*, No. 4:09-CR-006-CAP-WEJ, 2011 WL 2581018, at *4 (N.D. Ga. May 23, 2011) (R&R) ("[T]he ECST-R is designed to address issues related to trial competency . . . . Its questions are based on the so-called *Dusky* standard,[] used in the federal courts to determine trial competency."), *adopted*, No. 4:09-CR-006-CAP, 2011 WL 2580864 (N.D. Ga. June 29, 2011); *United States v. Cunningham*, No. 09-20926-CR, 2010 WL 2670871, at *2 (S.D. Fla. July 2, 2010) (finding defendant competent in part based on his performance on the ECST-R))].   The Government thus argues that since the ECST-R is a recognized barometer in this Circuit in determining trial competency and McCray performed well on that examination, the record supports Dr. Szyhowski's conclusion that McCray has a sufficient factual understanding of the charges against him, a sufficient rational understanding of the case proceedings, and an unimpaired ability to work with his counsel.  [*Id.* at 4 (citing T54)].[30]

---

[30]    The Government also argued that to the extent McCray is contesting Dr. Szyhowski's qualifications, he stipulated to his expertise at the hearing. [Doc. 170 at 4-5 (quoting T20)].  The Court agrees that McCray stipulated to Dr. Szyhowski's expertise and does not discuss the issue further.

Third, the Government argues that McCray's claim that his low verbal comprehension makes it impossible for him to assist counsel at trial is contrary to Eleventh Circuit caselaw recognizing that low verbal comprehension is not equated with incompetency.  [*Id.* at 5-6 (citing *United States v. Fuenmayor-Arevalo*, 490 Fed. Appx. 217, 222-23 (11th Cir. Sept. 18, 2012) (affirming competency despite evidence that defendant had been mildly to moderately mentally retarded since childhood, had verbal-ability IQ score of 52 and a full-scale IQ that fell in the "very poor" range at 66, showed signs of possible dementia, generally displayed the reasoning ability of a six-year-old child, appeared "to possibly be susceptible to suggestion," and appeared to assent to any proposition); *United States v. Thomas*, 178 Fed. Appx. 935, 937 (11th Cir. Apr. 28, 2006) (affirming judgment that defendant was competent to enter guilty plea despite "extremely low" verbal IQ test score and verbal intellectual function in the Low to Borderline range).  It also points to district court cases in the circuit that hold that low verbal comprehension does not warrant a finding of incompetence.  [*Id.* at 6 (citing *United States v. Madison*, No. 6:17-CR-15-ORL-37KRS, 2018 WL 3151676, at *6-8 (M.D. Fla. Jan. 22, 2018) (recommending finding of competence despite borderline verbal comprehension;  below-average  perpetual  reasoning,  working  memory,  and processing speed; and delusional beliefs) (R&R), *adopted*, 2018 WL 1167327

(M.D. Fla. Mar. 6, 2018); *Deruiter*, 2017 WL 9360880 at *5-9 (finding competency despite defendant scores in the sixteenth percentile ("low average range") for verbal reasoning and abstraction, seventh percentile ("impaired") in reading fluency, eighth percentile ("impaired") in math fluency; a Full Scale IQ of 82, placing him in the Low Average range at the twelfth percentile; WAIS-IV processing speed in the second percentile (first test) and third percentile (second test); and evidence of severe impairments in immediate memory); *United States v. Raiola*, No. 215CR106FTM38MRM, 2016 WL 11220474, at *4 (M.D. Fla. Dec. 21, 2016) (recommending finding of competency where defendant scored in twenty-third percentile for verbal comprehension, nineth percentile for semantic verbal fluency, and first percentile for lexical-verbal fluency) (R&R), *adopted*, 2017 WL 218830 (M.D. Fla. Jan. 19, 2017); *United States v. Derisma*, No. 2:09-cr-64-FtM-36SPC, 2011 WL 3878367, *4-5, 16 (M.D. Fla. June 27, 2011) (recommending defendant be found competent despite IQ score of 70, with "low average to severely impaired range" scores on Weschler subtests and reading and reading-comprehension skills in ninth-grade and sixth-grade equivalents respectively) (R&R), *adopted*, 2011 WL 3878359 (M.D. Fla. Sept. 2, 2011))].

Fourth, the Government claims that McCray abandoned his prior argument that the Government bore the burden of establishing that he was competent by merely noting the circuit split and asserting without support that the burden is upon the prosecution.  [*Id.* at 7-8].

Finally, the Government addressed the accommodations recommended by Dr. Szyhowski.  It first noted that McCray's only argument on this point was that no accommodations could render him competent.  [*Id.* at 8 (citing [Doc. 168 at 31-34])].   It then noted that the Court may recommend certain accommodations. [*Id.* at 9-10 (citing *Deruiter*, 2017 WL 9360880 at *28 (although recommending defendant be deemed competent without accommodation, noting that he "may be aided by accommodations such as frequent breaks, frequent redirection on topic, and additional time"); *Raiola*, 2016 WL 11220474 at *20 (recommending "simplifying and slowing down the trial proceedings, repeating information as needed, allowing ample time for Defendant to ask and respond to questions, allowing frequent breaks for counsel to discuss information and developments with Defendant, frequent redirection of Defendant's attention by Defendant's counsel, and lengthening the proceedings where necessary"); *United States v. Miranda-Martinez*, No. 1:13-CR-251-TWT, 2015 WL 630397, at *3 (N.D. Ga. Feb. 12, 2015) (adopting Dr. Szyhowski's recommendation that frequent

breaks be allowed in the trial to accommodate defendant's reduced ability to sit still for long stretches of time); *United States v. Carter*, No. 1:12-cr-29, 2013 WL 6668715, *13 (E.D. Tenn. Dec. 18, 2013) (adopting R&R recommending that defendant be found competent but that he be afforded accommodations of his cognitive deficits by (1) simplifying the proceedings wherever possible by paraphrasing complex concepts into familiar terms and avoiding legal jargon; (2) slowing down the proceedings, repeating information as needed, and allowing ample time for defendant to ask and respond to questions; and (3) allow breaks in order to provide opportunities to discuss information and developments with him as needed))].

The Court ordered McCray to file a surreply limited to the issue of accommodations. [Doc. 190 at 1]. His surreply went beyond that authorization, re-arguing that he is not competent to stand trial. [Doc. 193 at 5]. He also argues that the accommodations that the Government claims were recommended in other cases by magistrate judges were not implemented by the district judges, since the defendants in *Deruiter*, *Raiola*, *Miranda-Martinez*, and *Carter* all pleaded guilty before trial. [*Id.* at 6-9].

McCray next argues that he has verbal deficits far greater than the defendants in *Deruiter*, *Raiola*, *Miranda-Martinez*, and *Carter*. [*Id.* at 9]. He notes that he

scored in the bottom one-percentile in verbal comprehension, vocabulary, language, and reasoning.  [*Id.* at 9-10].  He points out, in comparison, that the *Deruiter* defendant suffered only from attention and memory deficits. [*Id.* at 10 & nn. 40, 41 (citing *Deruiter*, 2017 WL 3308967 at *26, *30)].  He further argues that he compares favorably to the *Raiola* defendant, who although diagnosed with cognitive defects affecting his processing speed, memory, and language skills, still was found to have adequate memory, the ability to review documents, think hypothetically about his case, testify relevantly, and to cook, review records, identify medications and explain what they treated, think on his feet, and be humorous (thus indicating speedy mental processing), and was able to engage in deductive reasoning.   [Doc. 193 at 11-12 (citing *Raiola*, 2017 WL 218830 at * 18)].  McCray argues that his own intellectual deficits— inability to think hypothetically, along with very concrete in his thinking, to the extent that he could not comprehend the concept of crossing state lines—are far greater.  [*Id.* at 12].  He also submits that the defendant in *Martinez-Miranda* only was diagnosed with Tourette's Syndrome and depression, while he is in a completely different category since he is in the lowest one-percentile in verbal ability.  [*Id.* at 13].  Finally, he argues that his intellectual deficits are far greater than those of the *Carter* defendant, who was withdrawn, had a low IQ, was a simple

58

thinker with a poor verbal memory, and who could be expected to have difficulty with complex hypothetical questions. [*Id.* at 13-14]. In short, he contends that none of the cases relied upon by the Government dealt with the same intellectual deficits as he has, with an inability to understand the basic concepts such as conspiracy, crossing state lines, or that the jury will not be comprised solely of police officers. [*Id.* at 14].

Instead, McCray points to *United States v. Cole*, 339 F. Supp. 2d 760 (E.D. La. 2004), as an analogous case. [Doc. 193 at 14-6]. The *Cole* defendant had limited intellectual ability, and one expert suggested that accommodations could compensate for those limitations. *Cole*, 339 F. Supp. 2d at 761. McCray argues that the *Cole* court's reservations about the accommodations ("How was one to know Cole was understanding the proceedings? Who would explain to him what was happening? How often? What role would his counsel play in advising about Cole's understanding, given that counsel believed Cole was not competent? If Cole did not understand some phase of the trial, how would it be repeated for him?"), [Doc. 193 at 15 (quoting *Cole*, 339 F. Supp. 2d at 762)], is similar to Dr. Flores's critique of Dr. Szyhowski's proposed accommodations in support of her contention that no accommodations could adequately mitigate McCray's incompetency. [*Id.* (citing T230, 247)].

59

Next, McCray disputes the effectiveness of the Government's proposed accommodations.   First, as to greater pretrial contacts between counsel and McCray, he submits that he fails to understand the most basic language and fairly basic legal concepts even after explanation and that more time with him does not account for counsel's lack of knowledge about what their client does or doesn't understand, much less account for his understanding in the dynamic environment of a trial.  Plus, the COVID-19 pandemic makes it impossible for counsel to spend any face-to-face time with him, and video-conferenced meetings are very poor substitute, if not completely ineffective, for gauging a client's understanding. [*Id.* at 16-17].   Second, he argues that the second suggested accommodation— greater explanation of what is happening during hearings and at trial—similarly fails because of his limited language abilities and lack of understanding of both legal concepts (conspiracy, crossing state lines) and more common terms (hydrant, state).  [*Id.* at 18].  He also argues that affording him extra time is an insufficiently effective accommodation, since Dr. Flores had in effect unlimited time to spend with him and yet could not get him to understand a simple concept like "crossing state lines."  [*Id.* at 19].   He also argues that the accommodation of a second attorney at trial, which he will have, is insufficient since the second attorney will be present to assist counsel in examining witnesses and dealing with legal issues

60

and not to rephrase into terms understandable to McCray the questions, testimony, arguments of counsel, and orders of the court.  [*Id.* at 19].  Counsel submits that given McCray's intellectual challenges and the dynamics of a trial, it is difficult to provide a list of accommodations that would adequately provide the services that McCray needs at trial.  [*Id.* at 20].

Next, McCray argues that if the Court finds him competent and recommends accommodations, then the Court should allow more time between questions, answers, and rulings, and should have someone similar to a guardian ad litem with training as a psychiatrist or psychologist, who would be able to report McCray's level of comprehension as to each question and answer at trial to counsel and the Court.  [*Id.* at 21].  He also contends that he should be assisted by a linguist to explain language and concepts to him in language that he would understand.  [*Id.*]. Finally, he asks that time be given after each phrase so that the psychologist or psychiatrist could determine his level of understanding.  [*Id.*].

## V.     DISCUSSION

As an initial matter, the Court agrees with the Government that McCray has the burden in this case of establishing his lack of competency.  *Bradley* expressly holds that the party raising a substantive claim of incompetency must demonstrate his incompetence by a preponderance of the evidence.  *Bradley*, 644 F.3d at 1268

(citing *Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995) (stating that a party raising a substantive claim of incompetency must demonstrate his incompetence by a preponderance of the evidence))[31]; *see also United States v. Greene*, 767 Fed. Appx. 793, 797 (11th Cir. Apr. 3, 2019).  Having raised the issue of incompetence before the District Judge, [Doc. 149], the burden is on McCray to prove that he is not competent to stand trial.

As for the merits of the issue before the Court, McCray does not contend, nor does the evidence support a finding, that he is irrational or pathological, or that he suffers from some mental defect or impairment that skews his view of reality, such as by suffering delusions or having psychosis.  Instead, his claim is that his cognitive capabilities are so impaired that he cannot understand the nature of the proceedings or assist his lawyer in his defense.  As the discussion that follows reflects, the Court agrees with portions of both the Defendant's and the Government's expert opinions.  That is, the Court agrees with Dr. Szyhowski that

---

[31]     Significantly, *Bradley* noted that prior circuit precedent placed the burden of proof as to competency on the government. *Bradley*, 644 F.3d at 1267-68 ("While earlier precedent tends to the contrary, *see United States v. Makris,* 535 F.2d 899, 905-06 (5th Cir. 1976), we have since decided that 'a petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence.' ") (citing *Medina v. Singletary*, 59 F.3d 1075, 1106 (11th Cir. 1995)).

McCray has a rational as well as a factual understanding of the proceedings against him.   However, the Court also agrees with Dr. Flores's opinion that the accommodations that Dr. Szyhowski concludes should be afforded McCray at trial are impractical given the realities of a criminal jury trial.   Thus the issue to be decided by the Court is how, if at all, to reconcile Dr. Szyhowski's opinion as to McCray's competency being conditioned upon certain accommodations being provided to McCray to allow him to understand the proceedings and consult with his lawyers, Govt. Ex. 2 at 11-12; T56-57, 97-98, 99-100, 118, 123-24, 126, with Dr. Flores's opinion that these accommodations are insufficient to ameliorate McCray's cognitive deficits, and that in any event, are impractical in a dynamic trial, and thus he is not competent.  Def. Ex. 2 at 11-12; T174-75.  The Court agrees with Dr. Flores's opinion that the accommodations are impractical in a fluid and dynamic trial but also concludes that steps can be taken before trial to render McCray able to understand the proceedings and assist his lawyer in defending this case.

Thus, as discussed below, applying the factors set out in *Drope*, 420 U.S. at 180, and *Woodall*, 648 F.2d at 273, the Court **RECOMMENDS** that McCrary be found competent to stand trial but that certain accommodations be

63

provided *before and during* trial in an effort to improve his ability to assist his counsel in providing a defense.

### A.   Medical History

Considering all of the evidence before the Court, as well as the arguments of the parties, McCrary's past history tilts in favor of finding him competent to stand trial.  It is true, as confirmed by objective examinations, that McCray has a lifelong history of serious cognitive difficulties, based on his below-average reading and verbal skills.  McCray's father reported that his son struggled his entire life with communication and being able to understand things and that he required a lot of repetition.  There also is evidence that he had relatives with cognitive deficits and learning problems.  As a child, McCray was hospitalized two times with head injuries.  He was in special-education classes due to a learning disability, primarily for verbal-abilities deficiencies, and was provided a more intensive resource class and tutoring.   Academic testing showed that he had extensive limitations in expressive and receptive language, and he received speech and language services throughout his schooling.  He was retained in the third grade.  The IEPs reviewed by Dr. Flores demonstrated an attempt to help McCray with verbal deficits, including learning to advocate for himself when he did not understand something. In high school, his IEPs included twenty-five hours per week in a small class setting

with other students in need and one-to-two hours per week of speech and language therapy.

Further, the testing conducted by Drs. Szyhowski and Flores demonstrates that McCray was not malingering, and although there were differences in the scores McCray obtained, and the experts differ over the best tests to have been employed, on each test McCray scored at a very low level in cognition.  It took Dr. Szyhowski twice as long as usual to complete the MCMI-IV examination—a fourth-grade level exam—because the questions had to be read to McCray and, even then, McCray was unable to answer ten out of 195 questions.  In taking this test, McCray had difficulty with many of the vocabulary terms and, for those he did not understand, he requested an explanation of a term's meaning in order to answer. He appeared to become frustrated, and he assented to answers in an effort to complete the test rather than understand it.  Further, the TIWRE indicated that McCray was reading at a fourth-grade level, which was well below average level.

It also took Dr. Flores a longer time than usual to conduct testing because of McCray's poor cognition.  She graded McCray in the first percentile on the WAIS-IV verbal comprehension index, that is, in the extremely low range, reflective of extensive deficits in vocabulary, general knowledge, and abstract reasoning.  Dr. Flores noted as examples his inability to know the meaning of the

word "assemble" and incorrectly defining the word "consume." Further, his nonverbal reasoning abilities as measured by a score of 71 on the PRI put him in the Borderline range and placed him in the third-percentile range. Dr. Flores found him to be in the Borderline range in the ability to sustain attention, concentrate, and exert mental control, because he graded in the sixth percentile in working memory. She noted, however, that these abilities were better developed than his verbal reasoning abilities. Dr. Flores also concluded that his ability to process simple or routine visual material without making errors was in the average range, although that result should be interpreted cautiously. Nonetheless, she concluded that McCray had extensive intellectual deficits and that he functions between the top of the Extremely Low and bottom of the Borderline range of intellectual functioning, with his general verbal-comprehension abilities being in the Extremely Low range and his general perceptual-reasoning abilities being towards the bottom of the Borderline range. She found him to be in the Borderline range in the ability to sustain attention, concentration, and exertion of mental control but average in the ability to process simple or routine visual material without making errors, although she cautioned that further analysis would be needed due to the variance between these two scores. His overall IQ score fell within the low end of the Borderline range because of his relative strength in processing-speed abilities. However, she

opined that his level of intellectual abilities is similar to that of individuals with a Mild Intellectual Disability.

Dr. Flores explained that McCray's score in the one-tenth percentile on the TOGRA meant that 99.9 percent of individuals his age have better reasoning and problem-solving abilities than he does, and she stated that the score told her why she was having difficulties in some interactions with him. She described McCray as "very black-and-white" and concrete, in that he has difficulties making inferences and connections between things. She concluded that this test result was indicative of his extensive deficits in reasoning abilities.

First, the Court agrees with the Government that based on the ECST-R, despite his cognitive deficiencies, McCray is able to understand the nature and consequences of the proceedings against him. Courts in this Circuit repeatedly have found it a reliable and objective device to measure a defendant's ability to understand the nature and consequences of the proceedings against him as well as his legal knowledge and abilities related to trial competency. *Rosso*, 2017 WL 5920387 at *3; *Deruiter*, 2017 WL 9360880 at *9 ("The ECST-R is an objective measure of legal knowledge and abilities related to trial competency); *Merriweather*, 921 F. Supp. 2d at 1308 (finding defendant competent based in part on his "outstanding performance" on the ECST-R, concluding that he "must

67

certainly be able to understand the charges against him, the defenses available to him, and the basic elements of the criminal trial"); *Cordell*, 2011 WL 2581018 at *4 ("[T]he ECST-R is designed to address issues related to trial competency . . . . Its questions are based on the so-called *Dusky* standard,[] used in the federal courts to determine trial competency."); *Cunningham*, 2010 WL 2670871 at *2 (finding defendant competent in part based on his performance on the ECST-R).

The Court rejects some of Dr. Flores's reasoning for concluding that McCray is not competent, that is, his inability to understand concepts such as conspiracy or crossing state lines.  An understanding of complex issues or legal theories is not required for a finding that a defendant is competent to stand trial.  *See Hogan*, 986 F.2d at 1373 (finding that minor defects in the defendant's cognitive abilities did not render him incompetent and noting that "[e]ven perfectly competent defendants often do not fully comprehend the intricacies of some of the defensive theories offered by their lawyers" and "[t]hat level of comprehension is not a requirement of competency").  The standard for mental competence does not require that a defendant have a clear understanding of legal terminology or that he be able to read and understand a legal document without assistance.  *Greene*, 767 Fed. Appx. at 797 (citing *Hogan*, *id.*).  "In the absence of evidence that the defendant was incapable of understanding the proceedings sufficiently to assist

counsel, 'low intelligence, mental deficiency,' or signs of mental illness are insufficient to show incompetence." *Id.* (quoting *Pardo v. Sec'y, Fla. Dep't of Corr.*, 587 F.3d 1093, 1101 (11th Cir. 2009)).

Similarly, the Court rejects Dr. Flores's concerns that neither she nor Dr. Szyhowski could shake McCray from his belief that detectives could be secretly empaneled on the jury: a criminal defendant's stubbornly-held beliefs that somehow the prosecution would try to get an upper-hand against him is not sufficient to demonstrate incompetence to stand trial. Although stated in a slightly different context (mental illness), the reasoning of the court in *United States v. Williams*, No. 5:06-cr-36, 2007 WL 1655371 (M.D. Fla. June 7, 2007), is illustrative: "Incompetency to stand trial is not defined in terms of mental illness. As such, a defendant can be competent to stand trial despite being mentally ill and similarly a defendant can be found incompetent to stand trial without being mentally ill." *Williams*, *id.* at *5 (internal citation and quotation marks omitted).

As to McCray's ability to assist properly in his defense, as noted, expert opinion on competency is not sacrosanct and can be discounted if there is a reason to do so. *Bradley*, 644 F.3d at 1268-69; *Izquierdo*, 448 F.3d at 1278-79. Several facts are in conflict with McCray's low test scores and the experts' conclusions as to meaning of those scores with regard to McCray's cognitive deficiencies.

McCray completed high school with a special-education diploma, and the reason he was unable to attend college was because his ACT[32] scores were inadequate. McCray also told the Court, under oath when entering a guilty plea to contempt of court, that he completed high school and had some college. *United States v. McCray*, No. 1:16-mj-00795-AJB (N.D. Ga. filed Sept. 22, 2016), Guilty Plea Transcript (Doc. 4 at 8). McCray dropped out of a music-education degree program and generally worked at manual-labor jobs. T71, 87, 88, 138-40.

Further, balanced against McCray's documented history of cognitive deficits is his conduct as alleged in this case. Considering his conduct as alleged, of course, is not to say that an individual who is charged with committing a crime is automatically competent to be tried for that offense, and evidence of a defendant's state of mind at the time of the offense usually is irrelevant in the inquiry as to whether the defendant is competent to stand trial. However, this is not the typical competency proceeding; instead this case turns on whether McCray has sufficient cognition to understand the nature of the proceedings against him and assist his

---

[32]     The ACT is an entrance exam used by most colleges and universities to make admissions decisions.  It is a multiple-choice, pencil-and-paper test administered by ACT, Inc.  The purpose of the ACT test is to measure a high school student's readiness for college and provide colleges with one common data point that can be used to compare all applicants. https://www.princetonreview.com/college/act-information (last visited 4/19/2021).

lawyer at trial. Given the evidence from both experts that McCray's cognition deficits are lifelong and stable or, better, have not further deteriorated, it is noteworthy to the Court that McCray utilized Backpage advertisements to promote his prostitution business, [33] posted his rap videos on YouTube, and, more significantly, understood his legal predicament enough to contact the victim in this case, A.B., and attempt to get her to provide testimony that was favorable to him, or at least provide evidence that was not unfavorable to him. The Court also notes that the District Judge who adopted the undersigned's R&R on McCray's motion to suppress concluded that McCray made a deliberate effort to separate himself from the rented vehicles that he used in his prostitution business, describing the effort as an acknowledgement that, had he tried to rent the vehicles on his own, he would have been refused. [Doc. 102 at 27]. Furthermore, when he was arrested, McCray voluntarily and intelligently waived his rights and was interviewed and stated that he could read, [*see id.* at 13], and there has been no claim that he was cognitively unable to comprehend his rights or the ability to waive them. Nor was

---

[33] The Court is not making a finding that McCray in fact authored the Backpage advertisements, only that he knowingly utilized them in his prostitution business, including prostituting A.B., the victim in this case. In any event, as noted, the burden to establish incompetency is upon McCray, so the Court properly construes the lack of evidence that he did not author these materials against him.

there an indication that he did not understand the interrogator's questions.  The Court recognizes Dr. Flores's opinion that McCray's cognitive deficits cause him to unnecessarily assent when he really does not understand, but as to all of the facts addressed immediately above, there has not been a claim that McCray merely assented due to a lack of understanding.  All of these facts demonstrate to the Court that McCray possesses greater cognitive abilities than some of the testing indicates.  Dr. Flores acknowledged that despite his cognitive deficiencies, McCray is able to get his needs met, and his acuity in conducting his businesses and his dealing with law enforcement demonstrate the validity of her opinion.

Moreover, despite McCray's cognitive deficits, the Court is mindful that "neither low intelligence [nor] mental deficiency . . . can be equated with mental incompetence to stand trial." *Medina*, 59 F.3d at 1107 (citation omitted); *Battle v. United States*, 419 F.3d 1292, 1299 (11th Cir. 2005) (per curiam) (same); *see also United States v. Merriweather*, 921 F. Supp. 2d 1265, 1307 n.62 (N.D. Ala. 2013) ("The *Dusky* standard, as commentators have noted, does not require that a defendant have a high level of ability or performance.  After all, a defendant surely does not have to be as intelligent and reasonable as his lawyers to be competent to stand trial.") (citing Note, *Incompetency to Stand Trial*, 81 Harv. L. Rev. 454, 458 (1967)).

As a result, the Court concludes that McCray's past history, on balance, is at worst neutral on the issue of his competency, but tends to demonstrate that despite his cognitive deficiencies, he is competent to stand trial.

## B.   Conduct in Court

McCray's conduct in court belies his incompetence.  He entered a guilty plea before the undersigned to contempt of court stemming from his contacting the alleged victim, A.B., in violation of a direct court order to not contact potential witnesses.  *United States v. McCray*, No. 1:16-mj-00795-AJB (N.D. Ga. filed Sept. 22, 2016).   During that proceeding, without delay or apparent misunderstanding, McCray answered, under oath, all of the Court's questions, including, significantly, that he understood what was going on in the courtroom that date, *id.*, ECF No. 4 at 6; that his formal education consisted of "[t]welfth grade and a little bit of college experience," *id.* at 8; that he could read and write English, *id.*; that he did not suffer from any mental disability, *id.* at 8-9; that he lacked any condition, physical or mental, that interfered with his ability to understand what he was doing on that date and or make important life decisions, *id.* at 9; and that he worked as a promoter and a chef for four years and acted as a supervisor of others, *id.* at 9-10.  After the Court explained his constitutional rights to him, he stated that he did not have any questions and that he understood his rights.  *Id.* at 11-17.  His

lawyer at the time advised the Court that he did not have any doubt about McCray's competency or his ability to enter a guilty plea. *Id.* at 10. McCray's demeanor and his responses to the Court reflected neither cognitive deficiencies or a need or desire to merely assent to the Court's inquiries. These facts strongly point towards McCray's competence.

### C.   Expert Opinions

Drs. Szyhowski and Flores disagree about the extent of McCray's impairment. Dr. Szyhowski recognizes that McCray has intellectual deficits but concludes that he is competent to stand trial as long as certain accommodations are afforded to him, while Dr. Flores opines that McCray's intellectual deficits are so great that any accommodations would be ineffective.

Therefore, while a defendant must be able to communicate with his lawyer in order to assist in his defense, there is a lack of evidence in the record that McCray is unable to communicate what happened in this case and who was involved. "The requirement that a defendant must be able to assist in the defense refers to the 'phases of a defense as a defendant usually assists in, such as accounts of the facts, names of witnesses, etc.' and not assistance with legal questions." *Williams*, 2007 WL 1655371 at 5 & n.12 (quoting *United States v. Sermon*, 228 F. Supp. 972, 978 (W.D. Mo. 1964)).

74

Quite often the best evidence of a defendant's competence to stand trial is the evidence of his behavior during the relevant time period, "especially the evidence of how he related to and communicated with others[.]" *Wright v. Sec'y for the Dep't of Corr.*, 278 F.3d 1245, 1259 (11th Cir. 2002). Here, the evidence demonstrates that McCray possessed a sufficient rational and factual understanding of the proceedings against him. He understands that he is charged with prostitution of a minor and that upon conviction he faces a lengthy prison sentence. T54-56; Govt. Ex. 2 at 6. He also understands the difference between a trial and a guilty plea, and that the choice was his in consultation with counsel. *Id.* at 7. Similarly, he understood that the alleged victim in the case was a potential witness at his trial and that what she testified about could either help him or hurt him. This evidence of how Defendant relates to others translates to a finding that he is competent.

Nonetheless, the Court is not free to disregard without adequate reasons the undisputed expert opinion that McCray suffers from significant cognitive deficiencies such that he likely could not assist his lawyer at trial without accommodations. Dr. Szyhowski recommended that to mitigate these impairments, McCray be given (1) additional time to consult with counsel or another person at counsel table to explain things to him; (2) the opportunity during proceedings to receive clarification on what is happening; (3) recesses and breaks to be able to

75

consult with counsel; and (4) an opportunity to have him explain things back in his own words when he needs to make a decision or when there is a critical juncture in the case.   T98; *see also* Govt. Ex. 2 at 11-12.   Dr. Flores's opinion is not that McCray does not need these accommodations but rather that they might not be enough and, in any event, they are not practical during the course of a dynamic and fluid situation as a criminal jury trial.   Def. Ex. 2 at 11-12; T174-75.

Given the Court's conclusions regarding McCray's medical history, conduct, and the experts' opinions, the Court concludes that McCray is competent to stand trial but needs some accommodations in order to assist his lawyer in defending this case.   The Court agrees with Dr. Flores that several of Dr. Szyhowski's recommended accommodations—namely, the opportunity during proceedings to receive clarification of what is happening; recesses and breaks to be able to consult with counsel; and an opportunity to have McCray explain things back in his own words when he needs to make a decision or when there is a critical juncture in the case—are impractical at a fluid and dynamic jury trial if they are too numerous or time-consuming, or if they unduly interfere with the flow of the trial and reasonable respect for the jury's time.   Instead, the Court recommends the following accommodations:

76

1.   The Government must be ordered to produce all of the exhibits it intends to introduce at trial, as well as all witness statements, *Jencks*, *Brady*, and *Agurs/Giglio* materials, and Rule 404(b) evidence, no later than sixty days before trial.  This will allow McCray and his lawyer(s) to have at their early disposal all of the Government's evidence so that McCray will have sufficient opportunity to repetitively go over all of the materials with them so that he is aware of the evidence that will be presented against him and assist his lawyer(s) with evidence that counters these witnesses and evidence.  So that this accommodation is an effective measure, the Court recommends that the District Judge order that the Government not be able to use at trial any evidence that is produced after this deadline, even if it is discovered after the deadline has passed.

2.   If McCray still is in pretrial custody at the time the Government produces all materials described in paragraph 1, the time for McCray and his lawyer(s) to jointly review the material should not begin until McCray is fully vaccinated against COVID-19, and he and his lawyer(s) should be allowed to meet in person at the place of detention.  Court orders effectuating in-person contact should be issued.

3.    McCray should be afforded an extra lawyer to sit at counsel table to consult with him as the trial proceedings progress, and he should be allowed a brief recess at the end of each Government witness's direct examination and before cross-examination in order to consult with lead and assisting counsel.

These measures will minimize undue interruptions at trial; provide sufficient time, opportunity, and resources for McCray to adequately understand the evidence against him so that he may assist his lawyer(s) in formulating and presenting a defense; and adequately cover the first three accommodations recommended by Dr. Szyhowski (i.e., additional counsel, extra time, and extra breaks). In this regard, the Court rejects the reasoning of the *Cole* court that, given the cognitive deficiencies of the defendant in that case, it was impossible to know whether he understood what was going on even if he was given accommodations designed to allow him to assist counsel by explaining and repeating information. *See Cole*, 339 F. Supp. 2d at 761, 762. McCray's affirmative responses under oath when he pleaded guilty to contempt of court, plus his conduct in reaching out to the victim in this case (in violation of the Court's orders), demonstrate that with these accommodations he can assist his counsel in presenting a defense.

Dr. Szyhowski also recommends that McCray also be given an opportunity to have McCray explain things back in his own words when he needs to make a decision or when there is a critical juncture in the case. The above-recommended accommodations should sufficiently give him the opportunity to ask counsel any questions that he may have during the trial proceedings and in deciding whether to go to trial in the first place or enter a guilty plea. To the extent that at trial there is a critical juncture that requires McCray to make a decision, such as whether to testify in his own defense or exercise his Fifth Amendment right to remain silent, after his extended consultation with counsel on this decision, the District Judge's colloquy at the appropriate time during trial should be sufficient to assure McCray's understanding of his rights and the consequences of giving them up. The Court observes that McCray did not voice any uncertainty in his understanding his rights or the consequences of waiving them when he entered a guilty plea earlier in these proceedings.

## VI.   <u>CONCLUSION</u>

For the above reasons, the undersigned **RECOMMENDS** that McCray be found competent to stand trial but that the District Judge afford him the accommodations set out in this Report and Recommendation.

The undersigned has now ruled upon or recommended a ruling as to all matters referred to it.  Accordingly, this action is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED and CERTIFIED**, this 28th day of April, 2021.

_____

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

80